No. 19-55376

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

VIRGINIA DUNCAN et al.,
*Plaintiffs-Appellees*,

v.

XAVIER BECERRA, in his official capacity as Attorney General of the State of California,
*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Southern District of California, No. 3:17-cv-01017-BEN-JLB

---

## BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY
## IN SUPPORT OF DEFENDANT-APPELLANT

---

Eric Tirschwell
Mark Anthony Frassetto
William J. Taylor, Jr.
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017

Antonio J. Perez-Marques
Antonio M. Haynes
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for amicus curiae Everytown for Gun Safety certifies that amicus is not a publicly held corporation, that amicus does not have a parent corporation, and that no publicly held corporation owns 10 percent or more of amicus's stock.

<u>s/ Antonio J. Perez-Marques</u>
Antonio J. Perez-Marques
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Email: antonio.perez@davispolk.com
*Counsel for Amicus Curiae*

INTEREST OF AMICUS CURIAE .......................................................................1

INTRODUCTION ...............................................................................................2

ARGUMENT .......................................................................................................4

I.     California's LCM Prohibition Is Part of a Longstanding History of
Identical and Analogous Prohibitions. ...........................................................4

     A.     There Is a Longstanding Tradition of Prohibiting Firearms
Capable of Quickly Firing Multiple Rounds Without Reloading.........6

     B.     Section 32310 Is Consistent with Centuries of Laws Prohibiting
Weapons Deemed to Be Especially Dangerous. ................................10

     C.     The District Court's Effort to Rebut this Historical Record
Fails. ................................................................................................12

          1.     The Existence of Weapon Designs, Experimental
Weapons and Unusual Weapons Capable of Firing
Multiple Rounds Without Reloading Does Not Limit the
Ability of States to Regulate Dangerous Weapons...................12

          2.     Militia Ammunition-Carrying Mandates are Irrelevant to
the Analysis of the Constitutionality of California's LCM
Prohibition...............................................................................14

II.     The Court Should Reject the "Common Use" Test Endorsed by the
District Court. ...............................................................................................16

III.     The Use of LCMs Makes Mass Shootings and Other Gun Violence
Incidents Deadlier..........................................................................................22

CONCLUSION .................................................................................................30

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Aymette v. State*,
   21 Tenn. 154 (1840) ........................................................10

*Caetano v. Massachusetts*,
   136 S. Ct. 1027 (2016) ...................................................17

*City of Renton v. Playtime Theatres, Inc.*,
   475 U.S. 41 (1986) ..........................................................20

*Cockrum v. State*,
   24 Tex. 394 (1859) ..........................................................11

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ...............................................*passim*

*Drake v. Filko*,
   724 F.3d 426 (3d Cir. 2013) ...............................................9

*Duncan v. Becerra*,
   265 F. Supp. 3d 1106 (S.D. Cal. 2017) ............................23

*Duncan v. Becerra*,
   742 F. App'x 218 (9th Cir. 2018) .....................................2

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir.), *cert. denied*, 136 S. Ct. 447 (2015) ......................*passim*

*Fyock v. City of Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015)......................................*passim*

*Gallinger v. Becerra*,
   898 F.3d 1012 (9th Cir. 2018)..................................*passim*

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) .......................................21

*Jackson v. City & Cty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014)............................................20

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir.) (en banc), *cert. denied*,
    138 S. Ct. 469 (2017) .................................................................*passim*

*Lindenau v. Alexander*,
    663 F.2d 68 (10th Cir. 1981) ................................................................15

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ...........................................................................14

*Powers v. Ohio*,
    499 U.S. 400 (1991) ...........................................................................15

*Presser v. Ill.*,
    116 U.S. 252 (1886) ......................................................................15, 16

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) (en banc)..................................................5

*Worman v. Healey*,
    293 F. Supp. 3d 251 (D. Mass. 2018), *aff'd*, 922 F.3d 26 (1st Cir. 2019)..........18

## STATUTES & RULES

7 Ric. 2, 35, ch. 13 (1383).....................................................................10

33 Hen. 8, ch. 6, § 1 (1541) ...................................................................10

47 Stat. 650, ch. 465, §§ 1, 14 (1932).......................................................7

1763-1775 N.J. Laws 346 ......................................................................10

1837 Ala. Laws 7, § 1 ...........................................................................10

1837 Ga. Laws 90 .................................................................................10

1837-1838 Tenn. Pub. Acts 200 ............................................................10

1879 Tenn. Pub. Acts 135, ch. 96, § 1 ...................................................11

1881 Ark. Acts § 1909 ..........................................................................11

1903 S.C. Acts 127, § 1 ......................................................................11

1907 Ala. Law 80, § 1 ........................................................................11

1909 Me. Laws 141 ............................................................................11

1911 N.Y. Laws 442, ch. 195, § 1 .......................................................11

1912 Vt. Acts & Resolves 310, § 1.......................................................11

1913 Iowa Acts 307, ch. 297, § 2 ........................................................11

1913 Minn. Laws 55 ...........................................................................11

1916 N.Y. Laws 338-39, ch. 137, § 1 ...................................................11

1917 Cal. Stat. 221, ch. 145, § 1 .........................................................11

1917 Minn. Laws 614, ch. 243, § 1 ......................................................11

1926 Mass. Acts 256, ch. 261 .............................................................11

1927 Cal. Stat. 938, ch. 552, §§ 1-2.......................................................8

1927 Mich. Pub. Acts 887, No. 372, § 3................................................11

1927 Mich. Pub. Acts 887, § 3...............................................................7

1927 Mich. Pub. Acts 887-89, § 3 ........................................................11

1927 R.I. Pub. Laws 256, §§ 1, 4.......................................................6, 11

1931 Ill. Laws 452, § 1 .........................................................................9

1932 La. Acts 337, § 1 .........................................................................9

1933 Cal. Stat. 1170, § 3 ......................................................................8

1933 Minn. Laws 232, § 1 ....................................................................8

1933 Ohio Laws 189, § 1 ....................................................................8

1933 S.D. Sess. Laws 245, § 1 ...........................................................9

1933 Tex. Gen. Laws 219, § 1 ............................................................9

1934 S.C. Acts 1288, § 1 ....................................................................9

1934 Va. Acts 137, § 1........................................................................8, 9

Cal. Penal Code § 32310..............................................................*passim*

O<small>THER</small> A<small>UTHORITIES</small>

Alex Yablon, *Most Californians Who Own 'Assault Rifles' Have 10+ Guns*,
The Trace (Nov. 12, 2018), https://goo.gl/aKEtmi............................18

Bonnie Berkowitz, Denise Lu, & Chris Alcantara, *The Terrible Numbers That
Grow With Each Mass Shooting*, Wash. Post (June 5, 2019),
https://wapo.st/2CMznZz......................................................................25

Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-
Capacity Magazines, Despite Ban on Sales*, The Trace (Mar. 27, 2017),
https://goo.gl/fgWrc7 ............................................................................27

Charles DiMaggio, *Changes in U.S. Mass Shooting Deaths Associated with the
1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*,
86 J. of Trauma and Acute Care Surgery 11 (2018),
https://goo.gl/R8qSgK .........................................................................27

Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun
Violence Experts Say*, Wash. Post. (Feb. 14, 2018), https://wapo.st/2JjFlSk.....27

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault
Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*,
National Institute of Justice (2004), http://bit.ly/2vBTGTX .............................28

Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity
Semiautomatic Firearms: An Updated Examination of Local and National
Sources*, 95 J. Urb. Health 313 (2017), https://bit.ly/2MRVqkd.................27, 28

Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 83 Tenn. L. Rev. 231 (2015) ...............................20

Daniel W. Webster et al., *Epidemiologic changes in gunshot wounds in Washington, D.C. 1983-1990*, 127 Archives of Surgery 694 (1992) ................29

David Fallis, *Data Indicate Drop in High Capacity Magazines During Federal Ban*, Washington Post, (Jan. 10, 2013), http://wapo.st/2wV9EMX ..................27

Elizabeth Palermo, *Flying Machines? 5 DaVinci Designs That Were Ahead of Their Time*, Livescience.com, https://bit.ly/2FO0pl0 .........................................13

Everytown, *Appendix to Mass Shootings in the United States: 2009-2016* (2017), https://every.tw/2JPBIVz ....................................................25

Everytown for Gun Safety, *Mass Shootings in the United States: 2009-2017* (Dec. 2018), https://everytownresearch.org/reports/mass-shootings-analysis/ ................23, 25

Everytown Law, *Why the Gun Lobby's Favorite Court Decision Is Wrong*, Medium, (May 28, 2019), https://medium.com/everytown-law/why-the-gun-lobbys-favorite-court-decision-is-wrong-5948a5b6cfe3 ........................................................................3

Jeffrey Roth & Christopher Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*: Final Report, Urban Institute, (1997), http://urbn.is/2wQKkrA .........................................................28

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. Legis. 279 (2016) .................................................19, 20

Justin George, *Shoot to Kill: Why Baltimore is One of The Most Lethal Cities in America*, Baltimore Sun (Sept. 30, 2016), https://bsun.md/2da4nci ............28, 29

Lois Beckett, *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each*, The Trace (Sept. 20, 2016), http://bit.ly/2d89dGH ..................18

Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 240-43 (2016) ...........................................................................................................27

MSD Public Safety Commission, *Initial Report to the Governor, Speaker of the House of Representatives and Senate President* 240 (2019), http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf ............................24

National Rifle Association, *Girandoni Air Rifle as Used by Lewis and Clark*, Youtube.com, https://bit.ly/1mU3PA6 ..............................................13

*NFM Treasure Gun – Cookson Volitional Repeating Flintlock*, NRA National Firearms Museum, https://bit.ly/2XiHTH9 .........................................13

Nikki Graf, *A Majority of U.S. Teens Fear a Shooting Could Happen at Their School, and Most Parents Share Their Concern*, Pew Research Ctr. (Apr. 18, 2018), https://pewrsr.ch/2Y0m0gi ................................................25, 26

Records of the Colony of New Plymouth in New England 230 (Boston 1861)......10

Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928)...........................................................................................7

Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment*, Business Insider (Dec. 17, 2012), https://www.businessinsider.com/evolution-of-semi-automatic-weapons-2012-12)..................................................................................................6

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55 (2017) ................................................5, 6

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://cnn.it/2J4sWCC ....................................................26

S.K. Wier, *The Firearms of the Lewis and Clark Expedition*, https://bit.ly/323mpS9..........................................................................................13

S. Rep. No. 72-575 (1932) ........................................................................7

The Laws of Plymouth Colony (1671) ....................................................10

Violence Policy Center, *Mass Shootings in the United States Involving High-Capacity Ammunition Magazines* (June 2019),
http://vpc.org/fact_sht/VPCshootinglist.pdf ......................................................25

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun violence prevention organization, with supporters in every state, including tens of thousands of California residents. It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed in the wake of the murder of twenty children and six adults in an elementary school in Newtown, Connecticut by an individual using a firearm with a large-capacity magazine ("LCM"). Currently, the mayors of more than 50 California cities are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws.

Everytown has drawn on its expertise to file briefs in numerous Second Amendment cases, including on the prior appeal in this action and in the district court below, offering historical, doctrinal, and social-science analysis that might otherwise be overlooked. It seeks to do the same here.[1]

---

[1] An addendum of historical gun laws accompanies this brief. All parties consent to the filing of this brief, and no counsel for any party authored it in whole or in part. Apart from amicus curiae, no person contributed money intended to fund the brief's preparation and submission.

**INTRODUCTION**

This case involves a challenge to California Penal Code § 32310 ("Section 32310"), which prohibits the possession, purchase, sale, transfer, receipt, or manufacture of LCMs capable of holding more than ten rounds of ammunition. The First, Second, Third, Fourth, Seventh, and D.C. Circuits have heard challenges to similar laws on the merits, and all six have upheld the laws as constitutional under the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *See* Brief of Appellant at 18-19, *Duncan v. Becerra*, No. 19-55376 (9th Cir. July 15, 2019) [hereinafter "State's Brief"]. No circuit has held to the contrary. And while this Court has not definitively ruled on the merits of such a law, in its only published decision reviewing a Second Amendment challenge to an LCM law, it upheld the denial of a preliminary injunction of a local ordinance similarly prohibiting the possession of LCMs accepting more than ten rounds. *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 1001 (9th Cir. 2015).[2]

As the State's brief shows, these courts got it right. Everytown files this amicus brief to urge this Court to join the unanimous circuit authority, reverse the

---

[2] On the prior appeal in this action, in an unpublished 2-1 decision, a panel of this Court affirmed, under an abuse-of-discretion standard, the district court's grant of a preliminary injunction of Section 32310's possession prohibition. *See Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir. 2018). The earlier panel made clear, however, that its decision "d[id] not 'determine the ultimate merits'" here. *Id.* at 220 (quoting *Fyock*, 779 F.3d at 995).

district court's error-filled decision, and uphold California's common-sense, life-saving measure—and, in particular, to make three points.[3]

*First*, Section 32310 is part of a long tradition of regulating weapons that legislatures have determined to be unacceptably dangerous—including a century of restrictions on firearms capable of firing a large number of rounds without reloading.[4]  This historical tradition alone is sufficient for this Court to find the law constitutional.  The district court's contrary conclusion that "restrictions on the possession of firearm magazines of any size have no historical pedigree," ER 34, is unsupported by the historical record.

*Second*, the Court should also reject the district court's dangerous and illogical view that the national prevalence of a firearm feature, like the LCMs at issue here, bestows Second Amendment protection on that firearm or feature. Such an approach, under which firearms and firearm features would become effectively immune from regulation the instant they are deemed in "common use" based on national sales and marketing figures, cannot be reconciled with either the

---

[3] For further analysis of the errors in the district court's decision, see Everytown Law, *Why the Gun Lobby's Favorite Court Decision Is Wrong*, Medium, (May 28, 2019), https://medium.com/everytown-law/why-the-gun-lobbys-favorite-court-decision-is-wrong-5948a5b6cfe3.

[4] *See Fyock*, 779 F.3d at 997 (noting "several state regulations from the early twentieth century that restricted the possession of firearms based on the number of rounds that the firearm could discharge automatically or semi-automatically without reloading"); State's Brief at 27-31.

Supreme Court's decision in *Heller* or common sense. Indeed, it divorces the Second Amendment from the self-defense right it protects. Further, such a test is inconsistent with core principles of federalism, preventing states from determining how to best regulate themselves. Simply put, the "common use" test utilized by the district court would transform the constitutional analysis into a consumer referendum influenced by the firearms industry's aggressive modern-day marketing and sales strategies. That is not, nor should it be, the law.

*Finally*, even if Section 32310 is found, or assumed, to regulate conduct protected by the Second Amendment, it passes intermediate scrutiny. Research conducted by Everytown, as well as other social science and statistical evidence, demonstrates that LCMs make both mass shootings and day-to-day gun violence more deadly, which supports the conclusion that there is a reasonable fit between California's LCM prohibition and the State's public safety concerns.

## ARGUMENT

### I. California's LCM Prohibition Is Part of a Longstanding History of Identical and Analogous Prohibitions.

Both the Supreme Court and this Court have emphasized that "longstanding prohibitions" on the possession of certain types of weapons are "traditionally understood to be outside the scope of the Second Amendment." *Fyock*, 779 F.3d at 997; *see Heller*, 554 U.S. at 626-27, 635 (noting that such "longstanding prohibitions" are treated as tradition-based "exceptions" by virtue of their

"historical justifications").  These prohibitions need not "mirror limits that were on the books in 1791."  *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc).  Instead, as this Court has noted, even "early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record."  *Fyock*, 779 F.3d at 997.[5]

Section 32310 is consistent with this history and tradition.  In particular, it is part of a long tradition of regulating or prohibiting weapons that lawmakers have determined to be unacceptably dangerous—including a century of restrictions enacted shortly after semi-automatic weapons capable of firing a large number of rounds without reloading became widely commercially available.  *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 67-68, 72 (2017) (explaining that "[firearm] laws were enacted not when these weapons were invented, but when they began to circulate widely in society").  Many of these laws were passed around the same time as the prohibitions on sales to felons and the mentally ill and restrictions on commercial arms sales, all laws that *Heller* identified as longstanding and therefore valid.  *See*

---

[5] *See also, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) (noting that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" despite the fact that "states didn't begin to regulate private use of machine guns until 1927," and that "regulating machine guns at the federal level" did not begin until 1934), *cert. denied*, 136 S. Ct. 447 (2015).

*Heller*, 554 U.S. at 626-27, 635; *see also* Spitzer, *supra*, at 82 (discussing the passage of prohibitions on possession of firearms by felons and the mentally ill in the early 20th century and on the possession of semi-automatic weapons with LCMs in the 1920s and 1930s). The district court erroneously claims that such restrictions "have no historical pedigree." ER 34. But, as further described below, there is indeed a longstanding historical tradition of regulation which, in and of itself, is sufficient to find Section 32310 constitutional.

**A.      There Is a Longstanding Tradition of Prohibiting Firearms Capable of Quickly Firing Multiple Rounds Without Reloading.**

States have regulated the ammunition capacity of semi-automatic firearms since shortly after these firearms first became widely commercially available at the turn of the twentieth century. *See* Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment*, Business Insider (Dec. 17, 2012), https://www.businessinsider.com/evolution-of-semi-automatic-weapons-2012-12 (explaining that semi-automatic weapons became commercially available in the early 1900s). Such laws often categorized large-capacity, semi-automatic firearms, along with fully automatic weapons, as "machine guns," and imposed restrictions that effectively prohibited them entirely. *See, e.g.*, 1927 R.I. Pub. Laws 256, §§ 1, 4 (prohibiting the "manufacture, s[ale], purchase or possess[ion]" of a "machine gun," which it defined as "any weapon which shoots more than twelve shots semi-automatically without reloading"); 1927

Mich. Pub. Acts 887, § 3 (prohibiting possession of "any machine gun or firearm which can be fired more than sixteen times without reloading").

In 1928, the National Conference of Commissioners on Uniform State Laws (now the Uniform Law Commission) adopted a model law prohibiting possession of "any firearm which shoots more than twelve shots semi-automatically without reloading," setting the national standard for laws prohibiting possession of semi-automatic firearms with large magazine capacities. *See* Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928).[6] Shortly thereafter, the federal government enacted a similar prohibition applicable to the District of Columbia. *See* 47 Stat. 650, ch. 465, §§ 1, 14 (1932) (making it a crime to "possess any machine gun," which it defined as "any firearm which shoots . . . semiautomatically more than twelve shots without loading"). Even the National Rifle Association endorsed passage of the D.C. law, saying, "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union." S. Rep. No. 72-575, at 5-6 (1932).

---

[6] This standard originated with a model law promulgated by the National Crime Commission in 1927. *Report of Firearms Committee*, at 422-23.

California first prohibited automatic weapons in 1927[7] and expanded this prohibition with a 1933 statute that prohibited the sale or possession of not only "all firearms . . . capable of discharging automatically," but also "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device *having a capacity of greater than ten cartridges*." 1933 Cal. Stat. 1170, § 3 (emphasis added).[8] The 1933 law was at least as restrictive as Section 32310, and indeed appears more restrictive inasmuch as it prohibited *firearms* capable of receiving LCMs, rather than only the LCMs at issue here. *See id.* Several other states, including Minnesota, Ohio, and Virginia, also prohibited or regulated firearms based on magazine capacity.[9] Still

---

[7] *See* 1927 Cal. Stat. 938, ch. 552, §§ 1-2 (prohibiting "all firearms . . . capable of discharging automatically and continuously . . . in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device").

[8] *See also* State's Brief at 29-30.

[9] *See* 1933 Minn. Laws 232, § 1 (prohibiting "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously" if the weapon was modified to allow for a larger magazine capacity); 1933 Ohio Laws 189, § 1 (requiring a $5000 bond to possess "any firearm which shoots more than eighteen shots semi-automatically without reloading"); 1934 Va. Acts 137, § 1 (prohibitively regulating possession or use of "weapons . . . from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading").

other states passed laws limiting possession of automatic weapons based on the number of rounds that a firearm could discharge without reloading.[10]

Four years ago, in *Fyock*, this Court made clear that the existence of "these early twentieth century regulations" on firing capacity, if "properly developed in the record," could preclude any Second Amendment challenge to an LCM prohibition. *Fyock*, 779 F.3d at 997. That historical record is now developed and before the Court. ER 1118-22, 1841-55. And, as just discussed, what it shows is that Section 32310 is the continuation of nearly a century of valid restrictions based on the ability to shoot large numbers of rounds in a short time without reloading. As such, the statute qualifies as a longstanding prohibition, which, accordingly, falls outside the scope of the Second Amendment. *See Fyock*, 779 F.3d at 996-97; *see also, e.g.*, *Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013) (finding that a concealed-carry licensing standard that had been in effect "in some form for nearly 90 years" "qualifies as a longstanding, presumptively lawful regulation") (internal quotation marks and citation omitted).

---

[10] These limitations were more stringent than California's current magazine prohibition of ten rounds. *See* 1933 S.D. Sess. Laws 245, § 1 (five rounds); 1933 Tex. Gen. Laws 219, § 1 (five rounds); 1934 Va. Acts 137, § 1 (seven rounds for automatics, 16 for semi-automatics); 1931 Ill. Laws 452, § 1 (eight rounds); 1932 La. Acts 337, § 1 (eight rounds); 1934 S.C. Acts 1288, § 1 (eight rounds).

**B.      Section 32310 Is Consistent with Centuries of Laws Prohibiting Weapons Deemed to Be Especially Dangerous.**

Section 32310 is also part of a long history of government prohibition of weapons that pose heightened threats to public safety, either because the weapons themselves are especially dangerous or because they are particularly suitable for criminal use.  Such prohibitions date back to early English legal history, beginning with the 1383 prohibition of launcegays (a particularly lethal type of spear) and the 1541 prohibition of crossbows and firearms less than a yard long.  *See* 7 Ric. 2, 35, ch. 13 (1383); 33 Hen. 8, ch. 6, § 1 (1541).  The regulation of especially dangerous weapons continued as the American colonies and first states adapted the English tradition.  *See generally* 1763-1775 N.J. Laws 346 (prohibiting set or trap guns); The Laws of Plymouth Colony (1671) (same); Records of the Colony of New Plymouth in New England 230 (Boston 1861) (same).

States continued to pass prohibitions or regulations on such weapons after ratification of the Second Amendment.  For example, several states banned or prohibitively taxed Bowie knives,[11] which were determined to be "instrument[s] of almost certain death."  *See Cockrum v. State*, 24 Tex. 394, 402 (1859) (finding

---

[11] *See* 1837 Ala. Laws 7, § 1 (prohibitively taxing Bowie knives); 1837 Ga. Laws 90 (banning Bowie knives); 1837-1838 Tenn. Pub. Acts 200 (prohibiting the sale of Bowie knives); *Aymette v. State*, 21 Tenn. 154, 158 (1840) (justifying a prohibition on Bowie knives on the basis that they are "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin").

Bowie knives are "differ[ent] from [guns, pistols, or swords] in [their] device and design" and are therefore more accurate and lethal than other contemporary weapons). In addition, a number of states prohibited certain types of small and easily concealable handguns, which were determined to be ideal for criminal use.[12]

Throughout the early twentieth century, as the technology of firearms and other dangerous weapons evolved, many states passed further laws prohibiting especially dangerous weapons.[13] States similarly prohibited dangerous weapon features, such as silencers.[14] And, in the 1920s and 1930s, at least 28 states and the federal government passed prohibitions or severe restrictions on automatic weapons, along with the restrictions on large capacity semi-automatic weapons discussed above. *See supra* Part I.A.

Within this historical context, California's prohibition on LCMs should be understood as the continuation of a longstanding tradition of government

---

[12] *See* 1881 Ark. Acts § 1909 (pocket pistols and "any kind of cartridge[] for any pistol"); 1879 Tenn. Pub. Acts 135, ch. 96, § 1 ("belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol"); 1907 Ala. Law 80, § 1 (similar); 1903 S.C. Acts 127, § 1 (similar).

[13] *See, e.g.*, 1917 Cal. Stat. 221, ch. 145, § 1 (blackjacks and billy clubs); 1911 N.Y. Laws 442, ch. 195, § 1 (slung-shots); 1917 Minn. Laws 614, ch. 243, § 1 (brass knuckles); 1913 Iowa Acts 307, ch. 297, § 2 (daggers and similar-length knives); 1927 Mich. Pub. Acts 887, No. 372, § 3 (explosives).

[14] *See, e.g.*, 1909 Me. Laws 141 (prohibiting silencers); 1912 Vt. Acts & Resolves 310, § 1 (same); 1913 Minn. Laws 55 (same); 1916 N.Y. Laws 338-39, ch. 137, § 1 (same); 1926 Mass. Acts 256, ch. 261 (same); 1927 Mich. Pub. Acts 887-89, § 3 (same); 1927 R.I. Pub. Laws 256, § 1 (same).

prohibition or regulation of especially dangerous weapons. This long history of analogous regulation further supports the conclusion that Section 32310 does not burden a "right secured by the Second Amendment." *Heller*, 554 U.S. at 626-27.

## C. The District Court's Effort to Rebut this Historical Record Fails.

The district court nevertheless took a very different view of the history. It rejected or ignored all of the supporting historical evidence just discussed and instead, in reaching its erroneous conclusion that "restrictions on the possession of firearm magazines of any size have no historical pedigree," ER 34, relied primarily on two other sources: (i) the existence of guns capable of firing multiple times without reloading near the time of the adoption of the Second Amendment and (ii) founding-era militia regulations requiring citizens to bring more than ten rounds of ammunition to muster. ER 35-36. As explained below, neither of these sources is convincing.

### 1. The Existence of Weapon Designs, Experimental Weapons and Unusual Weapons Capable of Firing Multiple Rounds Without Reloading Does Not Limit the Ability of States to Regulate Dangerous Weapons.

The district court notes in its opinion that "firearms with a firing-capacity of more than 10 rounds existed long before the 1920s," when the regulations discussed above were enacted, citing to the existence of several weapons at or prior to the founding period. ER 35. But it fails to mention that those were largely experimental, oddities, or very expensive, and thus unlikely to spur or necessitate

government regulation.  Their existence thus cannot rebut the historical record supporting LCM prohibitions.

The district court, for example, points to a "33-shot weapon" designed by Leonardo Da Vinci: a cannon with thirty-three individual barrels.  *Id.*  But it fails to mention that the weapon was never actually produced. *See* Elizabeth Palermo, *Flying Machines? 5 DaVinci Designs That Were Ahead of Their Time*, Livescience.com, https://bit.ly/2FO0pl0.  Lewis and Clark's Girandoni air rifle, which the district court also references, was only slightly less unusual.  Only 1,500 were ever produced, and, to function, the rifle required a sensitive and difficult-to-manufacture air tank, which took 1,500 strokes of a hand pump to charge. National Rifle Association, *Girandoni Air Rifle as Used by Lewis and Clark*, Youtube.com, https://bit.ly/1mU3PA6; S.K. Wier, *The Firearms of the Lewis and Clark Expedition*, https://bit.ly/323mpS9.  Other founding-era weapons partially mechanized the reloading process allowing for larger firing capacities, but, as described by a senior curator at the NRA's National Firearms Museum, such weapons were "most unusual."  *NFM Treasure Gun – Cookson Volitional Repeating Flintlock*, NRA National Firearms Museum, https://bit.ly/2XiHTH9. Simply stated, there is no evidence at all that these kinds of "arms with large firing-capacity" were widely owned during the founding period, let alone used in the kinds of criminal activity likely to trigger regulation.

The failure to regulate a product that was rarely owned, and not widely used in crime until 120 years afterwards, cannot be evidence of the historical understanding of the scope of the right. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 372 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is *ipso facto* unconstitutional, or else modern election laws . . . would be prohibited, as would (to mention only a few other categories) modern anti-noise regulation . . . and modern parade-permitting regulation . . . ."). The relevant historical record here is instead as follows: In the second half of the nineteenth century, firearms capable of being fired multiple times without reloading became less unusual; around the turn of the twentieth century, semi-automatic weapons became more popular, which, combined with larger replaceable magazines, allowed for much more lethal weapons; and, as explained above, *see supra* Part I.A, states began to regulate these weapons shortly thereafter. That history, which remains unrebutted, fully supports the constitutionality of Section 32310.

### 2. Militia Ammunition-Carrying Mandates are Irrelevant to the Analysis of the Constitutionality of California's LCM Prohibition.

The district court also places great weight in its historical analysis on early militia laws. In particular, it points to founding-era requirements that militia members muster with more than ten rounds of ammunition, reasoning that if such

conduct was mandated by state governments, it must also be included within the scope of the Second Amendment right. ER 35-36. This, too, fails to rebut the historical record supporting LCM prohibitions.

As an initial matter, the analogy here stretches historical reasoning to the breaking point. Carrying multiple rounds of ammunition, which had to be individually loaded into a firearm, is simply not analogous to LCMs, which allow for the semi-automatic fire of a large number of rounds without reloading.

More broadly, a government mandate to engage in conduct does not create an individual right to do so. *See, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 409 (1991) (noting that, while citizens have a duty to serve on a jury, "[a]n individual juror does not have a right to sit on any particular petit jury"); *Lindenau v. Alexander*, 663 F.2d 68, 72 (10th Cir. 1981) (noting that, while there is a duty to serve in the military if drafted,"[i]t is well established that there is no right to enlist in this country's armed services"). The Supreme Court made that clear in the militia context almost 150 years ago. In *Presser v. Illinois,* 116 U.S. 252, 263 (1886), the Court upheld a conviction for organizing and parading with a private militia company and rejected the claim that militia participation outside of a government-organized militia is protected. As the *Presser* Court stated:

> Military organization and military drill and parade under arms are subjects especially under the control of the government of every country. They cannot be claimed as a right independent of law. Under our political system

they are subject to the regulation and control of the state and federal governments . . . .

*Id.* at 267.  And this view was reaffirmed in *Heller*, where the Supreme Court found that "weapons of war," not typically possessed by law-abiding citizens for lawful purposes, fall outside of the scope of the Second Amendment, even though federal and state governments can mandate their use in the military or militia.  554 U.S. 570, 625 (2008).  Put simply, and despite what the district court asserted, the duty to carry arms when compelled does not create a reciprocal civilian right to use military weaponry.

## II.  The Court Should Reject the "Common Use" Test Endorsed by the District Court.

In its summary judgment opinion, the district court characterized the Second Amendment test used by courts in this Circuit as "an overly complex analysis that people of ordinary intelligence cannot be expected to understand" and "the wrong standard," and instead praised what it called the "simple *Heller* test," which asks only whether the weaponry at issue is "commonly used by responsible, law-abiding citizens for lawful purposes."  ER 22-24, 43.[15]  Such a "common use" test,

---

[15] Contrary to the district court's characterization, this test was not used in *Heller*, but rather was articulated by two justices in dissent from a denial of certiorari in *Friedman v. City of Highland Park*, 136 S. Ct. 447, 448-49 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari); *see also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, J., joined by Thomas, J., concurring in the judgment).  It has never been endorsed by a majority
(….continued)

however, is not well grounded in Second Amendment jurisprudence or sound logic, nor does it account for important principles of federalism. These flaws would only be amplified if the test were applied categorically, as the district court would prefer.

The argument that LCMs must be afforded Second Amendment protection because they are lawful in other states and "number in the millions," ER 24, dangerously misconstrues the Supreme Court's decision in *Heller*. While the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," 554 U.S. at 625, it does not logically follow—and neither the Supreme Court nor other courts have held— that the Second Amendment somehow protects *all* weapons that have achieved some preordained degree of commercial success. *See Kolbe*, 849 F.3d at 142 ("The *Heller* majority said nothing to confirm that it was sponsoring the popularity test."); *Worman v. Healey*, 293 F. Supp. 3d 251, 266 (D. Mass. 2018) ("[P]resent day popularity is not constitutionally material."), *aff'd*, 922 F.3d 26.

---

(continued….)
of the Supreme Court. *See Kolbe v. Hogan*, 849 F.3d 114, 142 (4th Cir. 2017) (en banc).

The district court also fails to clarify whether "common use" should be determined by considering the number of LCMs produced or sold, or the number of law-abiding owners. *See Kolbe*, 849 F.3d at 135-36. This distinction is critical because firearm ownership is extremely concentrated, with 3% of American adults possessing 50% of the country's stock of civilian guns. *See* Lois Beckett, *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each*, The Trace (Sept. 20, 2016), http://bit.ly/2d89dGH; *see also* Alex Yablon, *Most Californians Who Own 'Assault Rifles' Have 10+ Guns*, The Trace (Nov. 12, 2018), https://goo.gl/aKEtmi (reporting research finding that "four out of five assault rifles in [California] are owned by people who own 10 or more guns"). If production or sales numbers form the basis of the common use analysis, this small group of gun owners would be essentially placed in control of the meaning of the Second Amendment. This tyranny by a tiny minority cannot be what either the Framers or the *Heller* Court intended.

In addition to lacking firm jurisprudential foundation, the district court's formulation of the "common use" test is hopelessly circular. Following this approach would allow the constitutionality of weapons prohibitions to be decided not by how dangerous a weapon is, but rather by "how widely it is circulated to law-abiding citizens by the time a bar on its private possession has been enacted and challenged." *Kolbe*, 849 F.3d at 141. As the district court acknowledged, "it

would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." ER 27 (quoting *Friedman,* 784 F.3d at 409). So too would it be absurd to allow the fact that a law previously did not exist—thereby enabling ownership to become commonplace—to stand as a constitutional bar to its enactment. *See* Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. Legis. 279, 288-89 (2016) (discussing the "central circularity" that plagues the "common use" test: "what is common depends largely on what is, and has been, subject to regulation"). Yet this is what the district court's version of the "common use" test would dictate here.

The district court's approach also raises serious federalism concerns, as states that fail to immediately regulate new and potentially dangerous firearms or firearm features would risk losing the ability to do so if such firearms or features are quickly adopted by consumers in other states. Thus, firearm safety decisions made in some states would render the laws of other states "more or less open to challenge under the Second Amendment," and "would imply that no jurisdiction other than the United States as a whole can regulate firearms." *Friedman*, 784 F.3d at 408, 412. But *Heller* "does not foreclose *all* possibility of experimentation" by state and local governments. *Id*. at 412. Rather, it permits states and localities to do what they have long done in the realm of firearm

legislation: "experiment with solutions to admittedly serious problems," *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 966 (9th Cir. 2014) (quoting *City of Renton v. Playtime Theatres, Inc.* 475 U.S. 41, 52 (1986)).

A constitutional analysis driven by the prevalence of a firearm or firearm feature in the market would create perverse incentives for the firearms industry, giving gun makers the unilateral ability to insulate highly dangerous firearms or firearm features with Second Amendment protection "simply by manufacturing and heavily marketing them" before the government has had the chance to assess their danger, determine whether to regulate them, and build the political momentum to actually do so. Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of Weapon" Analysis*, 83 Tenn. L. Rev. 231, 265 (2015). These corporate profit-driven choices cannot and should not define the meaning of the Second Amendment. *See Kolbe*, 849 F.3d at 141-42 (rejecting such a test).

To the extent that "common use" should play any role in the constitutional analysis, it should be tied to "the purpose of the right to keep and bear arms." Blocher & Miller, *supra*, at 291. The test should focus, in other words, on whether the regulated weapons are commonly used or are reasonably necessary *for self-defense* or, in particular, *self-defense in the home*, which *Heller* holds is the core of the right. 554 U.S. at 635. The D.C. Circuit, in upholding a similar law, has

adopted that approach—and implicitly rejected the district court's market-share common-use test—by asking whether LCMs "are commonly used or are used specifically for self-defense." *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1261 (D.C. Cir. 2011).

As the State has demonstrated, the LCMs at issue in this case do not, and cannot, meet that standard. *See* State's Brief at 24-27. Indeed, as courts have noted, such weapons "are particularly designed and most suitable for military and law-enforcement applications," rather than self-defense. *Kolbe*, 849 F.3d at 125, 137; *see Gallinger v. Becerra*, 898 F.3d 1012, 1018-20 (9th Cir. 2018) (endorsing *Kolbe*'s reasoning regarding the dangers posed by LCMs and their minimal usefulness for self-defense). Put simply, and as the evidence before the Court shows, the district court's conclusion that the LCMs banned by Section 32310 fall "directly at the core of the right to self-defense in the home" enunciated in *Heller*, ER 31, is patently wrong.[16]

---

[16] *See also* State's Brief at 26, 34, 52 (rebutting various self-defense arguments).

**III. The Use of LCMs Makes Mass Shootings and Other Gun Violence Incidents Deadlier.**

Even if Section 32310 were not longstanding (which it is, *see supra* Part I.A), it should still be upheld as constitutional under intermediate scrutiny.[17] As this Court has recognized, the use of LCMs makes shootings more dangerous and more deadly. *See Gallinger*, 898 F.3d at 1019 (noting that "when 'assault weapons and large-capacity magazines are used, more shots are fired and more fatalities and injuries result than when shooters use other firearms and magazines'" (quoting *Kolbe*, 849 F.3d at 127)); *see also* State's Brief at 5. The data supports this assertion: Everytown's analysis, as well as other relevant research, demonstrates that the use of LCMs—whether in mass shootings or day-to-day gun violence—results in more people being shot, more injuries per victim, and more deaths. By prohibiting LCMs throughout California, Section 32310 is a reasonably tailored attempt to address this serious public safety concern—and thus, for this reason as well, it is constitutional.

*Everytown's research.* Relying on press coverage and police reports, Everytown has tracked and documented mass shootings since 2013 and has released several reports summarizing this data. While Everytown cannot present a comprehensive dataset of the magazines used in every mass shooting (the reality of

_____

[17] As the State explains in its brief, intermediate scrutiny is appropriate here under this Court's decision in *Fyock*, 779 F. 3d at 999. *See* State's Brief at 31-35.

gun violence is that mass shootings are so frequent that this information is not available in every instance), the information that is available indicates that LCMs make shootings significantly more deadly.

Data compiled by Everytown consistently indicate that mass shooting incidents involving LCMs result in significantly more shooting victims and significantly more deaths.[18]  The district court breezily states that this "may or may not be true," but the evidence here could not be clearer.  Everytown's most recent mass shootings report, which analyzed data from 2009 to 2017, demonstrates that of the 60 mass shootings where magazine size was known, those that involved the use of LCMs led to *14 times* as many people injured and *twice* as many deaths. Everytown for Gun Safety, *Mass Shootings in the United States: 2009-2017* (Dec. 6, 2018), https://everytownresearch.org/reports/mass-shootings-analysis/ [hereinafter *Everytown 2018 Mass Shootings Report*].

Everytown's tracking of mass shootings also shows that LCMs are invariably used in the most deadly and injurious events.  *Id*.  This Court has

---

[18] The district court mischaracterizes in its opinion, just as it had in its earlier preliminary injunction ruling, the findings from a 2013 survey of recent mass shootings published by Everytown's predecessor organization, Mayors Against Illegal Guns.  ER 54-55; *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1122-28 (S.D. Cal. 2017).  Everytown has previously explained (in its amicus brief on the preliminary injunction appeal) the district court's "critical errors" in its analysis of the Mayors' survey.  *See* Brief for Everytown for Gun Safety as Amicus Curiae Supporting Defendant-Appellant, *Duncan*, No. 17-56081 (9th Cir. Nov. 22, 2017), ECF 47, at 3-9.  Those errors remain.

recognized the same.  *See Gallinger*, 898 F.3d at 1018-19; *see also* State's Brief at

6.  These include:

- The attack at an office party in San Bernardino, California, that resulted in fourteen deaths and twenty-two injuries;

- The shooting at a country-western bar in Thousand Oaks, California, that left twelve dead and at least ten injured;

- The shooting at a movie theater in Aurora, Colorado that killed twelve and injured seventy;

- The attack on a school in Newtown, Connecticut that killed twenty-six people;

- The massacre of forty-nine people and wounding of fifty-three more in a nightclub in Orlando, Florida;

- The attack in Las Vegas, Nevada in which the shooter used dozens of assault weapons and LCMs to fire hundreds of rounds into a concert crowd resulting in the death of fifty-nine people and the injury of over 800 more, 400 of those directly as a result of gunshot wounds and/or shrapnel;

- The attack on a high school in Parkland, Florida that resulted in the death of seventeen people and wounding of seventeen more[19]; and

---

[19] The district court asserts that the Parkland shooter used only 10-round magazines to carry out his attack at Marjory Stoneman Douglas High School (MSD).  ER 54, 79.  But that is false.  In its official report, released nearly three months before the district court's decision, the MSD Public Safety Commission made clear that LCMs were used, noting that "[e]ight 30- and 40-round magazines were recovered from the scene," some of which "had swastikas etched into them."  MSD Public Safety Commission, *Initial Report to the Governor, Speaker of the House of Representatives and Senate President* 240, 262-63 (2019), http://www.fdle.state.fl.us/MSDHS/CommissionReport.pdf; *see* State's Brief at 39 n.13.

- The shooting at a church in Sutherland Springs, Texas that resulted in twenty-six deaths and twenty injuries.[20]

Indeed, in each of the ten deadliest mass shootings in modern American history, an LCM was used to perpetrate the crime.[21]

Mass shootings involving LCMs are also "highly salient" events that have a unique impact that policymakers may consider when weighing policy choices. *Friedman*, 784 F.3d at 412. Such shootings like those that occurred at San Bernardino, Thousand Oaks, Virginia Tech, Newtown, Las Vegas, Parkland, Sutherland Springs, and Aurora sear themselves into the national consciousness and affect the way people live their everyday lives. *See, e.g.*, Nikki Graf, *A Majority of U.S. Teens Fear a Shooting Could Happen at Their School, and Most Parents Share Their Concern*, Pew Research Ctr., (Apr. 18, 2018),

---

[20] *See Everytown 2018 Mass Shootings Report*, https://everytownresearch.org/reports/mass-shootings-analysis/; Everytown, *Appendix to Mass Shootings in the United States: 2009-2016*, at 3, 6, 24, 26 (2017), https://every.tw/2JPBIVz; Violence Policy Center, *Mass Shootings in the United States Involving High-Capacity Ammunition Magazines* (June 2019), http://vpc.org/fact_sht/VPCshootinglist.pdf [hereinafter *VPC Report*].

[21] These shootings are: Las Vegas, Nevada (58 fatalities); Orlando, Florida (49); Blacksburg, Virginia (32); Newtown, Connecticut (26); Sutherland Springs, Texas (26); Killeen, Texas (23); San Ysidro, California (21); Parkland, Florida (17); Austin, Texas (15); and San Bernardino, California (14). *See* Bonnie Berkowitz, Denise Lu, & Chris Alcantara, *The Terrible Numbers That Grow With Each Mass Shooting*, Wash. Post, (June 5, 2019) (continually updated), https://wapo.st/2CMznZz; *VPC Report*, http://vpc.org/fact_sht/VPCshootinglist.pdf.

https://pewrsr.ch/2Y0m0gi (results of a survey conducted in the two months following the Parkland shooting showed that a majority of U.S. teens (57%), and most parents (63%), fear a shooting could happen at their school). While shootings on the scale of these tragedies remain statistically rare compared to the plague of day-to-day gun violence, their enormous impact reinforces the compelling justifications for California's LCM prohibition.

***Other social-science research.*** Additional research—some of which this Court appears to reference in *Gallinger*, 898 F.3d at 1018-19—supports the conclusion reached by California that LCMs pose significant dangers to public safety.[22]

The evidence here is substantial. State prohibitions on large-capacity magazines are correlated with a 63% lower rate of shootings with three or more injuries or deaths. *See* Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN, (Oct. 5, 2017), https://cnn.it/2J4sWCC (noting Boston University Professor Michael Siegel's conclusion that "[w]hether a state has a [LCM] ban is the single best predictor of the mass shooting rate in that state"). Mass shootings were also 70% less likely to occur between 1994 and 2004, when the federal prohibition on assault weapons and large-capacity magazines was

---

[22] *See also* State's Brief at 38-52 (explaining why Section 32310 serves public safety and thus satisfies intermediate scrutiny).

in effect.  *See* Charles DiMaggio, *Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86  J. of Trauma and Acute Care Surgery 11, 13 (2018) https://goo.gl/R8qSgK.[23]

Likewise, several studies indicate that criminals are increasingly using LCMs in day-to-day gun violence, as evidenced by the increasing number of LCMs recovered by police.[24]  Indeed, a recent study found that "LCM firearms . . . appear to account for 22 to 36% of crime guns in most places, with some estimates upwards of 40% for cases involving serious violence."  Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An*

---

[23] *See also* Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 240-43 (2016) (finding that, compared with the 10-year period before the federal ban went into effect, the number of gun massacres where six or more people were shot and killed fell by 37% during the ban period and the number of people dying from gun massacres fell by 43%, and that gun massacres increased by 183% and massacre deaths by 239% in the decade after the ban lapsed); Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, Wash. Post., (Feb. 14, 2018), https://wapo.st/2JjFlSk (discussing Klarevas's research).

[24] *See, e.g.*, Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-Capacity Magazines, Despite Ban on Sales*, The Trace, (Mar. 27, 2017), https://goo.gl/fgWrc7 (noting a more than 5% increase in the percentage of guns recovered with LCMs by Baltimore police from 2010 to 2016); David Fallis, *Data Indicate Drop in High Capacity Magazines During Federal Ban*, Washington Post, (Jan. 10, 2013), http://wapo.st/2wV9EMX (noting that the percentage of LCM-equipped guns recovered by Virginia police decreased during the federal LCM prohibition, but then more than doubled between its expiration in 2004 and 2013).

*Updated Examination of Local and National Sources*, J. Urban Health (Oct. 2017), https://bit.ly/2MRVqkd. That same study found that LCMs pose a particular threat to law enforcement: "LCM weapons overall account for 41% of the guns used to kill [police] officers." *Id.*

And, when criminals use LCMs, they generally fire more shots and cause more injuries.[25] For example, a study of Milwaukee homicides found that those killed with guns containing LCMs had on average one additional gunshot injury than when a gun without an LCM was used, and the Maryland medical examiner's office reported that the number of cadavers with ten or more bullets more than doubled between 2006 and 2016. *See, e.g.*, Jeffrey Roth & Christopher Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*: Final Report, Urban Institute, (1997), http://urbn.is/2wQKkrA; Justin George, *Shoot to Kill: Why Baltimore is One of The Most Lethal Cities in America*, Baltimore Sun (Sept. 30, 2016), https://bsun.md/2da4nci. Shootings with more injuries invariably lead to more deaths. As one leading study found, gunshot victims shot twice are 60% more likely to die than those shot once. *See* Koper,

---

[25] Christopher Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, National Institute of Justice (2004), http://bit.ly/2vBTGTX (finding that handguns associated with gunshot injuries are up to 50% more likely to have LCMs than handguns used in other crimes and that guns used in shootings resulting in injuries are nearly 26% more likely to have LCMs).

*supra* note 25, at 87; s*ee also* Daniel W. Webster et al., *Epidemiologic changes in gunshot wounds in Washington, D.C. 1983-1990*, 127 Archives of Surgery 694 (1992) (finding that the fatality rate for multiple chest wounds is 61% higher than the fatality rate for a single chest wound).

*      *      *

In sum, whether this Court looks to the most recent empirical research, conducts a historical analysis of relevant laws, or looks to guidance from other federal circuits, the outcome is the same: Section 32310 should be upheld.

## CONCLUSION

For the reasons stated above, the district court's decision should be reversed.

Dated: July 22, 2019

Respectfully submitted,

/s/ Antonio J. Perez-Marques

Eric Tirschwell
Mark Anthony Frassetto
William J. Taylor, Jr.
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017

Antonio J. Perez-Marques
Antonio M. Haynes
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Email: antonio.perez@davispolk.com
*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

VIRGINIA DUNCAN et al.,
*Plaintiffs-Appellees*,

v.

XAVIER BECERRA, in his official capacity as Attorney General of the State of California,
*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Southern District of California, No. 3:17-cv-01017-BEN-JLB

---

## APPENDIX OF HISTORICAL LAWS OF AMICUS CURIAE
## EVERYTOWN FOR GUN SAFETY

---

Eric Tirschwell
Mark Anthony Frassetto
William J. Taylor, Jr.
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017

Antonio J. Perez-Marques
Antonio M. Haynes
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
*Counsel for Amicus Curiae*

# Addendum of Historical Laws

1837 Ala. Acts 7, § 1 ........................................................................ App. 1

1838 Tenn. Pub. Acts 200, ch. 137 ...................................... App. 2

1879 Tenn. Pub. Acts 135, ch. 96 § 1 ................................. App. 4

1881 Ark. Acts 191 ..................................................................... App. 6

1883 Tenn. Pub. Acts 17 ......................................................... App. 8

1903 S.C. Sess. Laws 127, § 1 ................................................ App. 9

1907 Ala. Laws 80, § 1 ............................................................. App. 11

1909 Me. Laws 141 ..................................................................... App. 12

1912 Vt. Acts and Resolves 310, § 1 .................................. App. 14

1913 Minn. Laws 55 .................................................................. App. 15

1927 Mich. Pub. Acts 888, § 3 ............................................. App. 16

1927 R.I. Pub. Laws 256, §§ 1, 4 ......................................... App. 23

*Report of Firearms Committee*, 38th Conference Handbook of the
    National Conference on Uniform State Laws and Proceedings of the
    Annual Meeting (1928) ....................................................... App. 27

1931 Ill. Laws 452, § 1 ............................................................. App. 38

District of Columbia Dangerous Weapons Act,
    47 Stat. 650 (1932), ch. 465, §§ 1, 14 ........................... App. 41

1932 La. Acts 336, § 1 .............................................................. App. 46

1933 Cal. Acts 1169 .................................................................. App. 50

1933 Minn. Laws 231 ............................................................... App. 53

1933 Ohio Laws 189 ................................................................. App. 56

1933 S.D. Sess. Laws 245, § 1 ............................................... App. 58

1933 Tex. Gen. Laws 219, § 1 ............................................... App. 61

1934 S.C. Acts 1288, § 1 ......................................................... App. 63

1934 Va. Acts 137, §§ 1(a), 4(d) .......................................... App. 65

Treasurer of the State, to deposit in the Bank of the State and its several branches, all that portion of the public revenue of the United States, which he has received or which he may hereafter receive, as the portion of Alabama, in the following proportion: One fifth in the Bank of the State at Tuscaloosa, one fifth in the Branch Bank at Montgomery, one fifth in the Branch Bank at Mobile, one fifth in the Branch Bank at Decatur, and one fifth in the Branch Bank at Huntsville; taking therefor certificates of deposite, and all laws or parts of laws, contravening the provisions of this act, be and the same are hereby repealed: *Provided,* That the amount of the surplus revenue already received and which may hereafter be received, shall be deposited in said Bank and its Branches, in the above and foregoing proportions, on or before the first day of May next.

*Treasurer to deposit the surplus revenue in the Bank and Branches.*

Approved June 30, 1837.

No. 11.]                          AN ACT
To suppress the use of Bowie Knives.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie Knife or Arkansaw Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

*Penalty for carrying Bowie knives*

Sec. 2. *And be it further enacted,* That for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same in his list of taxable property, he shall be subject to the pains and penalties of perjury.                        Approved June 30, 1837.

*Persons selling Bowie knives to be taxed.*

[No. 12.]                          AN ACT
To enlarge the prison bounds in the different counties in this State;

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That the several sections of an act passed in the year 1824, requiring the Judge of the county court and commissioners of roads and revenue, to mark and lay out the bounds of prisoners, be and the same is hereby repealed; and that from and after the passage of this act, the bounds of the different counties shall be the limits within which prisoners confined for debt shall be restricted, on entering into bond, as now required by law, to keep within the prison bounds; and hereafter the plaintiffs in suits shall not be compelled to pay the sustenance and support of prisoners who take the benefit of the bounds.

*Prison bounds enlarged.*

Approved June 30, 1837.

[No. 13.]                          AN ACT
For the relief of the purchasers of the Sixteenth Section, Township four, Range six, West, in the county of Lawrence and for other purposes.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That the President and Directors of the Branch of the Bank of the

to perform the duties enjoined on them by the second section of an act, passed at Nashville, the 19th of February, 1836, chapter XLVIII, that it shall be the duty of the several county surveyors to do and perform said services within their respective counties, and that said county surveyors shall be allowed the same fees, and be subject to the same penalties that said principal surveyors were entitled to, and liable for, in processioning said lands, and that said county surveyors shall return a plat and certificate of each tract so processioned by them to the entry taker of the county, who shall forthwith record the same in his survey book, for which services the said entry taker shall be allowed the same fees as for other services of the same kind, and that said several tracts of land shall be liable to attachment and final judgment for all expenses in processioning and recording the same.

JOHN COCKE,

*Speaker of the House of Representatives.*

TERRY H. CAHAL,

*Speaker of the Senate.*

Passed January 18th, 1838.

---

## CHAPTER CXXXVII.

An Act to suppress the sale and use of Bowie Knives and Arkansas Tooth Picks in this State.

Knives not to be sold or given away

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That if any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever, shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any other manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansaw tooth pick, such merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons for every such Bowie knife or knives, or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick so sold, given or otherwise disposed of, or offered to be sold, given or otherwise disposed of, shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

Not to be worn

SEC. 2. That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in

App. 2

Digitized from Best Copy Available

form, shape or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

Sec. 3. That if any person shall maliciously draw or attempt to draw any Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick, from under his clothes or from any place of concealment about his person, for the purpose of sticking, cutting, awing, or intimidating any other person, such person so drawing or attempting to draw, shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State for a period of time not less than three years, nor more than five years. *Penalty of drawing a knife*

Sec. 4. That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State, for a period of time not less than three years, nor more than fifteen years. *Penalty for using knife*

Sec. 5. That this act shall be in force from and after the first day of March next. And it shall be the duty of the several judges of the circuit courts in this State to give the same in charge to the grand jury every term of the respective courts, and any civil officer who shall arrest and prosecute to conviction and punishment any person guilty of any of the offences enumerated in this act, shall be entitled to the sum of fifty dollars, to be taxed in the bill of costs, and the attorney general shall be entitled to a tax fee of twenty dollars in each case, when a defendant shall be convicted, and no prosecutor required on any presentment or indictment for any of the offences enumerated in this act. *Of prosecutions*

JOHN COCKE,
*Speaker of the House of Representatives.*
TERRY H. CAHAL,
*Speaker of the Senate.*

Passed January 27th, 1838.

26

Digitized from Best Copy Available

## CHAPTER XCV.

AN ACT to change the day in which the Criminal Docket shall be taken up for Marshall County, Tennessee.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That an Act passed March 22nd, 1877, entitled, "An Act to repeal the Act establishing a Criminal Court in the counties of Williamson, Maury, Giles and Marshall," be so amended that Section 5 of said Act shall hereafter read, that the Criminal Docket shall be taken up on the second Monday of the term of court, instead of the first Thursday of the term, as heretofore fixed by said Act, and that the second Monday of the term shall be the day on which the criminal part of said term of court shall commence for said Marshall County hereafter.

SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it.

Passed March 14, 1879.

H. P. FOWLKES,
*Speaker of the House of Representatives.*
J. R. NEAL,
*Speaker of the Senate.*

Approved March 17, 1879.

ALBERT S. MARKS,
*Governor.*

---

## CHAPTER XCVI.

AN ACT to Prevent the Sale of Pistols.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That it shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the

State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol; *Provided* that this Act shall not be enforced against any persons now having license to sell such articles until the expiration of such present license.

Sale of pistols forbidden.

SEC. 2. *Be it further enacted*, That any person guilty of a violation of this Act, shall be subject to presentment or indictment, and on conviction, shall pay a fine of not less than twenty-five nor more than one hundred dollars, and be imprisoned at the discretion of the court.

Penalty.

SEC. 3. *Be it further enacted*, That it shall be the duty of the Criminal and Circuit Judges, and other Judges whose courts have criminal jurisdiction, to give this Act specially in charge to the grand jury at each term of the court.

Judges to charge.

SEC. 4. *Be it further enacted*, That it shall be the duty of the grand juries to send for witnesses, in all cases where they have good reason to believe, that the provisions of this Act have been violated. And upon satisfactory evidence of its violation, they shall make presentments of the same without a prosecutor.

Grand jury powers.

SEC. 5. *Be it further enacted*, That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

SEC. 6. *Be it further enacted*, That this Act shall take effect from and after its passage, the public welfare requiring it.

Passed March 14, 1879.

H. P. FOWLKES,
*Speaker of the House of Representatives.*
J. R. NEAL,
*Speaker of the Senate.*

Approved March 17, 1879.

ALBERT S. MARKS,
*Governor.*

---

## CHAPTER XCVII.

### AN ACT to amend the Law Taxing Wagons.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That sub-Section 38 of Section 553a

'buildings and grounds shall hereafter be used exclusively for State purposes, the title to the same being in the State.

SEC. 2. That this act take effect and be in force thirty days after its passage, allowing that time for said county to vacate said rooms, &c.

Approved, April 1st, 1881.

---

## No. XCVI.

'AN ACT To Preserve the Public Peace and Prevent Crime.

SECTION

1  Carrying of certain weapons constituted a misdemeanor; *proviso*, excepting officers, and persons journeying.
2  Carrying such weapons otherwise than in the hand, a misdemeanor.
3  Selling or disposing of such weapons, a misdemeanor.
4  Violation of act punishable by fine from $50 to $200.
5  Justices of the Peace knowing of violations of provisions of act and refusing to proceed, to be fined and removed.
6  Same penalty denounced any other officer knowing of such offense.
7  Violators of act how proceeded against.
8  Conflicting laws repealed; act in force 90 days after passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1. That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor; *Provided*, That officers, whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further,* That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises.

Sec. 2. Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as in [is] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be deemed guilty of a misdemeanor.

Sec. 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

Sec. 4. Any person convicted of a violation of any of the provisions of this act, shall be punished by a fine of not less than fifty nor more than two hundred dollars.

Sec. 5. Any justice of the peace in this State, who, from his own knowledge, or from legal information, knows, or has reasonable grounds to believe, any person guilty of the violation of the provisions of this act, and shall fail or refuse to proceed against such person, shall be deemed guilty of a nonfeasance in office, and upon conviction thereof, shall be punished by the same fines and penalties as provided in section four of this act, and shall be removed from office.

Sec. 6. Any officer in this State, whose duty it is to make arrests, who may have personal knowledge of any person carrying arms contrary to the provisions of this act, and shall fail or refuse to arrest such person and bring him to trial, shall be punished, as provided in section four of this act.

Sec. 7. All persons violating any of the provisions of this act may be prosecuted in any of the courts of this State, having jurisdiction to try the same.

Sec. 8. All laws or parts of laws, in conflict with the provisions of this act are hereby repealed, and this act to take effect and be in force ninety days after its passage.

Approved, April 1st, 1881.

Sec. 3. *Be it further enacted*, That this Act take effect from and after its passage, the public welfare requiring it.

Passed February 23, 1883.

B. F. ALEXANDER,

*Speaker of the Senate.*

W. L. LEDGERWOOD,

*Speaker of the House of Representatives.*

Approved February 27, 1883.

WM. B. BATE,

*Governor.*

---

## CHAPTER XIII.

A BILL to be entitled An Act to prevent the sale, loan or gift of pistol cartridges in this State.

*Be it enacted by the General Assembly of the State of Tennessee*, That it shall be unlawful for any person or persons to buy or sell or give away any pistol cartridges in this State. <sub>Pistol cartridges unlawful.</sub>

*Be it further enacted*, That any person or persons violating this Act, shall be guilty of a misdemeanor, and on conviction thereof shall be fined not less than twenty-five or more than one hundred dollars. <sub>Penalty.</sub>

*Be it further enacted*, That this Act shall be given in charge by the judges of the Circuit and Criminal Courts of this State, to the grand juries at each term of the Court, and that the grand juries are hereby clothed with inquisitorial powers to send for witnesses, and prefer presentments against any persons guilty of a violation of this Act; *provided, however*, that nothing in this Act shall be construed to interfere with the sale of cartridges for rifle guns or shot guns, or cartridges for army or navy pistols. <sub>Grand juries have inquisitorial powers.</sub>

Passed February 24, 1883

B. F. ALEXANDER,

*Speaker of the Senate.*

W. L. LEDGERWOOD,

*Speaker of the House of Representatives.*

Approved March 3, 1883.

WM. B. BATE,

*Governor.*

2

A. D. 1903.

the foregoing Sections of this Act shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine of not exceeding one hundred dollars, or by imprisonment not exceeding thirty days, or by both fine and imprisonment, in the discretion of the Court.

SEC. 4. This Act shall be of force and effect from and after April first, 1903.

SEC. 5. All Acts and parts of Acts in conflict with this Act be, and the same are hereby, repealed.

Approved the 23d day of February, A. D. 1903.

## No. 86.

AN ACT TO AMEND AN ACT ENTITLED "AN ACT TO AMEND SECTION 1 OF AN ACT ENTITLED 'AN ACT TO REGULATE THE CARRYING, MANUFACTURE AND SALE OF PISTOLS, AND TO MAKE A VIOLATION OF THE SAME A MISDEMEANOR,' APPROVED 20TH OF FEBRUARY, 1901, BY STRIKING OUT CERTAIN WORDS AND INSERTING OTHER WORDS IN LIEU THEREOF," APPROVED FEBRUARY 25TH, 1902, BY PROHIBITING LEASING, RENTING, BARTERING, EXCHANGING AND HANDLING PISTOLS.

SECTION 1. *Be it enacted* by the General Assembly of the State of South Carolina, That an Act entitled "An Act to amend Section 1 of an Act entitled 'An Act to regulate the carrying, manufacture and sale of pistols, and to make a violation of the same a misdemeanor,' approved 20th of February, 1901, by striking out certain words and inserting other words in lieu thereof," approved February 25, 1902, be amended by inserting after the words "offer for sale" and before the words "or transport for sale," the following words, "lease, rent, barter, exchange, handle ;" so that said Section, when amended, shall read as follows :

Act of 25 Feb., 1902, Vol. 23 of Acts, p. 1093, amended.

Section 1. That from and after the first day of July, 1902, it shall be unlawful for any one to carry about the person, whether concealed or not, any pistol less than twenty inches long and three pounds in weight ; and it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale,

Manufacture, sale, and carrying of certain pistols prohibited. Criminal Code, § 129, amended.

A. D. 1903. lease, rent, barter, exchange, or transport for sale or into this State, any pistol of less·length and weight.. Any violation of this Section shall be punished by a fine of not more than one thousand dollars, or imprisonment for not more than two years; and in case of a sale by a person, firm or corporation, the sum of one hundred dollars shall be forfeited to and for the use of the school fund of the County wherein the violation takes place, to be recovered as other fines and forfeitures: *Provided,* This Act shall not apply to peace officers in the actual discharge of their duties, or to carrying or keeping of pistols by persons while on their own premises.

Approved the 2d day of March, A. D. 1903.

## No. 87.

### AN ACT TO AMEND SECTION 20 OF THE CODE OF CIVIL PROCEDURE, FIXING THE TIMES FOR THE HOLDING OF THE CIRCUIT COURTS OF THE THIRD JUDICIAL CIRCUIT.

Code of Procedure, § 20, amended.

SECTION I. *Be it enacted* by the General Assembly of the State of South Carolina, That Section 20 of the Code of Civil Procedure be, and the same is hereby, amended, so as to read as follows: Sec. 20. The Circuit Courts of the Third Judicial Circuit of this State shall be held as follows:

Courts in Third Circuit.

Lee County.

1. The Court of General Sessions at Bishopville, for the County of Lee, on the first Monday in March, the first Monday in June and the fourth Monday in September; and the Court of Common Pleas at the same place on the Wednesdays first succeeding the Mondays herein fixed for the holding of the Court of General Sessions at said place.

Florence County.

2. The Court of General Sessions at Florence, for the County of Florence, on the second Monday after the first Monday in March, the second Monday in June and the second Monday after the fourth Monday in September; and the Court of Common Pleas at the same place on the Wednesdays first succeeding the Mondays herein fixed for the holding of the Court of General Sessions at said place.

Georgetown County.

3. The Court of General Sessions at Georgetown, for the County of Georgetown, on the fourth Monday after the first

No. 55.)          AN ACT          (H. 37.

To prohibit the sale, or barter, or having posses-
sion of small deadly weapons, such as small
pistols, bowie knives, dirks, brass knucks,
and slung shots.  Be it enacted by the leg-
islature of Alabama:

Penalty for
sale, etc.

Section 1.  That any person who sells, or bar-
ters, any pistol of less than twenty-four inches
in length of barrel, or any brass knucks, metalic
knucks, dirks, slung shot, bowie knives or knife
of like kind, must on conviction be fined not less
than one hundred ($100.00) nor more than one
thousand $1000.00 dollars, and may also be sen-
tenced to hard labor for not less than one nor
more than three months.

Penalty for
having pos-
session of.

Section 2.  Any person who has possession off
of his own premises, of any of the weapons named
in the first section of this act must on conviction
be fined not less than twenty-five ($25.00) nor
more than five hundred ($500.00) dollars, and
may also be sentenced to hard labor for less than
one nor more than three months.

Effect.

Section 2.  This act shall go into effect and be
operative from and after the first day of July,
1908.

Approved Nov. 23, 1907.

No. 56.)          AN ACT          (H. 50.

To provide for the registration of all conveyan-
ces of real and personal property and to re-
peal all laws in conflict therewith.

Instruments,
record of;
how made.

Section 1. Be it enacted by the legislature of
Alabama, That it shall be the duty of the pro-
bate judges to record all instruments filed with
them, and entitled to registration under the law,
by writing the same in a fair hand, or by print-
ing the same in books kept for that purpose, or

'Section 13. Every town shall raise and expend, annually, for the support of common schools therein, exclusive of the income of any corporate school fund, or of any grant from the revenue or fund from the state, or of any voluntary donation, devise or bequest, or of any forfeiture accruing to the use of schools, not less than eighty cents for each inhabitant, according to the census by which representatives to the legislature were last apportioned, under penalty of forfeiting not less than twice nor more than four times the amount of its deficiency, and all moneys provided by towns, or apportioned by the state for the support of common schools, shall be expended for the maintenance of common schools established and controlled by the towns by which said moneys are provided, or to which said moneys are apportioned; but nothing in this section shall be so construed as to annul, or render void, the provisions made in section eighteen of this chapter for the establishing and maintenance of union schools by adjoining towns.'

Section 2. This act shall take effect January one, nineteen hundred and ten.

*Towns to raise money for schools.*

*—expenditure.*

Approved March 24, 1909.

---

## Chapter 129.

An Act to prohibit the use of Firearms fitted with any device to deaden the sound of explosion.

*Be it enacted by the People of the State of Maine,* as follows:

Section 1. It shall be unlawful for any person to sell, offer for sale, use or have in his possession, any gun, pistol or other firearm, fitted or contrived with any device for deadening the sound of explosion. Whoever violates any of the provisions of this act shall forfeit such firearm or firearms and the device or silencer, and shall further be subject to a fine not exceeding one hundred dollars, or to imprisonment not exceeding sixty days, or to both fine and imprisonment. Any sheriff, deputy sheriff, constable, inland fish and game warden or deputy inland fish and game warden shall have authority to seize any firearm or firearms and any device or silencer found in possession of any person in violation of this act, and on conviction of the party from whom such firearm or firearms are seized, such firearm or firearms shall be sold, the proceeds to be paid to the state treasurer, and the device or silencer shall be destroyed.

*Use of firearms fitted with device to deaden sound, prohibited.*

*—penalty.*

*—seizure of firearms, and by whom.*

Military organizations not affected.

Section 2. This act does not apply to military organizations authorized by law to bear arms, or to the national guard in the performance of its duty.

Section 3. In all prosecutions arising under this act, municipal and police courts and trial justices in their respective counties shall have upon complaint original and concurrent jurisdiction with the supreme judicial and superior courts, and all fines, penalties and forfeitures recovered by any person for any violation of this act shall be paid forthwith by the person receiving the same to the state treasurer, to be credited to fines and license fees for the protection of birds and game.

Approved March 24, 1909.

## Chapter 130.

An Act to amend Paragraph Five, of Section Thirty, of Chapter Eighteen of the Revised Statutes, relating to By-laws of Local Boards of Health.

*Be it enacted by the People of the State of Maine,* as follows:

Paragraph 5, of section 30, chapter 18, R. S., amended.

Paragraph five, of section thirty, of chapter eighteen of the revised statutes is hereby amended by inserting after the word "county" in the seventh line thereof the words 'or by posting copies of said by-laws in six conspicuous and public places within the town;' also by inserting after the word "publication" in the eighth line thereof the words 'or posting,' so that said paragraph, as amended, shall read as follows:

Board of health may make by-laws for preservation of life and health.

—notice of by-laws.

'V. Make, alter and amend such orders and by-laws as they shall think necessary and proper for the preservation of life and health and the successful operation of the health laws of the state, subject to the approval of any justice of the supreme judicial court. Notice shall be given by the board of health, of all by-laws made or amended by them, by publishing the same in some newspaper, if there is one published in such town; if there is none, then in the nearest newspaper published in the county; or by posting copies of said by-laws in six conspicuous and public places within the town; and a record of such publication, or posting, of said orders and by-laws in the office of the town clerk, shall be deemed a legal notice to all persons.'

Approved March 24, 1909.

Sec. 5904. A person who sells, gives away or furnishes to a person under twenty-one years of age, cigarettes, cigarette papers or wrappers shall be imprisoned not more than two months or fined not more than fifty dollars, or both. A plainly printed copy of this and the preceding section shall, upon application, be furnished by the secretary of state and be posted in a conspicuous place in each store, shop, office or place of business where cigarettes are sold or kept for sale. A person who fails to so post such copy shall be fined not more than twenty-five dollars nor less than five dollars.

Sec. 2. This act shall take effect March 1, 1913.

Approved February 3, 1913.

---

## No. 236.—AN ACT TO IMPROVE SANITARY CONDITIONS IN THE SALE OF BREAD AND CAKE.

*It is hereby enacted by the General Assembly of the State of Vermont:*

Section 1. No person shall carry or cart about with intent to sell or offer for sale, or deliver to customers after it has been sold for human food, any kind or quality of bread or cake in loaf form, unless each loaf be wrapped separately in waxed paper, tissue paper or some similar wrapper or a sanitary container of sufficient thickness and quality to protect the bread and cake from dust and dirt.

Sec. 2. A person who violates a provision of this act shall be fined five dollars for each offense.

Approved December 10, 1912.

---

## No. 237.—AN ACT TO PREVENT THE MANUFACTURE, SALE OR USE OF GUNSILENCERS.

*It is hereby enacted by the General Assembly of the State of Vermont:*

Section 1. A person who manufactures, sells, or uses, or possesses with intent to sell or use, an appliance known as or used for a gunsilencer shall be fined twenty-five dollars for each offense. This act shall not prevent the use or possession of gunsilencers for military purposes when so used or possessed under proper military authority and restriction.

Sec. 2. This act shall take effect January 1, 1913.

Approved November 14, 1912.

agree on the verdict the same shall be signed by all the jurors who concur therein, and the clerk of said court shall enter on his minutes the number of said jurors concurring in said verdict.

Sec. 3. **Inconsistent acts repealed.**—All acts or parts of acts inconsistent herewith are hereby repealed.

Sec. 4. This act shall take effect and be in force from and after July 1st, 1913.

Approved March 13, 1913.

CHAPTER 64—H. F. No. 80.

*An Act to prevent the sale, offering or exposing for sale or having in possession for the use or for purpose of sale within this state, of a silencer for shot-gun, revolver, rifle or other fire-arm, defining a silencer and providing penalties for violation.*

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Use of silencers prohibited.**—No person shall within the state of Minnesota sell or offer or expose for sale, or have in possession for use upon or in connection with any rifle, shot-gun, revolver, or other fire-arm or have in possession for purposes of sale any silencer for a shot-gun, revolver, rifle or other fire-arm.

Sec. 2. **Possession prima facie evidence.**—In any prosecution hereunder proof of the having such silencer in possession by any person shall constitute prima facie evidence that same was had in possession of such person for use contrary to the provisions of this act.

Sec. 3. **Construction of word "silencer."**—A silencer within the meaning of this act is defined as a mechanical device or construction or instrument designed or intended to be temporarily or permanently attached to or used in connection with any shot-gun, revolver, rifle, or other fire-arm for the purpose of lessening or reducing the volume of sound caused by the discharge of or by the firing of such gun, rifle, revolver or other fire-arm.

Sec. 4. **Violation a misdemeanor.**—Any person violating any of the provisions of this act shall be guilty of a misdemeanor.

Approved March 13, 1913.

CHAPTER 65—H. F. No. 155.

*An Act to amend Section Four (4) of Chapter Two Hundred Thirty-One (231) of the General Laws of Minnesota for*

other purpose. Such persons shall hold office during the term
of their employment by the state highway department but
the authority herein vested shall cease upon the termination
of such employment. The persons so appointed shall by
reason of such appointment be members of the department
of public safety during the terms of such appointment but
shall serve without pay as members thereof.

Approved June 2, 1927.

---

## [No. 372.]

AN ACT to regulate and license the selling, purchasing, pos-
sessing and carrying of certain firearms; to prohibit the
buying, selling or carrying of certain firearms without a
license therefor; to prohibit the possession of certain
weapons and attachments; to prohibit the pawning of cer-
tain firearms; to prohibit the sale, offering for sale, or
possession for the purpose of sale of written or printed
matter containing any offer to sell or deliver certain fire-
arms or devices within this state; to provide penalties for
the violations of this act, and to repeal act number two
hundred seventy-four of the public acts of nineteen hundred
eleven, being sections fifteen thousand two hundred thirty-
six, fifteen thousand two hundred thirty-seven, fifteen thou-
sand two hundred thirty-eight, fifteen thousand two hun-
dred thirty-nine, fifteen thousand two hundred forty, fif-
teen thousand two hundred forty-one, fifteen thousand two
hundred forty-two, fifteen thousand two hundred forty-
three, fifteen thousand two hundred forty-four, fifteen
thousand two hundred forty-five and fifteen thousand two
hundred forty-six of the compiled laws of nineteen hundred
fifteen; act number three hundred thirteen of the public
acts of nineteen hundred twenty-five; and section sixteen
of chapter one hundred sixty-two of the revised statutes of
eighteen hundred forty-six, being section fifteen thousand
six hundred forty-one of the compiled laws of nineteen hun-
dred fifteen.

### *The People of the State of Michigan enact:*

SECTION 1. The word "pistol" as used in this act shall
mean any firearm, loaded or unloaded, thirty inches or less in
length. The word "purchaser" shall mean any person who
receives a pistol from another by purchase, gift or loan. The
word "seller" shall mean any person who sells, furnishes,
loans or gives a pistol to another. *Words defined.*

SEC. 2. No person shall purchase a pistol as defined in
this act without first having obtained a license therefor as *License before purchase.*

App. 16

prescribed herein. The commissioner or chief of police, or his duly authorized deputy, in incorporated cities or in incorporated villages having an organized department of police, and the sheriff, or his authorized deputy, in parts of the respective counties not included within incorporated cities or villages, are hereby authorized to issue licenses to purchase pistols to applicants residing within the respective territories herein mentioned. No such license shall be granted to any person except he be nineteen years of age or over, and has resided in this state six months or more, and in no event shall such a license be issued to a person who has been convicted of a felony or adjudged insane in this state or elsewhere. Applications for such licenses shall be signed by the applicant under oath upon forms provided by the commissioner of public safety. Licenses to purchase pistols shall be executed in duplicate upon forms provided by the commissioner of public safety and shall be signed by the licensing authority. One copy of such license shall be delivered to the applicant and the duplicate of such license shall be retained by such licensing authority as a permanent official record for a period of six years. Such license shall be void unless used within ten days after the date of its issue. Any person who shall sell to another any pistol as defined in this act without complying with the requirements of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or imprisonment in the county jail not more than ninety days, or both such fine and imprisonment in the discretion of the court. Such license shall be signed in ink by the holder thereof in the presence of the person selling, loaning or giving a pistol to such licensee and shall thereupon be taken up by such person, signed by him in ink and shall be delivered or sent by registered mail within forty-eight hours to the commissioner of public safety. The seller shall certify upon said license in the space provided therefor the name of the person to whom such pistol was delivered, the make, style, calibre and number of such pistol, and shall further certify that such purchaser signed his name on said license in the presence of the seller. The provisions of this section shall not apply to the purchase of pistols from wholesalers by dealers regularly engaged in the business of selling pistols at retail, nor to the sale, barter or exchange of pistols kept solely as relics, souvenirs or curios.

SEC. 3. It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand

*To whom granted.*

*Executed in duplicate.*

*Misdemeanor; penalty.*

*Unlawful to manufacture, etc., certain firearms, etc.*

*Penalty for violation.*

App. 17

dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. The provisions of this section shall not apply, however, to any person, firm or corporation manufacturing firearms, explosives or munitions of war by virtue of any contracts with any department of the government of the United States, or with any foreign government, state, municipality or any subdivision thereof.

SEC. 4. Any person who, with intent to use the same unlawfully against the person of another, goes armed with a pistol or other firearm or dagger, dirk, razor, stiletto, or knife having a blade over three inches in length, or any other dangerous or deadly weapon or instrument, shall be guilty of a felony and on conviction thereof shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison for not more than five years, or by both such fine and imprisonment in the discretion of the court.   *Felony, what deemed.*   *Penalty.*

SEC. 5. No person shall carry a dagger, dirk, stiletto or other dangerous weapon except hunting knives adapted and carried as such, concealed on or about his person, or whether concealed or otherwise in any vehicle operated or occupied by him, except in his dwelling house or place of business or on other land possessed by him. No person shall carry a pistol concealed on or about his person, or, whether concealed or otherwise, in any vehicle operated or occupied by him, except in his dwelling house or place of business or on other land possessed by him, without a license therefor as herein provided. Any person violating the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison for not more than five years, or by both such fine and imprisonment in the discretion of the court.   *Unlawful to carry, etc., dagger, etc.*

SEC. 6. The prosecuting attorney, the commissioner or chief of police and the commissioner of public safety or their respective authorized deputies in incorporated cities or in incorporated villages having an organized department of police, and the prosecuting attorney, the commissioner of public safety or their authorized deputies, and the sheriff, under-sheriff or chief deputy sheriff in parts of the respective counties not included within incorporated cities or villages shall constitute boards exclusively authorized to issue licenses to carry pistols concealed on the person to applicants residing within the respective territories herein mentioned. The county clerk of each county shall be clerk of such licensing boards, which boards shall be known in law as "The Concealed Weapon Licensing Board." No such license to carry a pistol concealed on the person shall be granted to any person except he be nineteen years of age or over and has resided in this state six months or over, and in no event shall such license be issued unless it appears that the applicant has good reason to fear injury to his person or property, or has   *Concealed weapon licensing board.*   *To whom license granted.*

App. 18

other proper reasons, and that he is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony or adjudged insane in this state or elsewhere. The prosecuting attorney shall be the chairman of the said board, which shall convene at least once in each calendar month and at such other times as they shall be called to convene by the chairman. Such licenses shall be issued only upon written application signed by the applicant and on his oath and upon forms provided by the commissioner of public safety. Such licenses shall issue only with the approval of a majority of said board and shall be executed in triplicate upon forms provided by the commissioner of public safety and shall be signed in the name of the concealed weapon licensing board by the county clerk and the seal of the circuit court affixed thereto. One copy of such license shall be delivered to the applicant, the duplicate of said license shall be retained by the county clerk as a permanent official record for a period of six years, and the triplicate of such license shall be forwarded to the commissioner of public safety who shall file and index licenses so received by him and keep the same as a permanent official record for a period of six years. Each license shall be issued for a definite period of not more than one year, to be stated in the license, and no renewal of such license shall be granted except upon the filing of a new application. Every license issued hereunder shall bear the imprint of the right thumb' of the licensee, or, if that be not possible, of the left thumb or some other finger of such licensee. Such licensee shall carry such license upon his person at all times when he may be carrying a pistol concealed upon his person and shall display such license upon the request of any peace officer.

SEC. 7. All licenses heretofore issued in this state permitting a person to carry a pistol concealed upon his person shall expire at midnight, December thirty-one, nineteen hundred twenty-seven.

SEC. 8. The licensing board herein created by section six may revoke any license issued by it upon receiving a certificate of any magistrate showing that such licensee has been convicted of violating any of the provisions of this act, or has been convicted of a felony. Such license may also be revoked whenever in the judgment of said board the reason for granting such license shall have ceased to exist, or whenever said board for any reasonable cause determine said licensee to be an unfit person to carry a pistol concealed upon his person. No such license shall be revoked except upon written complaint and then only after a hearing by said board, of which at least seven days' notice shall be given to the licensee either by personal service or by registered mail to his last known address. The clerk of said licensing board is hereby authorized to administer an oath to any person testifying before such board at any such hearing.

*Chairman of board.*

*Duration of license.*

*When license to expire.*

*When license revoked.*

App. 19

SEC. 9. On or before the first day of November, nineteen hundred twenty-seven, any person within this state who owns or has in his possession a pistol as defined in this act, shall, if he reside in an incorporated city or an incorporated village having an organized police department, present such weapon for safety inspection to the commissioner or chief of police of such city or village; if such person reside in a part of the county not included within the corporate limits of such city or village he shall so present such pistol for safety inspection to the sheriff of such county. Any person owning or coming into possession of a pistol after the first day of November, nineteen hundred twenty-seven, shall forthwith present such pistol for safety inspection in the manner provided in this section. A certificate of inspection shall thereupon be issued in triplicate on a form provided by the commissioner of public safety, containing the name, age, address, description and signature of the person presenting such pistol for inspection, together with a full description thereof; the original of such certificate shall be delivered to the registrant; the duplicate thereof shall be mailed to the commissioner of public safety and filed and indexed by him and kept as a permanent official record for a period of six years, and the triplicate of such certificate shall be retained and filed in the office of said sheriff, or commissioner or chief of police, as the case may be. The provisions of this section shall not apply to wholesale or retail dealers in firearms or to collections of pistols kept solely for the purpose of display, as relics, souvenirs, curios or antiques, nor to weapons heretofore registered under the provisions of section eleven of act number three hundred thirteen of the public acts of nineteen hundred twenty-five. Any person who fails to comply with the provision of this section shall be guilty of a misdemeanor and shall be punished by a fine not exceeding one hundred dollars or imprisonment in the county jail not exceeding ninety days, or by both such fine and imprisonment in the discretion of the court.

SEC. 10. No pawnbroker shall accept a pistol in pawn. Any person violating this section of this act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or imprisonment in the county jail for not more than ninety days or by both such fine and imprisonment in the discretion of the court.

SEC. 11. No person shall wilfully alter, remove or obliterate the name of the maker, model, manufacturer's number or other mark of identity of any pistol. Possession of any such firearm upon which the number shall have been altered, removed or obliterated, shall be presumptive evidence that such possessor has altered, removed or obliterated the same. Any person convicted under this section shall be punished by a fine not to exceed five hundred dollars or by imprisonment

*Safety inspection of weapons.*

*Certificate issued.*

*Pistol not accepted in pawn.*

*Alteration of pistol unlawful.*

App. 20

in the state prison not to exceed two years or by both such fine and imprisonment in the discretion of the court.

**Exceptions to act.**

SEC. 12. The provisions of section two, three, five and nine shall not apply to any peace officer of the state or any subdivision thereof who is regularly employed and paid by the state or such subdivision, or to any member of the army, navy or marine corps of the United States, or of organizations authorized by law to purchase or receive weapons from the United States or from this state, nor to the national guard or other duly authorized military organizations when on duty or drill, nor to the members thereof in going to or returning from their customary places of assembly or practice, nor to a person licensed to carry a pistol concealed upon his person issued by another state, nor to the regular and ordinary transportation of pistols as merchandise, or to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business, or in moving goods from one place of abode or business to another.

**When unlawfully possessed.**

SEC. 13. When complaint shall be made on oath to any magistrate authorized to issue warrants in criminal cases that any pistol or other weapon or device mentioned in this act is unlawfully possessed or carried by any person, such magistrate shall, if he be satisfied that there is reasonable cause to believe the matters in said complaint be true, issue his warrant directed to any peace officer, commanding him to search the person or place described in such complaint, and if such pistol, weapon or device be there found; to seize and hold the same as evidence of a violation of this act.

**Forfeited to state.**

SEC. 14. All pistols, weapons or devices carried or possessed contrary to this act are hereby declared forfeited to the state.

**Certain books, etc., unlawful to sell, etc.**

SEC. 15. It shall be unlawful to sell or deliver within this state, or to offer or expose for sale, or to have in possession for the purpose of sale, any book, pamphlet, circular, magazine, newspaper or other form of written or printed matter offering to sell or deliver, or containing an offer to sell or deliver to any person within this state from any place without this state any pistol or any weapon or device mentioned in section three hereof. The provisions of this section shall not apply to sales of or offers to sell pistols at wholesale to persons regularly engaged in the business of selling such pistols at wholesale or retail, nor to sales or offers to sell such pistols made or authorized by the United States government or any department or agency thereof.

**Penalty for violation.**

SEC. 16. Any person violating the provisions of section fifteen of this act shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine not to exceed one hundred dollars or by imprisonment in the county jail not to exceed ninety days, or by both such fine and imprisonment in the discretion of the court.

App. 21

SEC. 17. Act number two hundred seventy-four of the Acts repealed. public acts of nineteen hundred eleven, being sections fifteen thousand two hundred thirty-six, fifteen thousand two hundred thirty-seven, fifteen thousand two hundred thirty-eight, fifteen thousand two hundred thirty-nine, fifteen thousand two hundred forty, fifteen thousand two hundred forty-one, fifteen thousand two hundred forty-two, fifteen thousand two hundred forty-three, fifteen thousand two hundred forty-four, fifteen thousand two hundred forty-five and fifteen thousand two hundred forty-six of the compiled laws of nineteen hundred fifteen; act number three hundred thirteen of the public acts of nineteen hundred twenty-five; and section sixteen of chapter one hundred sixty-two of the revised statutes of eighteen hundred forty-six, being section fifteen thousand six hundred forty-one of the compiled laws of nineteen hundred fifteen, are hereby repealed: *Provided, however,* That any Proviso. proceedings pending under any of said sections herein repealed shall not be affected hereby but shall be concluded in accordance with the law of such repealed section or sections.

SEC. 18. This act is declared to be severable, and should Saving clause. any section hereof be hereafter declared unconstitutional or otherwise invalid, the remainder of the act shall not be affected thereby.

Approved June 2, 1927.

[No. 373.]

AN ACT to amend section twenty-five of chapter thirty of act number three hundred fourteen of the public acts of nineteen hundred fifteen, entitled "An act to revise and consolidate the statutes relating to the organization and jurisdiction of the courts of this state; the powers and duties of such courts, and of the judges and other officers thereof; the forms of civil actions; the time within which civil actions and proceedings may be brought in said courts; pleading, evidence, practice and procedure in civil actions and proceedings in said courts; to provide remedies and penalties for the violation of certain provisions of this act; and to repeal all acts and parts of acts inconsistent with, or contravening any of the provisions of this act," being section thirteen thousand two hundred fifty-three of the compiled laws of nineteen hundred fifteen, as amended by act number two hundred forty-three of the public acts of nineteen hundred seventeen, and to add a new section thereto to stand as section thirty-one.

*The People of the State of Michigan enact:*

SECTION 1. Section twenty-five of chapter thirty of act Section amended. number three hundred fourteen of the public acts of ninetee App. 22

## CHAPTER 1052.

AN ACT TO REGULATE THE POSSESSION OF FIREARMS.

*It is enacted by the General Assembly as follows:*

H 729 A
Approved
April 22, 1927.

Certain words and phrases, how construed:

Section 1. When used in this act the following words and phrases shall be construed as follows:

"Pistol."

"Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall length less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only.

"Machine gun."

"Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

"Firearm."

"Firearm" shall include any machine gun or pistol.

"Person."

"Person" shall include firm, association or corporation.

"Licensing authorities."

"Licensing authorities" shall mean the board of police commissioners of a city or town where such board has been instituted, the chief of police or superintendent of police of other cities and towns having a regular organized police force, and in towns where there is no chief of police or superintendent of police it shall mean the town clerk who may issue licenses upon the recommendation of the town sergeant;

"Crime of violence."

"Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering.

"Sell."
"Purchase."
"Purchasing."

"Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly."

SEC. 2. If any person shall commit or attempt to commit a crime of violence when armed with or having available any firearm, he may in addition to the punishment provided for such crime of violence be punished as provided in this act. In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with or had available a pistol without license to carry the same, or was armed with or had available a machine gun, shall be prima facie evidence of his intention to commit said crime of violence. *Additional punishment under this act.*

*What to be prima facie evidence of intention to commit crime of violence.*

SEC. 3. No person who has been convicted in this state or elsewhere of a crime of violence shall purchase, own, carry or have in his possession or under his control any firearm. *Who to be denied firearms.*

SEC. 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act. *Carrying of pistol forbidden, except when.*

*Machine gun.*

SEC. 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to the members thereof when at or going to or from *Sec. 4 not to apply to whom.*

their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

License to carry concealed pistol may be issued, to whom, when and how.

SEC. 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The

License, form of.

license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the fingerprint, name, address, description and signature of the licensee and the reason given for desiring a license.

Triplicate license, how disposed of.

The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said

Fee for license.

license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same.

Applicant for license to give bond.

Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issu-

ing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

SEC. 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney-general may prescribe. *Attorney-general may issue permit to banking institutions, etc.*

SEC. 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged. *Muffler or silencer for firearm forbidden.*

SEC. 9. Any person, except a member of the state police, the sheriff or his deputies, or a member of the police force of any city or town, or a member of the army, navy, or marine corps of the United States, or of the national guard or organized reserves when on duty, who possesses, or carries on or about his person or in a vehicle, a bomb or bomb shell, except for blasting or other commercial use, or who, with intent to use the same unlawfully against the person or property of another, possesses or carries any explosive substance, or any noxious liquid, gas or substance, shall be guilty of a violation of this act and punished as hereinafter provided. *Possession or carrying of bomb, explosive substance, or noxious liquid, gas, etc., forbidden.*

SEC. 10. No property right shall exist in any firearm unlawfully possessed, carried or used, and all such firearms are hereby declared to be nuisances and forfeited to the state. When such forfeited firearms shall be *Certain firearms to be nuisances and forfeited. Disposition of forfeited firearms.*

# REPORT OF FIREARMS COMMITTEE

*To the National Conference of Commissioners on Uniform State Laws:*

The report of this committee at Buffalo last year showed that following the publication of the Uniform Firearms Act as approved by the Conference and the Bar Association at Denver in July, 1926, some objections raised by the Police Commissioner of New York City through Governor Whitman induced the Executive Committee of the Conference in January, 1927, to recommend to the Conference the withholding of the act from presentation to the states, and the recommitment of the matter to the Firearms Committee for further study and report. (Handbook, 1927, p. 866.) In view of this action of the Executive Committee of the Conference the Executive Committee of the American Bar Association took under reconsideration the approval of the act, this action being approved at the Buffalo meeting. (Bar Assn. Reports, No. 52, 1927, p. 223.)

The Firearms Committee reported at the Buffalo meeting, outlining its efforts to cooperate with the National Crime Commission, which through a subcommittee had drafted and presented to the legislatures the so-called Crime Commission Bill on the subject of firearms regulation. The text of this was printed in display with the text of the Uniform Act. It was pointed out that the Crimes Commission had taken the Uniform Act as the basis of its work, adopting a great deal of it, but with the addition of some new matters, and the change of some of the principles of the Uniform Act. (Handbook, 1927, pp. 866-914.) These matters were also adverted to by President Young in his opening address. (*Ibid.*, p. 453.) In accordance with the recommendations of the committee the Conference voted as follows (*Ibid.*, pp. 267-268, 914):

419

"1. That in accordance with action already taken by the Executive Committee the Uniform Firearms Act be withheld from presentation to the legislatures until further action of the Conference.

"2. That the committee on the Uniform Firearms Act be continued for the purpose of giving further consideration to the objections thereto, for further study of other proposed legislation, for further conferences with the committee of the National Crime Commission, and for further report as to whether or not it is desirable that the act be amended or retained in its present form, or as to what definite disposition should be made thereof."

With the Uniform Act thus back for consideration various meetings have been held during the year between members of the undersigned committee and members of the subcommittee of the National Crime Commission. The final joint meetings were in Washington on April 26-27, 1928, at which were present on behalf of your committee Judge Ailshie and Messrs. O'Connell and Imlay, and on behalf of the subcommittee of the Crime Commission General J. Weston Allen and Mr. J. E. Baum, of the American Bankers Association.

As a result of these meetings and the separate attention given to these matters by your own committee, both in personal conference in Washington, and in an exchange of views by letter, your committee has formulated a proposed revision, printed herewith, of the Uniform Act, incorporating some of the new matter of the Crime Commission Bill, but retaining the basic features of the Uniform Act. In notes accompanying each section, which should be studied in connection with the parallel references in the two acts as printed in last year's report (Handbook, 1927, pp. 878-889), an attempt has been made to indicate the changes. Some of the matters of major importance may be summarized as follows:

1. The revision incorporates the new matter of the Crime Commission Bill on machine guns. Most of the firearms legislation passed in the current year has been on the subject of machine guns, e. g., General Laws of California of 1927, Ch. 552; Acts and Resolves of Mass., 1927, Ch. 326; Mich. Public Acts of 1927, No. 372; N. J. Public Laws 1927, Ch. 95, p. 180. There has been recent legislation on the subject also in Iowa.

420

2. The revision retains the principle of forbidding the carrying of concealed weapons with strict regulations for identification, but does not require a license to purchase as does the Crime Commission Bill. This constitutes the basic difference between the two acts. Upon this point your committee and the subcommittee of the Crime Commission have been unable to agree.

3. The revision retains the method of the Uniform Act in providing a general penalty section (S. 19) rather than, as in the other act, placing penalty clauses within the various sections.

4. The revision, like the original act, does not fix mandatory sentences, the matter of sentences being left open for the exercise of discretion by the courts.

Upon the basic difference between the two acts mentioned above your committee has bestowed much careful thought. The form of regulation contained in the Uniform Act was adopted by the Conference advisedly. That form is consistent with the forms of regulation which have always obtained and now obtain in the states generally, as the analysis of the subject in the second report of this committee shows. (Handbook, 1925, pp. 854-898.) The system of license to purchase has been for many years the law of New York. It was adopted in Michigan in 1925, being reenacted in the 1927 act mentioned above: it was also adopted in Massachusetts in 1926. (Acts of 1926, Ch. 395.) Beyond those states it has not gone, so far as this committee is advised.

This committee reaffirms the position heretofore taken on this subject, that such a provision is not only out of line with legislative precedents and experience, but is unenforceable. It would make criminals out of law-abiding citizens, and would not be obeyed by the lawless.

A bill drawn very much along the lines of this proposed revision, was introduced into the United States Senate April 16, 1928, by Senator Capper (S. 4086, 70th Cong.) as a local law for the District of Columbia: the same bill was introduced into the House of Representatives a few days later by Representative Frederick J. Zihlman of Maryland, a member of the District of Columbia Committee (No. 13211). The bills are now under consideration before the respective Committees on the District of Columbia of the two houses.

Your committee presents this revision for the consideration of the Conference and recommends its adoption as an act which preserves the results achieved in the work heretofore done on the Uniform Act, and incorporates valuable new material from the Crime Commission Act.

Respectfully submitted,

JOSEPH F. O'CONNELL, *Chairman*,
JAMES F. AILSHIE,
CHARLES V. IMLAY,
J. O. SETH,
L. C. SPIETH,
D. A. McDOUGAL,
GEORGE B. MARTIN,
HARRY L. CRAM.

## A UNIFORM ACT TO REGULATE THE SALE AND POSSESSION OF FIREARMS

AN ACT REGULATING THE SALE, TRANSFER AND POSSESSION OF CERTAIN FIREARMS, PRESCRIBING PENALTIES AND RULES OF EVIDENCE, AND TO MAKE UNIFORM THE LAW WITH REFERENCE THERETO

1  SECTION 1. (*Definitions.*) "Pistol," as used in this act,
2  means any firearm with a barrel less than twelve inches in
3  length.
4      "Machine gun," as used in this act, means any firearm
5  which shoots automatically and any firearm which shoots
6  more than twelve shots semi-automatically without reloading.
7      "Person," as used in this act, includes firm, association or
8  corporation.
9      "Sell" and "purchase" and the various derivatives of
10 such words, as used in this act, shall be construed to include
11 letting on hire, giving, lending, borrowing, and otherwise
12 transferring.
13     "Crime of violence," as used in this act, means any of the
14 following crimes or an attempt to commit any of the same,
15 namely: Murder, manslaughter, rape, mayhem, assault to do
16 great bodily harm, robbery, larceny, burglary, and house-
17 breaking.

422

*Note:* The words " or revolver " are omitted in the first definition and at other places where they occur in the Uniform Act, as in the Crime Commission Act, for greater simplicity.

The new definition of " machine gun " is substantially that of the Crime Commission Act.

The new definitions of " person " and " sell and purchase " are substantially those of the Crime Commission Act.

1  SECTION 2. (*Committing Crime When Armed.*) If any
2  person shall commit a crime of violence when armed with or
3  having readily available any pistol or other firearm, he may
4  in addition to the punishment provided for the crime be
5  punished also as provided by this act.

*Note:* The words " or having readily available " and " or other firearm " are added from the Crime Commission Act.

1  SECTION 3. (*Being Armed Prima Facie Evidence of In-*
2  *tent.*) In the trial of a person for committing a crime of
3  violence the fact that he was armed or had readily available
4  a pistol, and had no license to carry the same, or was armed
5  with or had readily available any other firearm having a total
6  length of less than twenty-six inches, or any machine gun,
7  shall be *prima facie* evidence of his intention to commit such
8  crime of violence.

*Note:* The words " or had readily available " are added from the Crime Commission Act: the words " or was armed with, etc.," are adopted from that act, to include firearms longer than twelve inches capable of being concealed on the person and machine guns.

1  SECTION 4. (*Persons Forbidden to Possess Certain Fire-*
2  *arms.*) No person who has been convicted in this state or
3  elsewhere of a crime of violence shall own a pistol or have one
4  in his possession or under his control.

*Note:* This section is substantially the same as that of the original Uniform Act and of the Crime Commission Act, except that the latter specifies a punishment which in this proposed revision as in the original Uniform Act is left for a general section.

1  SECTION 5. (*Carrying Pistol.*) No person shall carry a
2  pistol in any vehicle or concealed on or about his person, ex-
3  cept in his dwelling house or place of business or on other

423

4 land possessed by him, without a license therefor issued as
5 hereinafter provided.

*Note:* This section is the same as that of the original Uniform Act except that it incorporates the language of the corresponding Section 11 of the Crime Commission Act in making the prohibition against carrying pistols in vehicles absolute.

1 SECTION 6. (*Exceptions.*) The provisions of the preced-
2 ing section shall not apply to marshals, sheriffs, prison or
3 jail wardens or their deputies, policemen or other duly ap-
4 pointed law-enforcement officers, or to members of the army,
5 navy, or marine corps of the United States or of the national
6 guard or organized reserves when on duty, or to the regu-
7 larly enrolled members of any organization duly authorized
8 to purchase or receive such weapons from the United States
9 or from this state, provided such members are at or are going
10 to or from their places of assembly or target practice, or to
11 officers or employees of the United States duly authorized to
12 carry a concealed pistol, or to any person engaged in the busi-
13 ness of manufacturing, repairing, or dealing in firearms or
14 the agent or representative of any such person having in his
15 possession, using, or carrying a pistol in the usual or ordinary
16 course of such business, or to any person while carrying a
17 pistol unloaded and in a secure wrapper from the place of
18 purchase to his home or place of business or to a place of
19 repair or back to his home or place of business or in moving
20 goods from one place of abode or business to another.

*Note:* This section remains the same as that of the original Uniform Act with a few modifications introduced from the corresponding Section 12 of the Crime Commission Act.

1 SECTION 7. (*Issue of Licenses to Carry.*) [The justice
2 of a court of record, the chief of police of a city or town, and
3 the sheriff of a county or the persons authorized by any of
4 them] shall, upon the application of any person having a
5 bona fide residence or place of business within the jurisdic-
6 tion of said licensing authority or of any person having a
7 bona fide residence or place of business within the United
8 States and a license to carry a pistol concealed upon his per-
9 son issued by the lawful authorities of any state or subdivi-

424

10  sion of the United States, issue a license to such person to
11  carry a pistol within this state for not more than one year
12  from date of issue, if it appears that the applicant has good
13  reason to fear injury to his person or property or has any
14  other proper reason for carrying a pistol and that he is a
15  suitable person to be so licensed. The license shall be in tripli-
16  cate in form to be prescribed by the [Secretary of State] and
17  shall bear the name, address, description, photograph, and
18  signature of the licensee and the reason given for desiring a
19  license. The original thereof shall be delivered to the licensee,
20  the duplicate shall within seven days be sent by registered
21  mail to the [Secretary of State] and the triplicate shall be
22  preserved for six years by the authority issuing said license.

*Note:* This section remains substantially as in the original Uniform Act
and as in Section 10 of the Crime Commission Act.

1  SECTION 8.  (*Selling to Minors and Others.*)  No person
2  shall sell any pistol to a person who he has reasonable cause
3  to believe is not of sound mind, or is a drug addict, or is a
4  person who has been convicted in the District of Columbia or
5  elsewhere of a crime of violence, or, except when the relation
6  of parent and child or guardian and ward exists, is under
7  the age of eighteen years.

*Note:* This section has been expanded to include in addition to infants
the other disqualified persons named in the corresponding Section 7 of the
Crime Commission Act.

1  SECTION 9.  (*Transfers Regulated.*)  No seller shall de-
2  liver a pistol to the purchaser thereof until forty-eight hours
3  shall have elapsed from the time of the application for the
4  purchase thereof, and, when delivered, said pistol shall be
5  securely wrapped and shall be unloaded. At the time of ap-
6  plying for the purchase of a pistol the purchaser shall sign
7  in triplicate and deliver to the seller a statement containing
8  his full name, address, occupation, color, place of birth, the
9  date and hour of application, the caliber, make, model, and
10  manufacturer's number of the pistol to be purchased and a
11  statement that he has never been convicted in this state or
12  elsewhere of a crime of violence.  The seller shall within six

425

13 hours after such application sign and attach his address and
14 forward by registered mail one copy of such statement to the
15 chief of police of the city or town or the sheriff of the county
16 of which the seller is a resident; the duplicate the seller shall
17 within seven days send with his signature and address to the
18 [Secretary of State]; the triplicate he shall retain for six
19 years. This section shall not apply to sales at wholesale.

*Note:* This section has been modified to require forty-eight instead of
twenty-four hours to elapse from the time of application till the time of
delivery of a weapon. A provision is also inserted for a more immediate
notice to the police.

1  SECTION 10. (*Dealers to be Licensed.*) No retail dealer
2  shall sell or expose for sale or have in his possession with in-
3  tent to sell any pistol without being licensed as hereinafter
4  provided.

*Note:* This section remains in substance the same as in the original
Uniform Act except that with the new matters of definition adopted from
the Crime Commission Act it conforms in language to Section 6 thereof.

1  SECTION 11. (*Dealers' Licenses, by Whom Granted and
2  Conditions Thereof.*) The duly constituted licensing authori-
3  ties of any city, town, or political subdivision of this state
4  may grant licenses in form prescribed by the [Secretary of
5  State] effective for not more than one year from date of issue,
6  permitting the licensee to sell pistols at retail within this
7  state subject to the following conditions in addition to those
8  specified in Section 9 hereof, for breach of any of which the
9  license shall be subject to forfeiture and the licensee subject
10  to punishment as provided in this act:
11  1. The business shall be carried on only in the building
12  designated in the license.
13  2. The license or a copy thereof, certified by the issuing
14  authority, shall be displayed on the premises where it can
15  easily be read.
16  3. No pistol shall be sold (a) if the seller has reasonable
17  cause to believe that the purchaser is not of sound mind or
18  is a drug addict or has been convicted in this state or else-
19  where of a crime of violence or is under the age of eighteen

426

20 years, or (b) unless the purchaser is personally known to
21 the seller or shall present clear evidence of his identity.
22     4. A true record in triplicate shall be made of every pistol
23 sold, said record to be made in a book kept for the purpose,
24 the form of which may be prescribed by the [Secretary of
25 State] and shall be personally signed by the purchaser and
26 by the person effecting the sale, each in the presence of the
27 other, and shall contain the date of sale, the caliber, make,
28 model, and manufacturer's number of the weapon, the name,
29 address, occupation, color, and place of birth of the purchaser,
30 and a statement signed by the purchaser that he has never
31 been convicted in this state or elsewhere of a crime of vio-
32 lence. One copy of said record shall within six hours be sent
33 by registered mail to the chief of police of the city or town
34 or the sheriff of the county of which the dealer is a resident;
35 the duplicate the dealer shall within seven days send to the
36 [Secretary of State]; the triplicate the dealer shall retain for
37 six years.
38     5. No pistol or imitation thereof or placard advertising the
39 sale thereof shall be displayed in any part of said premises
40 where it can readily be seen from the outside.
41     No license to sell at retail shall be granted to anyone except
42 as provided in this section.

*Note:* This section remains substantially the same as the original
Section 11 and Section 6 of the Crime Commission Act, except that it
incorporates, like Section 9 hereof, a provision for a more immediate notice
by the dealer to the police.

1     SECTION 12. (*False Information Forbidden.*) No person
2 shall, in purchasing a pistol or in applying for a license to
3 carry the same, give false information or offer false evidence
4 of his identity.

*Note:* This section remains practically the same as the same section in
the original Uniform Act and as Section 13 of the Crime Commission Act,
except that the latter makes special mention therein of 'a penalty.

1     SECTION 13. (*Alteration of Identifying Marks Pro-*
2 *hibited.*) No person shall change, alter, remove, or obliterate
3 the name of the maker, model, manufacturer's number, or other
4 mark of identification on any pistol. Possession of any pistol

427

5 upon which any such mark shall have been changed, altered,
6 removed, or obliterated shall be *prima facie* evidence that the
7 possessor has changed, altered, removed, or obliterated the
8. same.

*Note:* This section remains the same as in the original Uniform Act and in the corresponding Section 18 of the Crime Commission Act.

1 SECTION 14. (*Existing Licenses Revoked.*) All licenses
2 heretofore issued in this state permitting the carrying of
3 pistols shall expire at midnight of the —— day of ———,
4 19—.

*Note:* This section remains the same as in the original Uniform Act and in Section 23 of the other act.

1 SECTION 15. (*Exceptions.*) This act shall not apply to
2 antique pistols unsuitable for use as firearms and possessed
3 as curiosities or ornaments.

*Note:* This section is the same in substance as in the original act, but it adopts from the corresponding Section 22 of the other act the words "and possessed as curiosities or ornaments."

1 SECTION 16. (*Pawning of Pistols Prohibited.*) No per-
2 son shall make any loan secured by mortgage, deposit, or
3 pledge of a pistol.

*Note:* This is a new section, adopting the substance of Section 8 of the Crime Commission Act.

1 SECTION 17. (*Machine Guns.*) No person shall possess
2 any machine gun. This section shall not apply to any foreign
3 government nor to members of the army, navy, or marine
4 corps of the United States, or of the national guard or organ-
5 ized reserves when on duty, nor to the Post Office Department
6 or its employees when on duty, nor to duly appointed law-
7 enforcement officers, nor to banking institutions established
8 under the laws of the United States, nor to public carriers
9 who are engaged in the business of transporting mail, money,
10 securities, or other valuables.

*Note:* This is a new section, incorporating the provisions of Sections 14 and 15 of the Crime Commission Act.

1 SECTION 18. (*Act Supersedes Local Laws.*) The provi-
2 sions of this act shall be effective and controlling throughout

428

3  this state, notwithstanding the provisions of any local law
4  or ordinance.

*Note:* This section remains the same as Section 16 of the original act and is the same in substance as Section 26 of the Crime Commission Act.

1     SECTION 19.  (*Penalties.*)  Any violation of any provi-
2  sion of this act shall constitute an offense punishable by a
3  fine of not more than [$——] or imprisonment for not more
4  than [———] or both, or by imprisonment in the peniten-
5  tiary for not less than [———] nor more than [———].

1     SECTION 20.  (*Constitutionality.*)  If any part of this act
2  is for any reason declared void, such invalidity shall not af-
3  fect the validity of the remaining portion of this act.

1     SECTION 21.  (*Short Title.*)  This act may be cited as
2  "Uniform Firearms Act."

1     SECTION 22.  (*Effective Date.*)  This act shall take effect
2  on the —— day of ———, 19—.

1     SECTION 23.  (*Certain Acts Repealed.*)  All laws or parts
2  of laws inconsistent herewith are hereby repealed.

*Note:* The above sections remain the same as Sections 17-21 in the original Uniform Act. Section 25 of the Crime Commission Act adopts Section 20. Section 24 of that act has a provision for a general penalty where none is otherwise specified, but as penalties are generally specified throughout the Crime Commission Act, Section 24 thereof differs from Section 19 hereof, which declares penalties for the whole act. This method was adopted advisedly by the Conference, as a more scientific way to deal with the subject of penalties.

429

owner or by destroying it or disposing of it according to the laws of the State of Illinois. Any officer of the law violating the provisions of this section is guilty of a misdemeanor and subject to a fine of not less than $100 nor more than $500, or imprisonment in the county jail for not less than one month nor more than six months, or both such fine and imprisonment.

APPROVED July 3, 1931.                    (Smith-Hurd, p. 1030)

---

## MACHINE GUNS.

§ 1.  Definitions.                          § 4.  Register to be kept.
§ 2.  Unlawful sale, possession, etc.—      § 5.  Penalties.
         Exceptions.                        § 6.  Search warrants.
§ 3.  Regulations for manufacturers         § 7.  Committing crime when armed
         and merchants.                              with machine gun—Penalty.

(SENATE BILL NO. 18.  APPROVED JULY 2, 1931.)

AN ACT to regulate the sale, possession and transportation of machine guns.

Be it enacted by the People of the State of Illinois, represented in the General Assembly:

SECTION 1. For purposes of this Act the term "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

The term "manufacturer" shall apply to and include all persons manufacturing machine guns; and

The term "merchant" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that

1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns.

2. The provisions of this Act shall not apply to the Army, Navy, or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns.

3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics.

4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment,

App. 38

transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers.

5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

§ 3. No manufacturer or merchant shall permit any machine gun to pass from his possession to the possession of any person other than

1. A manufacturer or a merchant.

2. A common carrier for shipment to a manufacturer or merchant.

3. A duly authorized agent of the government of the United States, or of this State, acting in his official capacity.

4. A person authorized to purchase a machine gun under the provisions of exceptions 1 and 4 of section 2 of this Act.

Manufacturers or merchants shall not deliver a machine gun to any of the persons authorized to purchase such gun under the provisions of exceptions 1 and 4 of section 2 hereof, unless such person presents a written permit to purchase and possess a machine gun, signed by the sheriff of the county wherein such manufacturer or merchant has his place of business or delivers such machine gun. The manufacturer or merchant shall retain such permit and keep it on file in his place of business. Each sheriff shall keep a record of all such permits issued by him.

§ 4. Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun.

Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business, for inspection by such officer.

§ 5. Any manufacturer or merchant who

1. Passes possession of a machine gun to any person not authorized to purchase and/or possess such gun under the provisions hereof; or

2. Passes possession of a machine gun to a person authorized to purchase a machine gun under the provisions of exceptions 1 and 4 of section 2 of this Act, without first receiving the written permit of a sheriff, as herein required; or

3. Fails to keep an accurate register, as provided in section 4; or

4. Fails, or is unable to produce or account for a sheriff's permit

for each machine gun sold by him for which a permit is necessary under the provisions of section 3 hereof, upon conviction, shall be punished by imprisonment in the penitentiary for not less than one nor more than five years.

Any other person who sells, keeps or offers for sale, loans or gives away, purchases, possesses, carries or transports any machine gun within this State, except as authorized by this Act, upon conviction, shall be imprisoned in the penitentiary for not less than one nor more than ten years.

Whoever, having been convicted of murder, robbery, burglary or assault with intent to commit a felony, thereafter violates any of the provisions of this Act, upon conviction, shall be imprisoned in the penitentiary for not less than three nor more than ten years.

§ 6. Warrants to search any house or place and seize any machine gun possessed in violation of this Act, may issue in the same manner and under the same restrictions as is provided by law in the case of personal property stolen, and the court upon application of the State's attorney shall have jurisdiction to order any machine gun so illegally possessed and seized, delivered to any officer, department or agency of the State or political subdivision of the State authorized by this Act to possess machine guns or to order the same sold to any person authorized to possess the same the proceeds to be covered into the treasury of the county in which the violation occurred.

§ 7. Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

APPROVED July 2, 1931.

---

MOB VIOLENCE.

§ 1.   Amends sections 4 and 5, Act of
        1905.
   § 4.   Damage by violence—Pen-          § 5.   Heirs of victims may re-
           alty — Action   against                  cover from municipality.
           municipality.

(HOUSE BILL No. 974.  APPROVED JULY 3, 1931.)

AN ACT to amend sections 4 and 5 of "An Act to suppress mob violence," approved May 16, 1905.

Be it enacted by the People of the State of Illinois, represented in the General Assembly:

SECTION 1.  Sections 4 and 5 of "An Act to suppress mob violence," approved May 16, 1905, are amended to read as follows:

§ 4.  Any person or persons composing a mob under the provisions of this Act, who shall by violence inflict material damage to the property or serious injury to the person of any other person upon the pretense of exercising correctional powers over such person or persons, by violence and without authority of law, shall be deemed guilty of a felony, and shall suffer imprisonment in the penitentiary not exceeding five years; and any person so suffering material damage to property or injury to person by a mob shall have an action against the county,

States, for the purpose of having such communication delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to such addressee in the United States, and as a result thereof such communication is delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to the address to which it is directed in the United States, then such person shall be punished in the same manner and to the same extent as provided in section 1 of this Act: *Provided*, That any person violating this section may be prosecuted either in the district into which such letter or other communication was carried by the United States mail for delivery according to the direction thereon, or in which it was caused to be delivered by the United States mail to the person to whom it was addressed.

*Punishment for.*
*Proviso.*
*Jurisdiction.*

Approved, July 8, 1932.

---

[CHAPTER 465.]

July 8, 1932.
[H. R. 8754.]
[Public, No. 275.]

AN ACT

To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes.

*Unauthorized use, etc., of pistols and other dangerous weapons in District of Columbia.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### DEFINITIONS

*Definitions.*

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length.

"Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

"Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

"Person," as used in this Act, includes, individual, firm, association, or corporation.

"Sell" and "purchase" and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

"Crime of violence" as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

*"Pistol."*
*"Sawed-off shotgun."*
*"Machine gun."*
*"Person."*
*"Sell" and "purchase," etc.*
*"Crime of violence."*

### COMMITTING CRIME WHEN ARMED

*Committing crime of violence when armed.
Punishment for.*

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the

crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

*Persons forbidden to possess certain firearms.*
*Convicted of a crime.*

### CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

*Illegally carrying, etc., dangerous weapon.*

### EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

*Exceptions.*
*Law enforcement officers.*
*Army, Navy, or Marine Corps.*
*National Guard, etc., on duty.*
*Other organizations.*
*Carrying to places of assembly, etc.*
*Manufacturer, etc.*

### ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

*Licenses.*

## SELLING TO MINORS AND OTHERS

*Selling to minors or others.*

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

## TRANSFERS REGULATED

*Time, etc., provisions.*

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase

*Register to be kept.*

of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the

*Limitation.*

other copy for six years. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the

*Wholesale trade.*

superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

## DEALERS TO BE LICENSED

*Dealers to be licensed.*

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

## DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

*Conditions, etc., for issuing dealers' licenses. Ante, p. 558.*

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale.

*Records.*

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

*Display, etc., forbidden.*

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

*False information or evidence forbidden.*

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

*Alteration, etc., of identification marks, prohibited.*

*Proviso.*
*Experimental work.*

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

*Toys, etc., excepted.*

POSSESSION OF CERTAIN DANGEROUS WEAPONS

Possession of certain
dangerous weapons for-
bidden.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

*Proviso.*
Exceptions.

PENALTIES

Punishment for vio-
lations.

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

CONSTITUTIONALITY

Invalidity of any
provision not to affect
remainder.

SEC. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

CERTAIN ACTS REPEALED

Vol. 31, p. 1328,
repealed.

SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

---

[CHAPTER 466.]

JOINT RESOLUTION

July 8, 1932.
[H. J. Res. 462.]
[Pub. Res., No. 35.]

Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000 : *Provided,* That all amounts expended under this appropriation in behalf of any veteran shall constitute a loan without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.

World War veterans.
Appropriation for, to
provide transportation
from District of Colum-
bia to their homes.
*Post,* p. 701.

*Proviso.*
Credited as a loan.

Approved, July 8, 1932.

Section 2. That all laws or parts of laws in conflict with or inconsistent with the provision of this Act be and the same are hereby repealed.

Approved by the Governor: July 7, 1932.

A true copy:

E. A. CONWAY,
Secretary of State.

---

ACT No. 79.

House Bill No. 753.                              By Mr. Bauer.

AN ACT

Authorizing the Louisiana Highway Commission, with the approval of the Governor, to sell, at public or private sale, automobile, trucks, tractors, engineering implements, road machinery, and, all other equipment owned by the Commission and not actually in use for any public purpose, or when the use to which the same was devoted, or the use for which the same was acquired, has in fact been abandoned or discontinued, and repealing all laws in conflict herewith.

Louisiana Highway Commission authorized to dispose of automobiles, trucks, tractors, etc.

Section 1. Be it enacted by the Legislature of Louisiana, That the Louisiana Highway Commission, with the approval of the Governor, is hereby authorized to sell and dispose of, at public or private sale, for such price and on such terms as it may deem best any automobiles, trucks, tractors, engineering implements, road machinery and all other equipment of whatsoever nature or kind, owned by the Commission and not actually used for any public purpose, or when the use to which the same was devoted or the use for which the same was acquired, has in fact been abandoned or discontinued.

Section 2. That all laws or parts of laws in conflict herewith be and the same are hereby repealed.

Approved by the Governor: July 7, 1932.

A true copy:

E. A. CONWAY,
Secretary of State.

---

ACT No. 80.

House Bill No. 424.                          By Mr. Gilmore,
                                                (By request).

AN ACT

To regulate the sale, possession and transportation of machine guns, and providing a penalty for a violation hereof; providing, further, that any one who has been

convicted of murder, robbery, burglary, or assault with intent to commit a felony, who violates any of the provisions of this Act, shall be guilty of a felony and punished as provided in this Act.

Section 1. Be it enacted by the Legislature of Louisiana, "That for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

The term "manufacturer" shall apply to and include all persons manufacturing machine guns;

The term "merchant" shall apply to and include all persons dealing with machine guns as merchandise.

Section 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that:

1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns.

2. The provisions of this act shall not apply to the Army, Navy, or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns.

3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns, which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics.

4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers.

*Definitions.*

*Prohibiting the sale and possession of machine guns.*

5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

*In possession of manufacturers and merchants.*

Section 3. No manufacturer or merchant shall permit any machine gun to pass from his possession to the possession of any person other than:

1. A manufacturer or a merchant.

2. A common carrier for shipment to a manufacturer or merchant.

3. A duly authorized agent of the government of the United States, or of this State, acting in his official capacity.

4. A person authorized to purchase a machine gun under the provisions of exceptions 1 and 4 of Section 2 of this Act.

Manufacturers or merchants shall not deliver a machine gun to any of the persons authorized to purchase such gun under the provisions of exceptions 1 and 4 of Section 2 hereof, unless such person presents a written permit to purchase and possess a machine gun, signed by the sheriff of the parish wherein such manufacturer or merchant has his place of business or delivers such machine gun. The manufacturer or merchant shall retain such permit and keep it on file in his place of business. Each sheriff shall keep a record of all such permits issued by him

*Register to be kept by manufacturer and merchant.*

Section 4. Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun.

Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business, for inspection by such officers.

Section 5. Any manufacturer who:

*Penalty for violation by manufacturer.*

1. Passes possession of a machine gun to any person not authorized to purchase or possess such gun under the provisions hereof; or

2. Passes possession of a machine gun to a person authorized to purchase a machine gun under the provisions of exceptions 1 and 4 of Section 2 of this Act. without first receiving the written permit of a sheriff, as herein required; or

3. Fails to keep an accurate register, as provided in Section 4; or

4. Fails, or is unable to produce or account for a sheriff's permit for each machine gun sold by him for which a permit is necessary under the provisions of Section 3 hereof, shall be guilty of a felony, and upon conviction shall be punished by imprisonment in the State penitentiary at hard labor for not less than one nor more than five years.

Any person who sells, keeps or offers for sale, loans or gives away, purchases, possesses, carries or transports any machine gun within this State, except as authorized by this Act, shall be guilty of a felony, and upon conviction shall be imprisoned in the State Penitentiary, at hard labor, for not less than one nor more than ten years.

Section 6. Whoever, having been convicted of murder, robbery, burglary or assault with intent to commit a felony, thereafter violates any of the provisions of this Act, shall be guilty of a felony, and upon conviction shall be imprisoned in the State Penitentiary, at hard labor, for not less than three nor more than ten years. *Penalty for committing felony.*

Approved by the Governor: July 7, 1932.

A true copy:

E. A. CONWAY,
Secretary of State.

---

## ACT No. 81.

House Bill No. 67.                    By Mr. Stich.

### AN ACT

To provide for the payment to any Judge of the Civil District Court for the Parish of Orleans of two-thirds pay, when he shall retire from active service as a member of said Court as authorized by the provisions of Section 8 of Article VII of the Constitution of 1921, and to require the City of New Orleans to budget and appropriate such sums as may be necessary to comply with the provisions of this Act.

Section 1. Be it enacted by the Legislature of Louisiana, That whenever any Judge of the Civil District Court for the Parish of Orleans shall retire from active service as a member of said Court, as authorized by the provisions of Section 8 of Article VII of the Constitution of 1921, said *Pay for retired Judges of Civil District Court for the Parish of Orleans.*

substance or matter of any kind which is injurious to person or property, or is nauseous, sickening, irritating or offensive to any of the senses.

(2) It shall be unlawful to manufacture or prepare, or to possess any liquid, gaseous, or solid substance or matter of any kind which is injurious to person or property, or is nauseous, sickening, irritating or offensive, to any of the senses with intent to throw, drop, pour, deposit, release, discharge or expose the same in, upon or about any theater, restaurant, place of business, place of amusement, or any other place of public assemblage.

(3) Penalty.  Any person violating any of the provisions Penalty. hereof shall be punished by imprisonment in the county jail for not less than three months and not more than one year, or by a fine of not less than five hundred dollars and not more than two thousand dollars, or by both such fine and imprisonment.

(4) Any person who, in violating any of the provisions of Use of subdivision (1) of this section, wilfully employs or uses any gases, etc. liquid, gaseous or solid substance which may produce serious illness or permanent injury through being vaporized or otherwise disbursed in the air or who, in violating any of the provisions of subdivision (1) of this section, wilfully employs or uses any tear gas, mustard gas or any of the combinations or compounds thereof, or wilfully employs or uses acid or explosives, shall be guilty of a felony and shall be punished by Penalty. imprisonment in the State prison for not less than one year and not more than five years.

---

# CHAPTER 450.

*An act to amend sections 1, 2, 3, 6, and 7 of an act entitled* Stats. 1927, *"An act regulating the sale, offering for sale, possession or* p. 938, *transportation of machine rifles, machine guns and sub-* amended. *machine guns, and providing a penalty for the violation thereof," approved May 16, 1927.*

[Approved by the Governor May 20, 1933.  In effect August 21, 1933.]

*The people of the State of California do enact as follows:*

SECTION 1.  Section 3 of the act cited in the title hereof is Stats. 1931, hereby amended to read as follows:                             p. 2203.

Sec. 3.  It shall be lawful for the Superintendent of the Permits re Division of Criminal Identification and Investigation of the machine Department of Penology to issue permits for the possession guns. and transportation or possession or transportation of such machine guns, upon a showing satisfactory to him that good cause exists for the issuance thereof to the applicant for such permit; provided, that no permit shall be issued to a person who is under twenty-one years of age.

Stats. 1931,
p. 2203.

SEC. 2.   Section 1 of said act is hereby amended to read as follows:

Possession
or sale of
machine
guns.

Section 1.   On and after the date upon which this act takes effect every person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun, except as herein prescribed, is guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the State Prison not to exceed five years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment.

Exceptions.

Provided, however, that nothing in this act contained shall prohibit the sale to, purchase by, or possession of such firearms by police departments and members thereof, sheriffs, and city marshals, or the military or naval forces of this State or of the United States for use in the discharge of their official duties.

Stats. 1927,
p. 938.

SEC. 3.   Section 2 of said act is hereby amended to read as follows:

Machine
gun defined.

Sec. 2.   The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

Stats. 1931,
p. 2203.

SEC. 4.   Section 6 of said act is hereby amended to read as follows:

Revocation
of permits.

Sec. 6.   Permits issued in accordance with this act may be revoked by the issuing authority at any time when it shall appear that the need for such firearms has ceased or that the holder of the permit has used such firearms for purposes other than those allowed by the permit or that the holder of the permit has not exercised great care in retaining custody of any weapons possessed under the permit.

Stats. 1931,
p. 2203.

SEC. 5.   Section 7 of said act is hereby amended to read as follows:

Licenses
to sell.

Sec. 7.   The Superintendent of the Division of Criminal Identification and Investigation of the Deartment of Penology may also grant licenses in a form to be prescribed by him effective for not more than one year from the date of issuance, to permit the sale at the place specified in the license of such firearm subject to all of the following conditions, upon breach of any of which the license shall be revoked:

Conditions.

1. Such business shall be carried on only in the place designated in the license.

2. Such license or a certified copy thereof must be displayed on the premises in a place where it may easily be read.

3. No such firearm shall be delivered to any person not authorized to receive the same under the provisions of this act.

4. A complete record must be kept of sales made under the authority of the license, showing the name and address of the purchaser, the descriptions and serial numbers of the weapons purchased, the number and date of issue of the purchaser's permit, if any, and the signature of the purchaser or purchasing agent. This record shall be open to the inspection of any peace officer or other person designated by the Superintendent of the Bureau of Criminal Identification and Investigation.

---

## CHAPTER 451.

*An act to amend section 4041.11 of the Political Code, relating to powers and duties of boards of supervisors.*

[Approved by the Governor May 20, 1933. In effect August 21, 1933.]

*The people of the State of California do enact as follows:*

SECTION 1. Section 4041.11 of the Political Code is hereby amended to read as follows: <span style="float:right">Stats. 1929, p. 1450.</span>

4041.11. (1) Under such limitations and restrictions as Pounds, are prescribed by law, and in addition to jurisdiction and etc. powers otherwise conferred, the boards of supervisors, in their respective counties, shall have the jurisdiction and powers to maintain, regulate and govern public pounds, fix the limits within which animals shall not run at large, and appoint poundkeepers, who shall be paid out of the fines imposed and collected from the owners of impounded animals, and from no other source.

(2) To provide for the prevention of injuries to sheep by Protection dogs, and to tax dogs and direct the application of the tax. of sheep.

(3) To provide for the destruction of gophers, squirrels, Pests. other wild animals, noxious weeds, plant diseases, and insects injurious to fruit or fruit trees, or vines, or vegetable or plant life.

(4) To provide by ordinances, not in conflict with the general laws of the State, for the protection of fish and game, and may shorten the season for taking or killing of fish and game, within the dates fixed by the general State laws, but shall not lengthen the same. <span style="float:right">Protection of fish and game.</span>

corrected thereby, and shall be certified by the proper officers of the municipality as to authorization and by an engineer or surveyor as to correctness, and the signatures of such persons shall be acknowledged in like manner as a deed.

Such plat or plats when so certified and acknowledged may be filed in the office of the register of deeds and the declaration thereon may be recorded at length in a "Book of Plat Certificates"; and when so filed and recorded such plat or plats and declaration together with the record thereof shall be prima facie evidence in all matters shown or stated therein as to the lands covered thereby.

This act shall not apply to a city whose charter provides for .official supervision of plats by municipal officers, commission or board.

Approved April 10, 1933.

---

CHAPTER 189—H. F. No. 166

*An act to amend Mason's Minnesota Statutes of 1927, Section 7456, relating to renewal of corporate existence.*

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Publication of notices of renewal of corporate existence.**—That Mason's Minnesota Statutes of 1927, Section 7456, be amended so as to read as follows:

. "7456. No such resolution shall take effect until a duly certified copy thereof shall have been filed, recorded, and published in the same manner as its original certificate. *Provided, that in the case of a co-operative association, it shall not be necessary to publish said resolution.*"

Approved April 10, 1933.

---

CHAPTER 190—H. F. No. 189

*An act making it unlawful to use, own, possess, sell, control or transport a "machine gun", as hereinafter defined, and providing a penalty for the violation thereof.*

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Definitions.**—(a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of this Act.

(b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accomodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun within the provisions of this Act.

(c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

Sec. 2. **Application.**—This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted of or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not useable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers and showing a particular description of such machine gun now owned or possessed by them or shall make such report as to hereinafter acquired machine guns within 10 days of the acquisition thereof; nor to any person legally summoned to assist in making arrests or preserving peace, while said person so summoned is engaged in assisting such officer; nor shall this Act apply to the armed forces of the United States or of the State of Minnesota.

Sec. 3. **Machine guns prohibited.**—Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

Approved April 10, 1933.

---

CHAPTER 191—S. F. No. 336

*An act to amend Mason's Minnesota Statutes of 1927, Section 646 relating to claims against counties.*

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Claims against county—appeal.**—That Mason's Minnesota Statutes of 1927, Section 646, be amended to read as follows:

"646. When any claim against a county is disallowed by the board in whole or in part, a claimant may appeal from its decisions to the district court by causing a written notice of such appeal to be filed in the office of the auditor within fifteen days after *written notice mailed to said claimant by the county auditor showing the disallowance of said claim* and giving security for costs, to be approved by the auditor, who shall forthwith notify the county attorney thereof. When any claim against a county shall be allowed in whole or in part by such board, no order shall be issued in payment of the same or any part thereof until after fifteen days from date of the decision; and the county attorney may, on behalf and in the name of such county, appeal from such decision to the district court, by causing a written notice of such appeal to be filed in the office of the auditor within fifteen days after date of the decision appealed from; or any seven taxpayers of the county may in their own names appeal from such decision, to the district court by causing a written notice of appeal stating the grounds thereof to be filed in the office of the auditor within fifteen days after the date of the decision appealed from, and giving to the claimant security for his costs and disbursements to be approved by a judge of the district court; and thereafter no order shall be issued in payment of any such claim until a certified copy of the judgment of the court shall be filed in the office of the auditor. Upon the filing of such notice of appeal, the court shall acquire jurisdiction of the parties and of the subject matter, and may compel a return to be made as in the case of an appeal from a judgment of a justice of the peace.

Approved April 10, 1933.

Passed March 30, 1933.

Approved April 6, 1933.

GEORGE WHITE,
*Governor.*

The sectional number herein is in conformity to the General Code.
JOHN W. BRICKER,
*Attorney General.*

Filed in the office of the Secretary of State at Columbus, Ohio, on the 10th day of April, A. D. 1933.
GEORGE S. MYERS,
*Secretary of State.*

File No. 63.

———

(House Bill No. 166)

## AN ACT

To supplement section 12819 of the General Code by the enactment of supplemental sections 12819-3, 12819-4, 12819-5, 12819-6 and 12819-7, relative to the sale and possession of machine guns.

*Be it enacted by the General Assembly of the State of Ohio:*

SECTION 1. That section 12819 of the General Code be supplemented by the enactment of sections 12819-3, 12819-4, 12819-5, 12819-6 and 12819-7, to read as follows:

### Definitions.

Sec. 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots.

### Machine gun permit; application; bond of applicant; exceptions.

Sec. 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the discretion of the

adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and the custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty. Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section.

**Penalty for possession, transportation, etc., without permit.**

Sec. 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years.

**Requirements for sale, etc.; penalty for violation.**

Sec. 12819-6. Whoever sells, barters or gives to another a machine gun, light machine gun or sub-machine gun, shall first require exhibition of the permit provided by section 12819-4 of the General Code, and shall use the information contained in such permit to make a complete record of such transaction, containing the date of the permit and of the transfer together with the names of the parties thereto, which record shall be preserved by such transferor for a period of five years. Whoever violates this section shall, upon conviction, be imprisoned in the penitentiary not less than one or more than five years. This section shall not apply to the barter or sale of machine guns, light machine guns or sub-machine guns to those not required by section 12819-4 of the General Code to procure such permit.

**War trophies excepted.**

Sec. 12819-7. This act shall not apply to captured war trophies

If the witness is summoned to attend and testify in the criminal prosecution in this state he shall be tendered the sum of ten cents a mile for each mile by the ordinary traveled route to and from the court where the prosecution is pending and five dollars for each day that he is required to travel and attend as a witness. A witness who has appeared in accordance with the provisions of the summons shall not be required to remain within this state a longer period of time than the period mentioned in the certificate.

Section 3. EXEMPTION FROM ARREST AND SERVICE OF PROCESS. If a person comes into this state in obedience to a summons directing him to attend and testify in a criminal prosecution in this state he shall not while in this state pursuant to such summons be subject to arrest or the service of process, civil or criminal, in connection with matters which arose before his entrance into this state under the summons.

If a person passes through this state while going to another state in obedience to a summons to attend and testify in a criminal prosecution in that state or while returning therefrom, he shall not while so passing through this state be subject to arrest or the service of process, civil or criminal, in connection with matters which arose before his entrance into this state under the summons.

Section 4. UNIFORMITY OF INTERPRETATION. This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of the states which enact it.

Section 5. SHORT TITLE. This act may be cited as "Uniform Act to Secure the Attendance of Witnesses from Without the State in Criminal Cases."

Section 6. REPEAL. Chapter 158 of the Session Laws of South Dakota of 1923 is hereby repealed.

Approved February 28, 1933.

---

## CHAPTER 206

### (S. B. 165)

#### ENACTING UNIFORM MACHINE GUN ACT

AN ACT Entitled, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto.

*Be It Enacted by the Legislature of the State of South Dakota:*

Section 1. DEFINITIONS. "Machine Gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device.

"Crime of Violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily

harm, robbery, burglary, housebreaking, breaking and entering, and larceny.

"Person" applies to and includes firm, partnership, association or corporation.

Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

Section 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

Section 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose:

(a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(b) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(c) when the machine gun is of the kind described in Section 8 and has not been registered as in said section required; or

(d) when empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

Section 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

Section 6. EXCEPTIONS. Nothing contained in this act shall prohibit or interfere with

1. the manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose;

2. the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake;

3. the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or large caliber, for a purpose manifestly not aggressive or offensive.

Section 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of

the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, for not exceeding six months or by both such fine and imprisonment.

Section 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of State, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

Section 9. Warrant to search an house or place and seize any machine gun adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the State's Attorney, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the state or a political subdivision thereof.

Section 10. If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

Section 11. UNIFORMITY OF INTERPRETATION. This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

Section 12. SHORT TITLE. This act may be cited as the Uniform Machine Gun Act.

Section 13. REPEAL. All acts or parts of acts which are in conflict with or inconsistent with the provisions of this act are hereby repealed.

Approved February 28, 1933.

the said Rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

[NOTE.—H. B. No. 45 passed the House by a vote of 109 yeas, 0 nays; passed the Senate by a vote of 29 yeas, 0 nays.]

Approved October 25, 1933.
Effective October 25, 1933.

———

## ANTI-MACHINE GUN LAW.

H. B. No. 64.]          CHAPTER 82.

An Act defining "machine gun" and "person"; making it an offense to possess or use machine guns; making it an offense to sell, lease, barter, give, exchange, trade or cause to be sold, leased, given, bartered, exchanged or traded a machine gun to any person; providing penalty for possessing machine gun; providing penalty for selling, leasing, bartering, giving, exchanging, trading or causing to be sold, leased, given, bartered, exchanged or traded a machine gun to any person; providing exceptions where machine guns are sold to the military forces or peace officers of the United States or any political subdivision thereof, and the transportation thereof; providing exceptions when the possession of machine guns for scientific purposes or possession of machine guns not usable as a weapon and possessed as a curiosity, ornament or keepsake, and possession of machine guns by officials or employees of the State Prison System; providing exceptions where machine guns are sold, leased, bartered, exchanged or given the Adjutant General of the State of Texas, the Sheriff of any county, the Chief of Police of a municipality, the purchasing agent for the Texas State Prison System; the military forces or peace officers of the United States, and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device.

"Person" applies to and includes firm, partnership, association or corporation.

SEC. 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two (2) nor more than ten (10) years.

SEC. 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than ten (10) years.

SEC. 4. Nothing contained in Section 2 of this Act shall prohibit or interfere with:

App. 61

1. The possession of machine guns by the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose.

2. The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake

3. The possession of machine guns by officials and employees of the Texas State Prison System.

SEC. 5. Nothing contained in this Act shall prohibit or interfere with the sale, lease, barter, exchange or gift of a machine gun as defined in this Act, or the transportation required for such purpose to the Adjutant General of the State of Texas, the duly qualified and commissioned Sheriff of a county in Texas, to a duly qualified and commissioned Chief of Police of any municipality within the State of Texas, the duly authorized purchasing agent for the Texas State Prison System, the military forces or peace officers of the United States.

SEC. 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

[NOTE.—H. B. No. 64 passed the House by a vote of 121 yeas, 0 nays; passed the Senate by a vote of 30 yeas, 0 nays.]

Approved October 25, 1933.
Effective October 25, 1933.

---

## SALARIES OF COMMISSIONERS IN CERTAIN COUNTIES.

H. B. No. 88.]          CHAPTER 83.

An Act amending Article 2350, Chapter 44 of the Revised Civil Statutes of the State of Texas, 1925, as amended by Act of the Thirty-ninth Legislature, Regular Session, Chapter 135, Section 1; and as amended by Act of the Fortieth Legislature, Page 435, Chapter 490, Section 1; and as amended by Act of the Fortieth Legislature, First Called Session, Page 138, Chapter 46, Section 1; and as amended by House Bill Number 555, Chapter 216, Page 727, Acts of the Forty-third Legislature, Regular Session, relating to the salaries of County Commissioners in certain Counties; providing that if any part of this Act be declared unconstitutional it shall not affect any remaining part, and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. That Article 2350, Chapter 44 of the Revised Civil Statutes of the State of Texas, 1925, as amended by Act

(801) **No. 731.**

## AN ACT Regulating the Use and Possession of Machine Guns

**Section 1. "Machine Gun" Defined.**—Be it enacted by the General Assembly of the State of South Carolina: For the purpose of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

**§ 2. Transportation of Machine Gun.**—It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent, or employe of any of them, or any other person acting in their behalf knowingly to ship or to transport from one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun.

**§ 3. Storing, Keeping, and/or Possessing Machine Gun.** —It shall be unlawful for any person to store, keep possess, or have in possession, or permit another to store, keep possess, or have in possession except as hereinafter provided, any firearm of the type defined above or commonly known as a machine gun.

**§ 4. Selling, Renting or Giving away Machine Gun.**— It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.

**§ 5. Exceptions—Register Machine Guns.**—The provisions of this Act shall not apply to the army, navy, or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, *Provided, further,* That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any

State prison, penitentiary, workhouse, county jail, city jail, or other institution for the detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or person authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not usable. Within thirty days after the passage of this Act every person permitted by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file in the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicant's name, residence and business address, description including sex, race, age, weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make of the machine gun which he possesses or desires to possess. Thereupon, the Secretary of State shall file such application in his office, registering such applicant together with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, and issue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registration shall be made on the date application is received and filed with the Secretary of State, and shall expire on December 31, of the year in which said license is issued.

§ 6. **Penalty.**—Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

§ 7. This Act shall go into effect immediately upon its approval by the Governor.

Approved the 2nd day of March, 1934.

CHAP. 95.—An ACT to empower the councils of cities and towns to release the liability and liens for interest, penalties and accrued costs, or any part thereof, on unpaid taxes due such cities and towns for any year or years to and including 1933, provided such taxes are paid within one hundred and twenty days after this act is in force.                                   [H B 48]

Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, That the councils of cities and towns are hereby empowered to release all persons, firms, associations and corporations from all liability, for interest, penalties and accrued costs on any taxes due such respective cities and towns for any year or years prior to and including the year nineteen hundred and thirty-three, that are unpaid at the time the ordinance relieving same goes into effect, provided such unpaid taxes are paid such cities or towns within one hundred and twenty days after the date this act shall be in force.

2. That nothing in this act contained shall empower any such council to release any liability for interest, penalties and accrued costs, or any part thereof, on such unpaid taxes as are not paid within the one hundred and twenty days aforesaid.

3. By reason of the necessity of immediately granting said councils power to grant taxpayers the above relief, an emergency is declared to exist, and this act shall be in force from its passage.

---

CHAP. 96.—An ACT to define the term "machine gun"; to declare the use and possession of a machine gun, for certain purposes, a crime and to prescribe the punishment therefor; to require manufacturers, dealers and other persons, with certain exemptions, in possession thereof, to register all machine guns with the Secretary of the Commonwealth; to keep records of and report transfers and sales to the said Secretary; to allow inspection of records and of machine guns by peace officers; to provide for seizures and search warrants; to prescribe rules of evidence and presumptions; to provide penalties, and to repeal all inconsistent acts.                           [S B 110]

Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, as follows: Section 1. Where used in this act:

(a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading.

(b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault with intent to maim,

disable, disfigure or kill, robbery, burglary, housebreaking, breaking and entering, and larceny.

(c) "Person" applies to and includes firm, partnership, association or corporation.

Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term of not less than twenty years.

Section 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

Section 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose:

(a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(b) When in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or

(d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

Section 5. The presence of a machine gun in any room, boat, or vehicle shall be *prima facie* evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

Section 6. Nothing contained in this act shall prohibit or interfere with

First. The manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose. This act shall not apply to machine guns and automatic arms issued to the National Guard of Virginia by the United States or such arms used by the United States Army or Navy or in the hands of troops of the National Guards of other States or Territories of the United States passing through Virginia, or such arms as may be provided for the officers of the State Police or officers of penal institutions.

Second. The possession of a machine gun for scientific purposes, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake;

Third. The possession of a machine gun other than one adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber, for a purpose manifestly not aggressive or offensive.

Section 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer or dealer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not less than one hundred dollars nor more than one thousand dollars.

Section 8. Every machine gun now in this State adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber shall be registered in the office of the Secretary of the Commonwealth on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within twenty-four hours after its acquisition. Blanks for registration shall be prepared by the Secretary of the Commonwealth, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The Secretary of the Commonwealth shall immediately upon registration required in this section furnish the registrant with a certificate of registration, which shall be kept by the registrant and produced by him upon demand by any peace officer. Failure to keep or produce such certificate for inspection shall be a misdemeanor and punishable by a fine of not less than five nor more than one thousand dollars, and any peace officer may, without warrant, seize the machine gun and apply for its confiscation as provided in section nine of this act. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

Section 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber possessed in violation of this act may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the Commonwealth's attorney, a police officer or conservator of the peace, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the State or a political subdivision thereof.

Section 10. If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given

effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

Section 11. This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

Section 12. This act may be cited as the Uniform Machine Gun Act.

Section 13. All acts or parts of acts which are inconsistent with the provisions of this act are hereby repealed.

---

CHAP. 97.—An ACT to make effective the Constitutional provision to the effect that the General Assembly shall establish and maintain an efficient system of public free schools throughout the State, and to repeal all acts and parts of acts inconsistent with this act. [S B 153]

Approved March 7, 1934

Whereas, section one hundred and twenty-nine of the Constitution of Virginia provides that "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State," now, therefore,

1. Be it enacted by the General Assembly of Virginia, as follows:

Section 1. The school board of each and every school division in the State is hereby empowered and required to maintain the public free schools of such division for a period of at least eight months or one hundred and sixty teaching days in each school year. In order that each school division may have the funds necessary to enable the school board to maintain the elementary and high schools thereof for such minimum terms, it is hereby provided that when any county, city or town has legally complied with the existing laws with reference to local school levies, such school division or divisions shall be allotted out of the public school funds held in the treasury of the State for each group of twenty-five to forty pupils in average daily attendance, a sum equal to the amount to be derived by dividing said public school fund by the number of groups of twenty-five to forty pupils in average daily attendance in the State, depending upon the density of population, to be apportioned by the State Board of Education, as provided in section one hundred and thirty-five of the Constitution and in conformity with the provisions of the Code and of the Acts of the Assembly under such rules and regulations as may be set up by said State Board of Education.

Section 2. That in addition the counties and cities shall provide, from local school taxes, as provided in section one hundred and thirty-six of the Constitution of Virginia, for the supplementing of their instructional programs such amounts as will insure the services of properly prepared and effective teaching personnel, and to the degree that financial ability and community interest in education will permit; provided further, that the counties and cities shall provide, in keeping with the laws already existing, such funds as may be necessary for debt service, capital outlay, transportation, general operation and maintenance.