# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs-Appellees*,

v.

XAVIER BECERRA,

*Defendant-Appellant*.

**On Appeal from the United States District Court
for the Southern District of California**
No. 17-cv-1017-BEN-JLB
The Honorable Roger T. Benitez, Judge

## PETITION FOR REHEARING EN BANC

XAVIER BECERRA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
SAMUEL P. SIEGEL
HELEN H. HONG
*Deputy Solicitors General*
MARK R. BECKINGTON
*Supervising Deputy Attorney General*
JOHN D. ECHEVERRIA
*Deputy Attorney General*

CALIFORNIA DEPARTMENT OF JUSTICE
1300 I Street
Sacramento, CA 95814
(916) 210-6260
Sam.Siegel@doj.ca.gov

August 28, 2020

# TABLE OF CONTENTS

**Page**

Introduction and Rule 35 statement .............................................................. 1

Statement ...................................................................................................... 3

    A.    California's LCM restriction ..................................................... 3

    B.    Procedural history .................................................................... 5

Reasons for granting rehearing en banc ...................................................... 6

    I.    The panel's conclusion that California's LCM law substantially burdens core Second Amendment rights creates an intra- and inter-circuit conflict ........................................................................ 6

    II.    The panel's intermediate scrutiny analysis creates an intra- and inter-circuit conflict .................................................................... 11

    III.    This case presents a question of exceptional importance ............ 17

Conclusion ................................................................................................. 19

# TABLE OF AUTHORITIES

**Page**

C̲ASES

*Association of New Jersey Rifle & Pistol Clubs, Inc. v.*
    *Attorney General of New Jersey*
    910 F.3d 106 (3d Cir. 2018) ........................................................*passim*

*Atonio v. Wards Cove Packing Co.*
    810 F.2d 1477 (9th Cir. 1987) .............................................................16

*Bauer v. Becerra*
    858 F.3d 1216 (9th Cir. 2017) .............................................................15

*District of Columbia v. Heller*
    554 U.S. 570 (2008).........................................................1, 2, 7, 17

*District of Columbia v. Heller*
    670 F.3d 1244 (D.C. Cir. 2011)....................................................*passim*

*Duncan v. Becerra*
    742 F. App'x 218 (9th Cir. 2018) .........................................................5

*Friedman v. City of Highland Park*
    784 F.3d 406 (7th Cir. 2015) .........................................................8, 11

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015) ......................................................*passim*

*Jackson v. City and County of San Francisco*
    746 F.3d 953 (9th Cir. 2014) ...........................................14, 15, 16, 17

*Kanter v. Barr*
    919 F.3d 437 (7th Cir. 2019) .............................................................15

*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017) ......................................................*passim*

*Lair v. Bullock*
    798 F.3d 736 (9th Cir. 2015) .............................................................10

*Mai v. United States*
  952 F.3d 1106 (9th Cir. 2020) ....................................................15, 16

*New York State Rifle & Pistol Ass'n v. Cuomo*
  804 F.3d 242 (2d Cir. 2015) ........................................................*passim*

*Pena v. Lindley*
  898 F.3d 969 (9th Cir. 2018) ..............................................14, 15, 16

*Peruta v. County of San Diego*
  824 F.3d 919 (9th Cir. 2016) ........................................................3, 15

*Silvester v. Harris*
  843 F.3d 816 (9th Cir. 2016) ........................................................3, 16

*Tyler v. Hillsdale County Sheriff's Department*
  837 F.3d 678 (6th Cir. 2016) ..............................................................15

*United States v. Chovan*
  735 F.3d 1127 (9th Cir. 2013) ...........................................................16

*United States v. McGinnis*
  956 F.3d 747 (5th Cir. 2020) ..............................................................15

*United States v. Reese*
  627 F.3d 792 (10th Cir. 2010) ...........................................................15

*Wiese v. Becerra*
  263 F. Supp. 3d 986 (E.D. Cal. 2017) ................................................4

*Worman v. Healey*
  922 F.3d 26 (1st Cir. 2019)........................................................*passim*

**STATUTES**

California Penal Code

  § 16590...................................................................................................3
  § 16740...................................................................................................4

§ 16740(a) ................................................................................5
§§ 30210-33690 ......................................................................3
§ 30352 ...................................................................................3
§ 30370 ...................................................................................3
§ 32310 ................................................................................3, 5
§ 32310(c) ............................................................................4, 5
§ 32310(d) ..............................................................................5

COURT RULES

Federal Rules of Appellate Procedure

Rule 35(b)(1)(A) ....................................................................1
Rule 35(b)(1)(B) ....................................................................2

## INTRODUCTION AND RULE 35 STATEMENT

California respectfully petitions for rehearing en banc of the panel's decision, which invalidates a state law restricting large-capacity magazines that can hold more than 10 rounds of ammunition (LCMs). California voters adopted the current LCM law in response to a spate of mass shootings in this State and across the Nation, and in light of evidence establishing the severe toll inflicted by mass shootings involving LCMs. A divided panel of this Court, however, held that this law is among the policy choices that the Second Amendment takes "off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

The panel's decision squarely conflicts with this Court's decision in *Fyock v. Sunnyvale*, 779 F.3d 991, 994 (9th Cir. 2015), which affirmed the denial of a preliminary injunction with respect to a materially identical LCM restriction on a comparable record. *See* Fed. R. App. P. 35(b)(1)(A). Whereas *Fyock* applied intermediate scrutiny after concluding that the challenged law did "not severe[ly]" burden the "core Second Amendment right," 779 F.3d at 999, the panel here applied strict scrutiny after concluding that California's LCM law imposes a "substantial" burden on the core right "to defend hearth and home," Opn. 31. The panel then reasoned, in the alternative, that California's LCM law would fail intermediate scrutiny. Opn. 58-66. That portion of the panel's decision creates further intra-circuit conflicts by breaking from the established standard governing

1

intermediate scrutiny and by rejecting *Fyock*'s application of that standard to a comparable law.

As the dissenting judge recognized, the panel's decision also creates a conflict with "every other Circuit to address the Second Amendment issue presented here." Opn. 67 (Lynn, J., dissenting); *see* Fed. R. App. P. 35(b)(1)(B). Indeed, five other circuits have considered a Second Amendment challenge to a similar or identical LCM restriction, held that the law is subject to intermediate scrutiny, and then rejected the challenge on the ground that there was a substantial relationship between the LCM restriction and important public safety interests.

This case involves a question of exceptional importance, affecting the safety of every Californian. *See* Fed. R. App. P. 35(b)(1)(B). All agree that the Second Amendment protects a fundamental right, Opn. 9, and California has adopted tailored regulations that accommodate the exercise of that right while also protecting public safety, *see Heller*, 554 U.S. at 636 (States retain a "variety of tools" to combat "the problem of handgun violence"). California enacted its current LCM law to mitigate the devastation caused by mass shootings. The record confirms that the law advances that interest while also preserving gun owners' ability to defend themselves. The Second Amendment allows this type of regulation—and the consequences of invalidating it could be devastating.

This Court should grant rehearing en banc both to secure uniformity of its decisions and to ensure that California and other States retain the ability to adopt reasonable regulations addressing the deadly threat posed by LCMs. The Court should also order supplemental briefing to allow the parties to address these important issues in the light of the panel decision and in a manner that would be most helpful to the en banc panel.

## STATEMENT

### A. California's LCM Restriction

To protect both individual rights and public safety, California has adopted a "multifaceted statutory scheme regulating firearms." *Peruta v. Cty. of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (en banc). California generally allows law-abiding adults to possess and carry firearms in their homes, places of business, and in certain other places and for certain purposes, including when necessary to protect persons or property from immediate and grave danger. *Id.* at 925-926. Californians who pass a background check may acquire as many approved firearms as they want, *see Silvester v. Harris*, 843 F.3d 816, 823-825 (9th Cir. 2016), and as much ammunition as they want, *see* Cal. Penal Code §§ 30352, 30370.

But California restricts certain especially lethal weapons. *See* Cal. Penal Code §§ 16590, 30210-33690. The restriction challenged here bars the manufacture, acquisition, purchase, sale, or possession of LCMs, *id.* § 32310,

defined as ammunition-feeding devices with the capacity of accepting more than 10 rounds, *id.* § 16740.[1]  Magazines holding 10 rounds or less remain "widely available" in California and are "compatible with most, if not all, semiautomatic firearms," including handguns.  ER 256.

California's original LCM law built on a 1994 federal statute (which expired in 2004) prohibiting the sale or acquisition of magazines with more than 10 rounds. *Fyock*, 779 F.3d at 994.  In 2000, California adopted its own restriction on the manufacture, importation, and sale of LCMs.  Opn. 10.  Over the next decade, California added certain other LCM restrictions.  Opn. 10-11.  But those provisions did not bar individuals from possessing LCMs acquired before 2000, Opn. 11, and police could not readily distinguish between magazines that were lawfully "grandfathered" and those that were prohibited, *see Wiese v. Becerra*, 263 F. Supp. 3d 986, 993 (E.D. Cal. 2017).

California voters addressed that issue in 2016 by passing Proposition 63, Opn. 11, which closed "loopholes that le[ft] communities throughout the state vulnerable to gun violence and mass shootings," ER 1200.  Among those reforms, Proposition 63 made it unlawful to possess an LCM after July 2017.  Cal. Penal

---

[1] The law provides several exceptions, including for certain law enforcement officials.  *See* Opn. 11 n.2.

Code § 32310(c). It also required individuals with LCMs to dispose of them in specified ways. *Id.* § 32310(d); *see also id.* § 16740(a).

## B. Procedural History

After the voters passed Proposition 63, plaintiffs filed this lawsuit challenging California's LCM law in its entirety. *See* ER 1943-1965. Two days before the new provisions were set to take effect, the district court granted a preliminary injunction regarding the possession ban. Opn. 13. A divided panel of this Court affirmed in an unpublished decision. *Duncan v. Becerra*, 742 F. App'x 218, 221– 22 (9th Cir. 2018).[2] The district court subsequently granted summary judgment to the plaintiffs, holding that Section 32310 was invalid and permanently enjoining the entire provision. Opn. 14.[3]

A divided panel of this Court affirmed. *See* Opn. 9-66. The majority applied this Court's "two-prong" framework governing Second Amendment challenges. Opn. 18. At the first step, it concluded that California's LCM law "burden[ed] conduct protected by the Second Amendment." *Id.* At the second step, it held that the LCM law must be assessed under strict scrutiny because it "substantially

---

[2] In response to an order directing the parties to address whether the matter should be reheard en banc, California explained that en banc review was not warranted at that time because a forthcoming decision on a motion for summary judgment could moot the appeal of the preliminary injunction. C.A. No. 17-56081, Dkt. 104.

[3] The district court also held that certain provisions of Section 32310 violated the Takings Clause. Opn. 14.

burdens core Second Amendment rights" by "categorically bar[ring] the possession of magazines that are commonly used in handguns." Opn. 33. It then concluded that the law did not survive either strict scrutiny, Opn. 56-58, or (in the alternative) intermediate scrutiny, Opn. 58-66.

Chief Judge Lynn, sitting by designation, dissented. Opn. 67-81. She observed that the "majority opinion conflicts with this Circuit's precedent in *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), and with decisions in every other Circuit to address the Second Amendment issue presented here." Opn. 67. She "assume[d]" California's LCM law "implicates conduct protected by the Second Amendment," but disagreed with the majority about the appropriate level of scrutiny and its application. *Id.* She would have upheld the law under intermediate scrutiny because it does not substantially burden core Second Amendment rights, and because it is substantially related to California's important public safety interests. Opn. 69-81.

## REASONS FOR GRANTING REHEARING EN BANC

## I. THE PANEL'S CONCLUSION THAT CALIFORNIA'S LCM LAW SUBSTANTIALLY BURDENS CORE SECOND AMENDMENT RIGHTS CREATES AN INTRA- AND INTER-CIRCUIT CONFLICT

The panel held that California's LCM law is subject to strict scrutiny because it substantially burdens the "core right of law-abiding citizens to defend hearth and home." Opn. 31. That holding squarely conflicts with this Court's precedent and

is at odds with out-of-circuit authority. In *Fyock*, this Court held that an LCM regime materially identical to the one challenged here did "not severe[ly]" burden the "core Second Amendment right." 779 F.3d at 999. The Court reasoned that a ban on the possession of LCMs is "simply not as sweeping as the complete handgun ban at issue in *Heller*," and does not "affect the ability of law-abiding citizens to possess the 'quintessential self-defense weapon'—the handgun." *Id.* (quoting *Heller*, 554 U.S. at 629). Nor does it "restrict the possession of magazines in general such that it would render any lawfully possessed firearms inoperable" or "restrict the number of magazines that an individual may possess." *Id.* Instead, such a law prohibits "possession of only a subset of magazines that are over a certain capacity." *Id.*

California's LCM regime mirrors the ordinance considered in *Fyock* in each of those respects. And *Fyock* accords with the decisions of five other federal circuits that have held that similar or identical LCM restrictions did not "substantial[ly] burden" core Second Amendments right because they did "not effectively disarm individuals or substantially affect their ability to defend themselves." *District of Columbia v. Heller*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) (*Heller II*); *see also Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 118 (3d Cir. 2018) (*ANJRPC*); *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (en banc);

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) (*NYSRPA*).[4]

The panel decision also conflicts with the reasoning of *Fyock* and the out-of-circuit authorities. *Fyock* held that Sunnyvale's LCM ordinance limited possession of "only a subset of magazines that are over a certain capacity." 779 F.3d at 999; *cf. ANJRPC*, 910 F.3d at 117 (New Jersey's LCM law "does not categorically ban a class of firearms"); *Worman*, 922 F.3d at 32 n.2 (similar); *NYSRPA*, 804 F.3d at 260 (similar). But the panel here concluded that California's LCM law "bans an entire class of arms." Opn. 41 (quotation marks omitted). And *Worman* held that Massachusetts's LCM restriction did not "circumscribe in any way" the right or ability to use a handgun to defend the home, because the record before it gave "no indication" that LCMs "have commonly been used for" that purpose. 922 F.3d at 37, 40; *see also ANJRPC*, 910 F.3d at 118 ("The record here demonstrates that LCMs are not well-suited for self-defense."). In contrast, the panel here concluded that LCMs are "commonly used for self-defense," Opn. 41, apparently because magazines with a capacity of more than 10 rounds sometimes "come standard in Glocks, Berettas, and other handguns that are staples of self-defense," Opn. 9. But

---

[4] While the Seventh Circuit did not apply the substantial burden test, it upheld an LCM ordinance in part because it left "residents with many self-defense options." *Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015).

the record shows that those handguns—and nearly all others—remain available for self-defense, because magazines holding 10 rounds or fewer are "widely available in the state and compatible with most, if not all, semiautomatic firearms."  ER 256; *cf. ANJRPC*, 910 F.3d at 118 & n.20 (New Jersey's LCM restriction "has no impact on the many other firearm options that individuals have to defend themselves in their home").[5]

Although the panel attempted to distinguish *Fyock*, Opn. 53-55, the proffered distinctions "rest on a flimsy firmament," Opn. 73 (Lynn, J., dissenting).  The panel reasoned that "*Fyock* does not hold that as a matter of law intermediate scrutiny applies" because it reviewed "a preliminary injunction denial" under the abuse of discretion standard.  Opn. 53-54.  But *Fyock* necessarily reviewed the "underlying legal principles de novo."  779 F.3d at 995; *see* Opn. 75 (Lynn, J., dissenting).  The Court's substantial burden inquiry turned on whether the challenged LCM ordinance "le[ft] open alternative channels for self-defense," *Fyock*, 779 F.3d at 999, and the circumstances considered by the Court in

---

[5] The panel repeatedly asserted that California's law would ban "half of all magazines in America."  Opn. 9; *see* Opn. 12, 22, 40, 41 n.15, 42, 45, 50, 66.  That figure appears to be drawn from the report of plaintiffs' expert, who cautioned that it was "an estimation based on extrapolation from indirect sources and" could not "be confirmed as unequivocally accurate."  ER 1700.  And that figure says little about what proportion of Americans or gun-owning Americans possess LCMs—or the extent to which LCMs are used for self-defense.

answering that question are materially identical to the circumstances presented here, *see id.*[6] The panel also sought to distinguish *Fyock* on the ground that the opinion in that case was only "eight pages" and involved an "affluent" city with a lower "violent crime rate" than California as a whole. Opn. 54. None of those considerations justifies departing from this Court's "normal[]" rule that one three-judge panel is "bound by the decisions of prior three-judge panels." *Lair v. Bullock*, 798 F.3d 736, 745 (9th Cir. 2015).

The panel's attempt to distinguish the out-of-circuit authority (Opn. 52-53) is equally unpersuasive. Most of those courts considered LCM restrictions just as "sweeping" as California's. Opn. 52. All but one of those laws banned both the "possession of LCMs" and their "sale." Opn. 52; *see Heller II*, 670 F.3d at 1249; *Worman*, 922 F.3d at 31; *NYSRPA*, 804 F.3d at 249, 251; *ANJRPC*, 910 F.3d at 110. Only two mention a "grandfather" clause. Opn. 52; *see Worman*, 922 F.3d at 31; *NYSPRA*, 804 F.3d at 251 n.19. In any event, nothing in those decisions

---

[6] Although Sunnyvale's LCM ban contained an exemption if a firearm "could not function with a lower capacity magazine," *Fyock*, 779 F.3d at 999, the record here confirms that "most, if not all, semiautomatic firearms" can operate with magazines of 10 rounds or less, ER 256.

suggests that the "allegedly distinguishing features" noted by the panel "made a critical difference to the courts' analyses." Opn. 73 (Lynn, J., dissenting).[7]

Nor are the out-of-circuit authorities "unsound" because some involved challenges to laws regulating "*both* LCMs *and* assault weapons." Opn. 53. Each decision recognized that the law at issue regulated both assault weapons and LCMs, and presumably the courts took that feature into account in holding that the LCM restrictions did not "heavily burden the core right of self-defense in the home." *Worman*, 922 F.3d at 37; *see also Heller II*, 670 F.3d at 1262; *NYSRPA*, 804 F.3d at 260; *Kolbe*, 840 F.3d at 138; *Friedman*, 784 F.3d at 411; Opn. 74 (Lynn, J., dissenting). If anything, the fact that five other federal circuits have concluded that restrictions on assault weapons and LCMs considered together do not substantially burden the core Second Amendment right supports the view that LCM restrictions do not substantially burden that right by themselves.

## II. THE PANEL'S INTERMEDIATE SCRUTINY ANALYSIS CREATES AN INTRA- AND INTER-CIRCUIT CONFLICT

1. Although the panel held that California's LCM law failed strict scrutiny, it reasoned in the alternative that the law would fail intermediate scrutiny. Opn. 58. That conclusion warrants en banc review in its own right, because it conflicts with

---

[7] The panel also never explained why the possession restrictions render the separate prohibitions on the manufacture, importation, or purchase of LCMs unconstitutional.

*Fyock* and is inconsistent with every other federal appellate decision applying intermediate scrutiny to a similar statute. *See Fyock*, 779 F.3d at 1000-1001; *Heller II*, 670 F.3d at 1264; *Worman*, 922 F.3d at 40; *NYSRPA*, 804 F.3d at 264; *ANJRPC*, 910 F.3d at 122; *Kolbe*, 849 F.3d at 140. Each of those decisions required the government to introduce evidence showing that the LCM law advanced a "substantial and important" government interest, *e.g.*, *Fyock*, 779 F.3d at 1000, and to establish a substantial relationship between that interest and the LCM restriction, *see, e.g.*, *Heller II*, 670 F.3d at 1262-1264. Each decision properly concluded that the law in question survived intermediate scrutiny in light of the compelling public safety interests at stake.

The panel's contrary conclusion cannot be reconciled with those decisions. As in *Fyock*, California presented evidence in this case demonstrating that the "use of large-capacity magazines results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries." *Fyock*, 779 F.3d at 1000; *see, e.g.*, ER 357, 405, 756-757. California also presented evidence that LCMs are "disproportionately used in mass shootings as well as crimes against law enforcement" and that a "reduction in the number of large-capacity magazines in circulation may decrease the use of such magazines in gun crimes." *Fyock*, 779 F.3d at 1000; *see, e.g.*, ER 358, 405, 418, 756. This Court previously held that this was "precisely the type of evidence" that the government may "rely upon to

substantiate its interest," and was sufficient to establish a reasonable fit between an LCM possession ban and the substantial government interest in public safety. *Fyock*, 779 F.3d at 1001.

Here again, *Fyock* comports with decisions from the First, Second, Third, Fourth, and D.C. Circuits. *Worman*, 922 F.3d at 38-40; *NYSRPA*, 804 F.3d at 261-264; *ANJRPC*, 910 F.3d at 119-124; *Kolbe*, 849 F.3d at 139-141; *Heller II*, 670 F.3d at 1262-1264. Those courts held that the challenged LCM restriction withstood intermediate scrutiny, reasoning that "ample evidence" confirms the "unique dangers posed by" LCMs; that imposing restrictions "will help curtail outbreaks of mass violence"; and that the "fit between the asserted governmental interests and the means chosen to advance them is close enough to pass intermediate scrutiny," because the restrictions remove especially lethal magazines from circulation without limiting the number of firearms or magazines, or the amount of ammunition, that a person may lawfully possess. *Worman*, 922 F.3d at 39; *see, e.g.*, *NYSRPA*, 804 F.3d at 263; *Heller II*, 670 F.3d at 1264. Those conclusions were based on evidentiary records that are "nearly identical" to the one in this case, involving "many of the same experts and studies." Opn. 80-81 (Lynn, J., dissenting).

The panel's conclusion that the "fit" between California's LCM law and the public safety interests it addresses is "excessive and sloppy" (Opn. 63) relies on

contentions that other courts have rejected.  The Third Circuit dismissed the claim

that mass shootings involving LCMs are too infrequent to support LCM

restrictions, *see* Opn. 65, because it "downplays the significant increase in the

frequency and lethality of these incidents."  *ANJRPC*, 910 F.3d at 121.  The First

Circuit rejected the criticism that LCM prohibitions deprive law-abiding citizens of

effective tools for self-defense, *see* Opn. 64, as "too facile by half," because it

gives "unduly short shrift to the legislature's prerogative to weigh the evidence,

choose among conflicting inferences, and make necessary policy judgments."

*Worman*, 922 F.3d at 40 (citation, quotation marks, and alternation omitted).  And

the Fourth Circuit dismissed concerns about the prospect of imperfect compliance,

*see* Opn. 65, reasoning that LCM restrictions would still "curtail" the availability

of those magazines to "criminals and lessen their use in mass shootings, other

crimes, and firearms accidents."  *Kolbe*, 849 F.3d at 139, 140.

2.  En banc review is also warranted because the panel's decision will create

confusion about how courts should apply intermediate scrutiny in future Second

Amendment cases.  Until the panel's decision, the standard in this Circuit has been

clear:  the intermediate scrutiny test asks whether the government's interest is

"significant, substantial, or important," and, if so, whether there is a "'reasonable

fit' between the challenged law and the asserted objective."  *Pena v. Lindley*, 898

F.3d 969, 979 (9th Cir. 2018) (quoting *Jackson v. City and Cty. of San Francisco*,

746 F.3d 953, 965 (9th Cir. 2014)). The government need not show that a regulation is the "least restrictive means" of achieving its interest; only that the interest would be "achieved less effectively absent the regulation." *Id.*

This Court has routinely applied that test when analyzing various firearms restrictions. *See, e.g.*, *Jackson*, 746 F.3d at 965-966 (storage requirements); *Mai v. United States*, 952 F.3d 1106, 1120 (9th Cir. 2020) (prohibited persons); *Bauer v. Becerra*, 858 F.3d 1216, 1223-1224 (9th Cir. 2017) (fees).[8] Every federal court of appeals to apply intermediate scrutiny in this context has adopted a similar test.[9]

The panel's analysis here, however, imposed an "unnecessarily rigid burden of proof," effectively requiring that the LCM law be the "least restrictive means" of preventing "all mass shootings." Opn. 74, 79 (Lynn, J., dissenting); *see also id.* at 79 ("[T]he Court should not improperly transform intermediate scrutiny into strict scrutiny."). The panel attempted to justify this break from precedent by characterizing the Court's jurisprudence as "inconsistent in its application" of

---

[8] Judge Graber's concurrence in *Peruta* applied the same test in the context of concealed carry restrictions, 824 F.3d at 945, and the majority of the en banc panel "agree[d]" with that analysis, *id.* at 942. This issue is also implicated in *Young v. Hawaii*, which the Court is currently considering en banc. *See* C.A. No. 12-17808, Dkt. 245, 36-42.

[9] *See also United States v. McGinnis*, 956 F.3d 747, 758 (5th Cir. 2020); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 693 (6th Cir. 2016) (en banc); *Kanter v. Barr*, 919 F.3d 437, 448 (7th Cir. 2019); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010).

intermediate scrutiny. Opn. 61. But the panel is simply wrong that *Silvester,*

*Fyock, Jackson*, and *Chovan* applied a more demanding standard than the one

applied in *Pena* and elsewhere. Opn. 61-62. Each of those cases conducted the

same inquiry into whether the challenged regulation is "'substantially related to the

important government interest of reducing firearm-related deaths and injuries.'"

*Silvester*, 843 F.3d at 827 (quoting *Jackson*, 843 F.3d at 966); *see also Fyock*, 779

F.3d at 1000; *United States v. Chovan*, 735 F.3d 1127, 1139-1141 (9th Cir. 2013).

This Court has repeatedly recognized that, in conducting that inquiry, forecasts

about the practical effects of a law are not susceptible to proof with "scientific

precision," *Mai*, 952 F.3d at 1118, and the Court's proper role in the face of

"policy disagreements" or "conflicting" evidence is limited to ensuring that the

State has "select[ed] among reasonable alternatives," *Pena*, 898 F.3d at 980

(citation and quotation marks omitted).

And even if there were any conflict among the Court's prior decisions, it is

not a three-judge panel's prerogative to pick and choose which decisions "get it

right." Opn. 62. Rather, the panel should have "call[e]d for en banc review,"

which is the "appropriate mechanism for resolving" such a conflict. *Atonio v.*

*Wards Cove Packing Co.*, 810 F.2d 1477, 1478-79 (9th Cir. 1987) (en banc); *see*

*also* Opn. 79 n.10 (Lynn, J., dissenting).

## III. THIS CASE PRESENTS A QUESTION OF EXCEPTIONAL IMPORTANCE

This case also presents a question of exceptional importance. California recognizes and protects the "right to armed self-defense." Opn. 9. Except for certain traditionally prohibited persons, Californians may possess as many approved firearms, magazines, and rounds of ammunition as they want. *See supra* p. 3. But California also has a profound interest in protecting the safety of everyone in the State. As the panel acknowledged, California "has latitude" to "enact[] laws to curb the scourge of gun violence," Opn. 9, and it must be afforded "reasonable opportunit[ies] to experiment with solutions to admittedly serious problems," *Jackson*, 746 F.3d at 966 (citation and quotation marks omitted).

California's LCM law is a reasonable regulation that is consistent with the Second Amendment. It does not render handguns (or other firearms) "inoperable," *Heller*, 554 U.S. at 628, as a legal or practical matter, *see* ER 256. Nor does it make it "impossible for citizens to use [handguns] for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630. Indeed, the 10-round limit is well above the average number of shots fired (2.2) when a gun is used for self-defense. *See* ER 287.

What California's LCM law does do is protect the safety of the public and law enforcement officers, at a time when mass shootings are occurring with disturbing frequency. Although not all mass shootings involve LCMs, *see* Opn.

50, those committed with LCMs are far deadlier—inflicting an average of *nearly three-and-a-half times as many casualties* as those that do not, *see* ER 756-757. While no law can eliminate the possibility that assailants might "illegally smuggle[]" LCMs into California, Opn. 65, States that restrict LCMs have witnessed fewer mass shootings, fewer mass shootings featuring LCMs, and fewer deaths from mass shootings (on a per capita basis) than those that have not. ER 363-365, 388-389. And experience has demonstrated that LCMs are "disproportionately used" in "crimes against law enforcement." *Fyock*, 779 F.3d at 1000; *see also* ER 405.

The significance of this case thus extends beyond the fact that the panel's decision departs from this Court's precedent, creates an inter-circuit conflict, and would engender confusion in the law. The panel's decision to invalidate California's LCM law in its entirety could also have devastating practical effects throughout the State. The Court should grant rehearing en banc to eliminate the discord that the panel's decision would otherwise create.

## CONCLUSION

The petition for rehearing en banc should be granted.

Dated:  August 28, 2020          Respectfully submitted,

_s/ Samuel P. Siegel_

XAVIER BECERRA
_Attorney General of California_
MICHAEL J. MONGAN
_Solicitor General_
THOMAS S. PATTERSON
_Senior Assistant Attorney General_
SAMUEL P. SIEGEL
HELEN H. HONG
_Deputy Solicitors General_
MARK R. BECKINGTON
_Supervising Deputy Attorney General_
JOHN D. ECHEVERRIA
_Deputy Attorney General_

CALIFORNIA DEPARTMENT OF JUSTICE
1300 I Street
Sacramento, CA 95814
(916) 210-6260
Sam.Siegel@doj.ca.gov

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing or Answers

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** | 19-55376

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/answer to petition is (*select one*):

☉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: | 4,196 | .

*(Petitions and answers must not exceed 4,200 words)*

**OR**

☐ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/ Samuel P. Siegel | **Date** | August 28, 2020

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11** | *Rev. 12/01/2018*

# ADDENDUM

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VIRGINIA DUNCAN; RICHARD LEWIS; PATRICK LOVETTE; DAVID MARGUGLIO; CHRISTOPHER WADDELL; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation, *Plaintiffs-Appellees*, v. XAVIER BECERRA, in his official capacity as Attorney General of the State of California, *Defendant-Appellant.* | No. 19-55376 D.C. No. 3:17-cv-01017-BEN-JLB OPINION |

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted April 2, 2020
Pasadena, California

Filed August 14, 2020

2                         DUNCAN V. BECERRA

Before:  Consuelo M. Callahan and Kenneth K. Lee,
Circuit Judges, and Barbara M. G. Lynn,[*] District Judge.

Opinion by Judge Lee;
Dissent by Judge Lynn

## SUMMARY[**]

### Second Amendment

The panel affirmed the district court's summary judgment in favor of plaintiffs challenging California Government Code § 31310, which bans possession of large-capacity magazines ("LCMs") that hold more than ten rounds of ammunition; and held that the ban violated the Second Amendment.

The Ninth Circuit employs a two-prong inquiry to determine whether firearm regulations violate the Second Amendment: (1) whether the law burdens conduct protected by the Second Amendment; and (2) if so, what level of scrutiny to apply to the regulation.  *United states v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)

The panel held that under the first prong of the test, Cal. Penal Code § 32310 burdened protected conduct.  First, the panel held that firearm magazines are protected arms under

---

[*] The Honorable Barbara M. G. Lynn, United States Chief District Judge for the Northern District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the Second Amendment. Second, the panel held that LCMs are commonly owned and typically used for lawful purposes, and are not "unusual arms" that would fall outside the scope of the Second Amendment. Third, the panel held that LCM prohibitions are not longstanding regulations and do not enjoy a presumption of lawfulness. Fourth, the panel held that there was no persuasive historical evidence in the record showing LCM possession fell outside the ambit of Second Amendment protection.

Proceeding to prong two of the inquiry, the panel held that strict scrutiny was the appropriate standard to apply. First, the panel held that Cal. Penal Code § 32310 struck at the core right of law-abiding citizens to self-defend by banning LCM possession within the home. Second, the panel held that Section 32310's near-categorical ban of LCMs substantially burdened core Second Amendment rights. Third, the panel held that decisions in other circuits were distinguishable. Fourth, the panel held that this circuit's decision in *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), did not obligate the panel to apply intermediate scrutiny.

The panel held that Cal. Penal Code § 32310 did not survive strict scrutiny review. First, the panel held that the state interests advanced here were compelling: preventing and mitigating gun violence. Second, the panel held that Section 32310 was not narrowly tailored to achieve the compelling state interests it purported to serve because the state's chosen method – a statewide blanket ban on possession everywhere and for nearly everyone – was not the least restrictive means of achieving the compelling interests.

The panel held that even if intermediate scrutiny were to apply, Cal. Penal Code § 32310 would still fail. The panel

4                          DUNCAN V. BECERRA

held that while the interests expressed by the state qualified
as "important," the means chosen to advance those interests
were not substantially related to their service.

Chief District Judge Lynn dissented, and would reverse
the district court's grant of summary judgment. Judge Lynn
wrote that the majority opinion conflicted with this Circuit's
precedent in *Fyock*, and with decisions in all the six sister
Circuits that addressed the Second Amendment issue
presented here. Judge Lynn would hold that intermediate
scrutiny applies, and Cal. Penal Code § 32310 satisfies that
standard.

## COUNSEL

John D. Echeverria (argued), Deputy Attorney General; Mark R. Beckington, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, California, Los Angeles, California; for Defendant-Appellant.

Erin E. Murphy (argued), Paul D. Clement, Kasdin M. Mitchell, and William K. Lane III, Kirkland & Ellis LLP, Washington, D.C.; C.D. Michel, Sean A. Brady, and Anna M. Barvir, Michel & Associates P.C., Long Beach, California; for Plaintiffs-Appellees.

Scott D. Danzis, Thomas C. Villalon, Rafael Reyneri, and Nora Conneely, Covington & Burling LLP, Washington, D.C.; Jonathan E. Lowy and T. Tanya Schardt, Brady, Washington, D.C.; for Amicus Curiae Brady.

Jonathan K. Baum, Katten Muchin Rosenman LLP, Chicago, Illinois; Mark T. Ciani, Katten Muchin Rosenman LLP, New York, New York; for Amici Curiae California Chapter of the American College of Emergency Physicians; American Academy of Pediatrics, California; and California Academy of Family Physicians.

Karl A. Racine, Attorney General; Loren L. Alikhan, Solicitor General; Caroline S. Van Zile, Deputy Solicitor General; Sonya L. Lebsack, Assistant Attorney General; Office of the Solicitor General, Washington, D.C.; William Tong, Attorney General, Hartford, Connecticut; Clare E. Connors, Attorney General, Honolulu, Hawaii; Brian E. Frosh, Attorney General, Baltimore, Maryland; Burbir S. Grewal, Attorney General, Trenton, New Jersey; Letitia

James, Attorney General, New York, New York; Keith Ellison, Attorney General, St. Paul, Minnesota; Kathleen Jennings, Attorney General, Wilmington, Delaware; Kwame Raoul, Attorney General, Chicago, Illinois; Maura Healey, Attorney General, Boston, Massachusetts; Hector Balderas, Attorney General, Santa Fe, New Mexico; Dana Nessel, Attorney General, Lansing, Michigan; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Josh Shapiro, Attorney General, Harrisburg, Pennsylvania; Thomas J. Donovan Jr., Montpelier, Vermont; Robert W. Ferguson, Attorney General, Olympia, Washington; Peter F. Neronha, Attorney General, Providence, Rhode Island; Mark R. Herring, Attorney General, Richmond, Virginia; for Amici Curiae District of Columbia, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New Mexico, New York, Michigan, Minnesota, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington.

Dennis J. Herrera, City Attorney; Aileen McGrath, Co-Chief of Appellate Litigation; City Attorney's Office, San Francisco, California; for Amicus Curiae City and County of San Francisco.

Michael N. Feuer, City Attorney; James P. Clark, Kathleen Kenealy, Blithe Smith Bock, and Danielle L. Goldstein, Office of the City Attorney, Los Angeles, California; for Amicus Curiae City of Los Angeles.

Antonio J. Perez-Marques and Antonio M. Haynes, Davis Polk & Wardwell LLP, New York, New York; Eric Tirschwell, Mark Anthony Frassetto, and William J. Taylor Jr., Everytown Law, New York, New York; for Amicus Curaie Everytown for Gun Safety.

Scott A. Edelman, Gibson Dunn & Crutcher LLP, Los Angeles, California; Vivek R. Gopalan and Matthew C. Reagan, Gibson Dunn & Crutcher LLP, San Francisco, California; Kathryn M. Cherry, Gibson Dunn & Crutcher LLP, Dallas, Texas; Hannah Shearer and Hannah Friedman, Giffords Law Center to Prevent Gun Violence, San Francisco, California; for Amicus Curiae Giffords Law Center to Prevent Gun Violence.

James E. Hough, Jamie A. Levitt, and Cesar A. Francia, Morrison & Foerster LLP, New York, New York, for Amici Curiae Pride Fund to End Gun Violence, Equality California, and Gays Against Guns.

Nezida S. Davis, Bakari Law LLC, Decatur, Georgia; Stephen P. Halbrook, Fairfax, Virginia; for Amici Curiae National African American Gun Association Inc. and Pink Pistols.

John Parker Sweeney, James W. Porter III, Marc A. Nardone, and Candice L. Rucker, Bradley Arant Boult Cummings LLP, Washington, D.C., for Amicus Curiae National Rifle Association of America Inc.

Robert J. Olson, Jeremiah L. Morgan, William J. Olson, and Herbert W. Titus, William J. Olson P.C., Vienna, Virginia; Joseph W. Miller, Joseph Miller Law Offices LLC, Fairbanks, Alaska; Steven C. Bailey, Ramona, California; for Amici Curiae Gun Owners of America Inc., Gun Owners Foundation, Gun Owners of California, California Constitutional Rights Foundation, Virginia Citizens Defense League, Conservative Legal Defense and Education Fund, Policy Analysis Center, The Heller Foundation, and Restoring Liberty Action Committee.

Lawrence G. Keane and Benjamin F. Erwin, National
Shooting Sports Foundation Inc., Newtown, Connecticut;
Craig A. Livingston and Crystal L. Van Der Putten,
Livingston Law Firm P.C., Walnut Creek, California; for
Amicus Curiae National Shooting Sports Foundation Inc.

Dan M. Peterson, Dan M. Peterson PLLC, Fairfax, Virginia,
for Amici Curiae Law Enforcement Groups and State and
Local Firearms Rights Groups.

Joseph G.S. Greenlee, Firearms Policy Coalition,
Sacramento, California; George M. Lee, Seiler Epstein LLP,
San Francisco, California; for Amici Curiae William Wiese,
Jeremiah Morris, Lance Cowley, Sherman Macaston,
Clifford Flores, L.Q. Dang, Frank Federau, Alan Normandy,
Todd Nielsen, California Gun Rights Foundation, Firearms
Policy Coalition, Firearms Policy Foundation, Armed
Equality, San Diego County Gun Owners, Orange County
Gun Owners, Riverside County Gun Owners, California
County Gun Owners, and Second Amendment Foundation.

Donald E. J. Kilmer Jr., Law Offices of Donald E. J. Kilmer
Jr. APC, San Jose, California, for Amicus Curiae Madison
Society Inc.

John Cutonilli, Garrett Park, Maryland, as Amicus Curiae.

## OPINION

LEE, Circuit Judge:

In the wake of heart-wrenching and highly publicized mass shootings, the state of California barred its citizens from owning so-called "large capacity magazines" (LCMs) that hold more than ten rounds of ammunition. But even well-intentioned laws must pass constitutional muster. California's near-categorical ban of LCMs strikes at the core of the Second Amendment — the right to armed self-defense. Armed self-defense is a fundamental right rooted in tradition and the text of the Second Amendment. Indeed, from pre-colonial times to today's post-modern era, the right to defend hearth and home has remained paramount.

California's law imposes a substantial burden on this right to self-defense. The ban makes it criminal for Californians to own magazines that come standard in Glocks, Berettas, and other handguns that are staples of self-defense. Its scope is so sweeping that half of all magazines in America are now unlawful to own in California. Even law-abiding citizens, regardless of their training and track record, must alter or turn over to the state any LCMs that they may have legally owned for years — or face up to a year in jail.

The state of California has latitude in enacting laws to curb the scourge of gun violence, and has done so by imposing waiting periods and many other limitations. But the Second Amendment limits the state's ability to second-guess a citizen's choice of arms if it imposes a substantial burden on her right to self-defense. Many Californians may find solace in the security of a handgun equipped with an LCM: those who live in rural areas where the local sheriff may be miles away, law-abiding citizens trapped in high-

crime areas, communities that distrust or depend less on law enforcement, and many more who rely on their firearms to protect themselves and their families. California's almost-blanket ban on LCMs goes too far in substantially burdening the people's right to self-defense. We affirm the district court's summary judgment, and hold that California Penal Code section 32310's ban on LCMs runs afoul of the Second Amendment.

## BACKGROUND

### A. California Penal Code section 32310 prohibits the people from owning LCMs.

In 2016, California amended California Penal Code section 32310 to enact a wholesale ban on the possession of LCMs[1] by almost everyone, everywhere, in the state of California. *See* Cal. Penal Code § 32310(c) (2016) (criminalizing "any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired").

But section 32310 has not always been so broad. As originally enacted in 2000, it prohibited the manufacture, importation, and sale of LCMs. *See* Act of July 19, 1999, ch. 129, 1999 Cal Stat. §§ 3, 3.5 (codified as amended at Cal. Penal Code § 12020(a)(2) (2000)) (superseded by Deadly Weapons Recodification Act of 2010, ch. 711, 2010 Cal. Stat. § 6 (codified at Cal. Penal Code § 32310)); *see also* Cal. Penal Code § 16740 (defining what constitutes an LCM). In

---

[1] To retain symmetry with the parties' briefing and the statute under review, we employ the term "large capacity magazine" (LCM) to denote any firearm magazine capable of holding more than ten rounds of ammunition. But we note that this definition is purely a function of the statutory framework challenged here.

other words, California at first did not regulate the possession of LCMs.

Ten years later, California declared unlawfully possessed LCMs to be a nuisance subject to confiscation and destruction. *See* Cal. Penal Code § 18010(b); *see also* Deadly Weapons Recodification Act of 2010, ch. 711, 2010 Cal. Stat. § 6 (codified at Cal. Penal Code § 32390). And in 2013, California further extended the law to prohibit the purchase and receipt of LCMs. *See* 2013 Cal. Stat. 5299, § 1 (amending Cal. Penal Code § 32310(a)).

It may seem that after the 2013 amendments, California had completed the circle in regulating LCMs. By then, the state had long since foreclosed the transfer and sale of LCMs. As of 2013, it prohibited their purchase and receipt. But the law still allowed Californians who lawfully bought LCMs well before section 32310's enactment to keep them.

So, in 2016, the California legislature passed Senate Bill 1446 that prohibited possession of LCMs outright after July 1, 2017. *See* 2016 Cal. Stat. 1549, § 1. A few months later, California voters approved Proposition 63, which subsumed S.B. 1446 and strengthened its prohibitions by providing that possession may constitute a misdemeanor offense punishable by up to a year's worth of jail time. *See* Cal. Penal Code § 32310(c). The law as amended also requires citizens who own LCMs to remove the magazines from the state, sell them to a firearms dealer, or surrender them to law enforcement for destruction.[2] Under Penal Code

---

[2] The Penal Code provides several exceptions to § 32310, including those for active or retired law enforcement officers, *see* Cal. Penal Code §§ 32400, 32405, 32406, 32455, armored vehicle security forces, *see id.* § 32435, manufacture for government use, *see id.* § 32440, holders of

section 16740(a), LCM owners may permanently modify nonconforming magazines to accept ten rounds or fewer, thus removing those magazines from the definition of what constitutes an LCM.

## B. Large capacity magazines are prevalent in America.

Millions of Americans across the country own LCMs. One estimate based in part on government data shows that from 1990 to 2015, civilians possessed about 115 million LCMs out of a total of 230 million magazines in circulation. Put another way, half of all magazines in America hold more than ten rounds. Today, LCMs may be lawfully possessed in 41 states and under federal law.

Notably, LCMs are commonly used in many handguns, which the Supreme Court has recognized as the "quintessential self-defense weapon." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008). For example, several variants of the Glock pistol — dubbed "America's gun" due to its popularity[3] — come standard with a seventeen-round magazine. Almost all Glock models, except for subcompact variants designed for concealed carry, come standard with magazine capacities greater than ten rounds. Another popular handgun used for self-defense is the Beretta Model

---

special weapons permits for limited purposes, *see id.* § 32450, and use as props in film production, *see id.* § 32445.

[3] *See* Paul M. Barrett, Glock: The Rise of America's Gun (2012); *see also Proposals to Reduce Gun Violence: Protecting our Communities While Respecting the Second Amendment: Hearing Before the Subcomm. on the Constitution, Civil Rights & Human Rights of the S. Comm. on the Judiciary*, 113th Cong. 13-14 (2013) (statement of Laurence H. Tribe, Carl M. Loeb University Professor, Harvard Law School) (discussing the Glock).

92, which entered the market in 1976 and comes standard with a sixteen-round magazine. Indeed, many popular handguns commonly used for self-defense are typically sold with LCMs.[4]

## C. Procedural history.

Virginia Duncan and other plaintiffs, who lawfully acquired LCMs or represent those who do (collectively, the "Owners"), brought a constitutional challenge to California Penal Code section 32310. Two days before the possession ban was to take effect, the district court issued a preliminary injunction enjoining enforcement of the law. On appeal, this court affirmed. *See Duncan v. Becerra*, 742 F. App'x 218, 221–22 (9th Cir. 2018).

While the interlocutory appeal was pending, the Owners filed a motion for summary judgment. The district court issued an order granting the Owners' motion, concluding that section 32310 violates the Second Amendment and the Fifth Amendment's Takings Clause.

On the Second Amendment claim, the court rested its extensive decision on three independent holdings. First, it concluded that section 32310 did not satisfy the "simple *Heller* test," which queries whether the firearm or firearm component is commonly owned by law-abiding citizens for lawful purposes. Central to the court's analysis were separate reports by two expert witnesses, James Curcuruto and Stephen Helsley. The Curcuruto report concluded that

---

[4] For example, Smith & Wesson (S&W) M&P 9 M2.0 nine-millimeter magazines contain seventeen rounds, and other S&W variants have similar capacities. The Ruger SR9 has a 17-round standard magazine. The Ruger SR9 and SR40 carry between nine and 17 rounds. Springfield Arms XD non-subcompact pistols hold up to 19 rounds.

14             DUNCAN V. BECERRA

"[t]here are at least one hundred million magazines of a capacity of more than ten rounds in possession of American citizens, commonly used for various lawful purposes." The Helsley report echoed Curcuruto's findings, noting that after four decades of sales, "millions of semiautomatic pistols with a magazine capacity of more than ten rounds and likely multiple millions of magazines" are in circulation in the United States. The court thus found that "[m]illions of ammunition magazines able to hold more than 10 rounds are in common use by law-abiding responsible citizens for lawful uses like self-defense."

Second, the court held that section 32310 fails under strict scrutiny for lack of narrow tailoring. The court found section 32310's complete prohibition on possession by nearly everyone, everywhere, to be the hallmark of a sloppy fit. Finally, the district court held that, even though it believed intermediate scrutiny was decidedly "the wrong standard" to apply, section 32310 still fails under this more lenient standard because the statute was not a reasonable fit to the important public safety interests that it was enacted to serve. As for the Fifth Amendment claim, the court found that section 32310 effectuates an unconstitutional taking.

Based on these conclusions, the district court found no genuine dispute of material fact that section 32310 violates the Second and Fifth Amendments of the United States Constitution, and ordered summary judgment for the Owners. California timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review a district court's grant of summary judgment de novo. *See Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).

## ANALYSIS

The state of California[5] argues that the district court erred by granting summary judgment for the Owners. We disagree with the government's position, and we affirm. California Penal Code section 32310 severely burdens the core of the constitutional right of law-abiding citizens to keep and bear arms. The statute is a poor means to accomplish the state's interests and cannot survive strict scrutiny. But even if we applied intermediate scrutiny, the law would still fail.[6]

## I. The Second Amendment is a fundamental right rooted in both text and tradition.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 2008, the Supreme Court held that the Second Amendment protects "an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. The Court later incorporated the Second Amendment to the states through the Fourteenth Amendment's Due Process Clause. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). A citizen's right to self-defense, the Court held,

---

[5] This opinion will also use the terms "the state" or "the government" to refer to the Defendant-Appellant.

[6] We note that the district court's "simple *Heller* test" conflicts with our court's two-step inquiry framework for the Second Amendment. *See infra* at II.A. We are aware of the criticism that the two-step test "appears to be entirely made up" and that "its application has yielded analyses that are entirely inconsistent with *Heller*." *Rogers v. Grewal*, 590 U.S. ___ at 3 (June 15, 2020) (Thomas, J., dissenting from denial of certiorari). But we must follow this court's precedent.

is "deeply rooted in this Nation's history and tradition," and "fundamental to our scheme of ordered liberty." *Id*. at 767–78. And indeed, history, text, and tradition underscore that the right to armed self-defense is fundamental. As the *McDonald* decision noted, "many legal systems from ancient times to the present day" have recognized the right to defend oneself from aggressors. *Id*. at 767.

From 1639 to 1660, the British people endured a civil war — and the creation and dissolution of a Republic during the Interregnum — until the Stuart Monarchy Restoration. Starting in 1662, the Catholic Stuarts persecuted their political enemies, enacting laws that dispossessed all arms from those deemed "dangerous to the peace of the kingdom." 13 & 14 Car. II c. 3 (1662). In 1670, Charles II further restricted possession of "guns" to the exclusive benefit of the wealthy — the purpose being the "prevention of popular insurrections and resistance to the government, by disarming the bulk of the people." 22 Car. II c. 25 (1670); 2 William Blackstone, Commentaries *412. In the continuing tumult of the Protestant Reformation, James II and VII continued these policies by trying to disarm Protestants while allowing Catholics to maintain arms. Such despotism led to the King's ouster through the Glorious Revolution of 1688, and the enactment of the Declaration of Rights in 1689. Among these "true, ancient and indubitable rights" was the right of "[Protestants] [to] have Arms for their Defence suitable to their Condition, and as are allowed by Law." 1 W. & M., Sess. 2, c.2 (1689); s*ee also Heller*, 554 U.S. at 592–93.

In April 1775 and closer to home, a rag-tag group of private citizens, armed only with their personal firearms and makeshift weapons, fired the "shot heard round the world" in Concord, Massachusetts. Reminders of British efforts to confiscate personal firearms filled the Founders' minds

when drafting the Bill of Rights in 1789. During the
ratification of the Constitution, Antifederalists raised alarm
over a potentially despotic national government that could
disarm the people, as occurred under the Stuart Kings and
other British regimes. *See McDonald*, 561 U.S. at 768. In
response, the Federalists agreed to include a Bill of Rights,
which, of course, featured the right to bear arms. *See
McDonald*, 561 U.S. at 769.

In sum, self-defense "is a basic right, recognized by
many legal systems from ancient times to the present day,
and . . . individual self-defense is 'the central component' of
the Second Amendment right." *McDonald*, 561 U.S. at 767
(citing *Heller*, 544 U.S. at 599) (emphasis and internal
citation omitted). *Heller*'s holding ultimately led the Court
to invalidate a District of Columbia law that virtually banned
handgun possession in the home and further required all
other firearms to be "unloaded and disassembled or bound
by a trigger lock or similar device." 554 U.S. at 630, 635.
The Court found the "inherent right to self-defense" to be a
critical component of the Second Amendment and that the
virtual handgun ban was constitutionally infirm because the
handgun is the "quintessential self-defense weapon." *Id.*
at 628–29. The Court similarly found the disassembly or
trigger-lock requirement unconstitutional because it "makes
it impossible for citizens to use [arms] for the core lawful
purpose of self-defense." *Id.* at 630.

But the ruling in *Heller* was "not unlimited" and rejected
the idea that citizens may "keep and carry any weapon
whatsoever in any manner whatsoever and for whatever
purpose." *Id.* at 626. *Heller* thus recognized that certain
exceptions to the Second Amendment apply. For example,
weapons that are "dangerous and unusual" fall outside the
Second Amendment's protection. *Id.* at 627. Furthermore,

the Court cited an open-ended list of "presumptively lawful regulatory measures" that constitute acceptable "longstanding prohibitions" on firearm ownership. *Id.* at 626–27, 627 n.26. Such prohibitions include possession of firearms by felons and the mentally ill, prohibitions on carriage in sensitive locations, and conditions or qualifications on the commercial sale of firearms. *Id.*

## II. Under this court's precedent, California Penal Code section 32310 runs afoul of the Second Amendment.

Applying this court's precedent, we hold that strict scrutiny is the proper standard of constitutional review. California Penal Code section 32310 cannot withstand this level of scrutiny and is unconstitutional.

### A. The Ninth Circuit employs a two-prong test to determine whether firearm regulations violate the Second Amendment.

The Ninth Circuit assesses the constitutionality of firearm regulations under a two-prong test. This inquiry "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013) (internal citations omitted).

To determine whether the law burdens protected conduct, this court appears to ask four questions. First, as a threshold matter, we determine whether the law regulates "arms" for purposes of the Second Amendment. *See Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Second, we ask whether the law regulates an arm that is *both* dangerous *and* unusual. *See United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (citing *Heller*,

554 U.S. at 627). If the regulated arm is both dangerous and unusual, then the regulation does not burden protected conduct and the inquiry ends. Third, we assess whether the regulation is longstanding and thus presumptively lawful. *See Chovan*, 735 F.3d at 1137. And fourth, we inquire whether there is any persuasive historical evidence in the record showing that the regulation affects rights that fall outside the scope of the Second Amendment. *See Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). If either of these latter questions is found in the affirmative, the law does not burden protected conduct and the inquiry ends.

If a court finds that a regulation burdens protected conduct, then it must proceed to the second prong of analysis and determine the appropriate level of constitutional scrutiny. *See Chovan*, 735 F.3d at 1136. This, in turn, requires the court to ask two more questions. First, we ask how "close" the challenged law comes to the core right of law-abiding citizens to defend hearth and home. *See id.* at 1138. And second, we analyze whether the law imposes substantial burdens on the core right. *See id*. If a challenged law does not strike at the core Second Amendment right or substantially burden that right, then intermediate scrutiny applies. *See Silvester*, 843 F.3d at 821; *Jackson*, 746 F.3d at 961; *Chovan*, 735 F.3d at 1138. Only where both questions are answered in the affirmative will strict scrutiny apply. *See Silvester*, 843 F.3d at 821.

### B. Prong One: California Penal Code section 32310 burdens protected conduct.

With our course now charted, we apply the first prong of the Ninth Circuit's test to determine whether California Penal Code section 32310 burdens protected conduct. We hold that it does.

20                     DUNCAN V. BECERRA

      1.  Firearm magazines are protected arms under the
Second Amendment.

Firearm magazines are "arms" under the Second
Amendment. Magazines enjoy Second Amendment
protection for a simple reason: Without a magazine, many
weapons would be useless, including "quintessential" self-
defense weapons like the handgun. *See Heller*, 554 U.S.
at 629. We have opined that where firearms "are commonly
possessed by law-abiding citizens for lawful purposes," then
"there must be some corollary, albeit not unfettered, right to
possess the magazines necessary to render those firearms
operable." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998
(9th Cir. 2015). In *Jackson*, we held that ammunition is a
protected arm because "without bullets, the right to bear
arms would be meaningless." 746 F.3d at 967.

We are not alone in this assessment. Our colleagues in
the Third Circuit explicitly held that magazines are protected
arms. *See Ass'n of New Jersey Rifle and Pistol Clubs v.
Attorney Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018)
("*ANJRPC*"). This was so because "magazines feed
ammunition into certain guns, and ammunition is necessary
for such a gun to function as intended." *Id.* Put simply, a
regulation cannot permissibly ban a protected firearm's
components critical to its operation. *See Heller,* 554 U.S.
at 630 (holding that a regulation that "makes it impossible
for citizens to use [their firearms] for the core lawful purpose
of self defense" is unconstitutional).

      2.  LCMs are not unusual arms.

We next determine whether LCMs are arms that fall
outside the scope of the Second Amendment. *Heller*
provides that some arms are so dangerous and unusual that
they are not afforded Second Amendment protection. *See*

554 U.S. at 627. But not so for LCMs. The record before us amply shows that LCMs are commonly owned and typically used for lawful purposes, *i.e.*, not unusual.

The Second Amendment "guarantees the right to carry weapons 'typically possessed by law-abiding citizens for lawful purposes.'" *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1030 (2016) (Alito, J., concurring) (per curiam) (quoting *Heller*, 554 U.S. at 625). "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.* at 1031. In addressing "unusualness," the Supreme Court held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding*." *Id.* at 1030 (quoting *Heller*, 554 U.S. at 582). In other words, just because a weapon was not in existence during the founding era does not mean it is "unusual." And, where a "weapon belongs to a class of arms commonly used for lawful purposes," "the relative dangerousness of a weapon is irrelevant." *Id.* at 1031 (citing *Heller*, 554 U.S. at 627).

To determine whether an arm is unusual, courts look to an arm's commonality or whether it is typically possessed by law-abiding citizens for purposes of self-defense. *See, e.g.*, *Silvester*, 843 F.3d at 830 (Thomas, C.J., concurring) (finding that the "right to keep and bear arms is limited to 'the sorts of weapons' that are 'in common use'" (quoting *Heller*, 554 U.S. at 627–28)); *see ANJRPC*, 910 F.3d at 116 (holding that for the first prong inquiry, courts "consider whether the type of arm at issue is commonly owned" (citing *United States v. Marzzarella*, 614 F.3d 85, 90–91 (3d. Cir. 2010)).

Commonality is determined largely by statistics. But a pure statistical inquiry may hide as much as it reveals. In the Second Amendment context, protected arms may not be

22          Duncan v. Becerra

numerically common by virtue of an unchallenged, unconstitutional regulation. Our colleagues in the Third and Seventh Circuits agree. *See ANJRPC*, 910 F.3d at 116 n.15 (common use alone "is not dispositive" because of an unconstitutional regulation restricting the quantity of protected arms in circulation); *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity."). Thus, "[w]hile common use is an objective and largely statistical inquiry, typical possession requires us to look into both broad patterns of use and the subjective motives of gun owners." *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) ("*NYSRPA*") (internal alterations and quotation marks omitted).

As discussed earlier, nearly half of all magazines in the United States today hold more than ten rounds of ammunition. And the record shows that such magazines are overwhelmingly owned and used for lawful purposes. This is the antithesis of unusual.

That LCMs are commonly used today for lawful purposes ends the inquiry into unusualness. But the record before us goes beyond what is necessary under *Heller*: Firearms or magazines holding more than ten rounds have been in existence — and owned by American citizens — for centuries. Firearms with greater than ten round capacities existed even before our nation's founding, and the common use of LCMs for self-defense is apparent in our shared national history.

Semi-automatic and multi-shot firearms were not novel or unforeseen inventions to the Founders, as the first firearm

that could fire more than ten rounds without reloading was invented around 1580. Rapid fire guns, like the famous Puckle Gun, were patented as early as 1718 in London. Moreover, British soldiers were issued magazine-fed repeaters as early as 1658. As a predecessor to modern revolvers, the Pepperbox pistol design pre-dates the American Revolution by nearly one hundred years, with common variants carrying five to seven shots at the ready and with several European variants able to shoot 18 or 24 shots before reloading individual cylinders. Similarly, breech-loading, repeating rifles were conceptualized as early as 1791.

After the American Revolution, the record shows that new firearm designs proliferated throughout the states and few restrictions were enacted on firing capacities. The Girandoni air rifle, developed in 1779, had a 22-round capacity and was famously carried on the Lewis and Clark expedition. In 1821, the Jennings multi-shot flintlock rifle could fire 12 shots without reloading. Around the late antebellum period, one variant of the Belgian Mariette Repeating Pepperbox could fire 18 shots without reloading. Pepperbox pistols maintained popularity over smaller-capacity revolvers for decades, despite the latter being of newer vintage. At this time, revolving rifles were also developed like the Hall rifle that held 15 shots.

The advent of repeating, cartridge-fed firearms occurred at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66, which was a full-size lever-action rifle capable of carrying 17 rounds. The carbine variant was able to hold 12 rounds. Repeating rifles could fire 18 rounds in half as many seconds, and over 170,000 were sold domestically. The

Model 66 Winchester was succeeded by the Model 73 and Model 92, combined selling over 1.7 million total copies between 1873 and 1941.

The innovation of the self-contained cartridge along with stronger steel alloys also fostered development in handguns, making them smaller and increasing their capacities. Various revolver designs from France and Germany enabled up to 20 shots to be fired without reloading. A chain-fed variant, the French Guycot, allowed pistols to carry up to 32 shots and a rifle up to 100 shots. One American manufacturer experimented with a horizontally sliding "row of chambers" (an early stacked magazine) through a common frame, dubbed the Jarre "harmonica" pistol, holding ten rounds and patented in 1862. In 1896, Mauser developed what might be the first semi-automatic, recoil-operated pistol — the "Broomhandle" — with a detachable 20-round magazine. Luger's semiautomatic pistol hit the market in 1899 and came with seven or eight round magazines, although a 32-round drum magazine was widely available.

In 1935, Browning developed the 13-round Hi-Power pistol which quickly achieved mass-market success. Since then, new semi-automatic pistol designs have replaced the revolver as the common, quintessential, self-defense weapon. Many of these pistol models have increased magazine capacities as a result of double-stacked magazines. One of the most popular handguns in America today is the Glock 17, which comes standard with a magazine able to hold 17 bullets.

Rifle magazine development paralleled that of pistol magazines. In 1927, Auto Ordinance Company released its semi-automatic rifle with a 30-round magazine. A decade and a half later, the M-1 carbine was invented for the "citizen soldier" of WWII. The M-1 remained a common and popular

rifle for civilians after the war. In 1963, almost 250,000 M-1s, capable of holding between 15 and 30 rounds, were sold at steeply discounted prices to law-abiding citizens by the federal government. The ultimate successor to the M-1 was the M-16, with a civilian version dubbed the Armalite Model 15, or AR-15. The AR-15 entered the civilian market in 1963 with a standard 20-round magazine and remains today the "most popular rifle in American history." The AR-15 was central to a 1994 Supreme Court case in which the Court noted that semiautomatic rifles capable of firing "only one shot with each pull of the trigger" "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 602 n.1, 603, 612 (1994). By the early-1970s, the AR-15 had competition from other American rifle models, each sold with manufacturer-standard 20-round or greater magazines. By 1980, comparable European models with similar capacities entered the American market.

The point of our long march through the history of firearms is this: The record shows that firearms capable of holding more than ten rounds of ammunition have been available in the United States for well over two centuries.[7] While the Supreme Court has ruled that arms need not have been common during the founding era to receive protection under the Second Amendment, the historical prevalence of firearms capable of holding more than ten bullets underscores the heritage of LCMs in our country's history. *See Heller*, 554 U.S. at 582. Thus, we hold that LCMs are

---

[7] For a comprehensive discussion on the history of firearms and magazines, *see* Clayton E. Cramer and Joseph Edward Olson, *Pistols, Crime, and Public: Safety In Early America*, 44 Willamette L. Rev. 699 (2008); *see also* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015).

not "unusual" arms. And because LCMs are not "unusual," we need not opine on their dangerousness under our court's test.[8]

The state claims that LCMs fall outside the scope of the Second Amendment because they are "most useful in military service." But that claim misses its mark. The state relies on a Fourth Circuit case in which a sharply divided court held that LCMs are not arms protected by the Second Amendment because they are "most useful in military service." *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017). *Kolbe* remains an outlier, and other circuits have rejected its analysis. *See, e.g.*, *Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019) (rejecting the test); *NYSRPA*, 804 F.3d at 256 (finding the test to be "difficult to manage in practice"). We reaffirm the test announced by the Supreme Court in *Heller* and *Caetano*: Arms are not unusual if commonly owned and typically used by law-abiding citizens for lawful purposes.

---

[8] Dangerousness is a more difficult question because weapons are necessarily dangerous. The "very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous." *Heller*, 554 U.S. at 711 (Breyer, J., dissenting). While we do not opine on the dangerousness of LCMs, we note that statistics in the record show that criminal use of LCMs is relatively low compared to their market saturation. Despite nearly 115 million LCMs in circulation in America today, between 1982 and 2012 LCMs were used 31 times in an incident where four or more people were killed. Let us be perfectly clear: We do not cite these statistics to downplay the gravity of these tragic and heartbreaking events. Rather, they are necessary to discern the "broad patterns of use and subjective motives of gun owners" when assessing whether "typical possession" is for lawful purposes. *See New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015). Based on the statistics in the record, we conclude that LCMs are in fact both commonly owned and typically possessed for lawful purposes.

*See Caetano*, 136 S. Ct. at 1030 (Alito, J., concurring); *see also Heller*, 554 U.S. at 621–25.

> 3. LCM prohibitions are not longstanding regulations and do not enjoy a presumption of lawfulness.

Some firearm prohibitions are presumptively lawful because of their longstanding nature. *Heller* lists three types of permissible regulations that are presumptively consistent with the Second Amendment: prohibitions on possession by the mentally ill or felons, laws forbidding carriage in sensitive places, and laws that place qualifications on commercial sales of firearms. 554 U.S. at 626–27.[9] But because this list was held to be non-exhaustive by *Heller* and later affirmed in *McDonald*, 561 U.S. at 786, a court reviewing other types of laws must determine whether those laws are sufficiently longstanding regulations.

This, of course, raises the question of what constitutes a sufficiently longstanding regulation. In our circuit, we have looked for evidence showing whether the challenged law

---

[9] *Heller* did not clarify whether these "presumptively lawful" restrictions are rebuttable. *See* 554 U.S. at 626–27, 627 n.26. Our court has not directly addressed this issue. *See United States v. Phillips*, 827 F.3d 1171, 1176 n.5 (9th Cir. 2016) (noting that it "remains to be seen" whether someone can challenge a felon-in-possession charge if the felony predicate is "stealing a lollipop"). Several of our sister circuits, however, have held that a litigant may be able to raise an as-applied challenge to such laws. *See Binderup v. Attorney Gen. U.S.*, 836 F.3d 336, 343–44 (3d Cir. 2016) (en banc); *Schrader v. Holder*, 704 F.3d 980, 988–89 (D.C. Cir. 2013); *United States v. Moore*, 666 F.3d 313, 316 (4th Cir. 2012); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States v. Williams*, 616 F.3d 685, 691–92 (7th Cir. 2010); *see also United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) (hearing as-applied challenge to § 922(g)(1) but not mentioning *Heller*).

traces its lineage to founding-era or Reconstruction-era regulations. In *Chovan*, for example, we expressed strong doubts that bans on firearm possession for violent offenders were sufficiently longstanding because the first known restriction was not enacted until 1938. *See* 735 F.3d at 1137 (citing C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698, 708 (2008)). In *Jackson*, we reviewed regulations on handgun storage and sales of certain ammunition, keying our analysis to analogues in founding-era and Reconstruction-era fire safety laws. 746 F.3d at 962–63.

Section 32310 cannot be considered a longstanding regulation that enjoys presumptive legality. As noted above, when the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years. Only during Prohibition did a handful of state legislatures enact capacity restrictions.[10] As the Third Circuit in *ANJRPC* noted, "LCMs were not regulated until the 1920s, but most of those laws were invalidated by the 1970s." 910 F.3d at 117 n.18.

At the federal level, Congress chose to impose the strictest regulations on fully automatic machine guns with the National Firearms Act of 1934. *See* Pub. L. No. 73-474, 48 Stat. 1236. But despite its strong regulations, the law imposed no similar restrictions on magazine possession. Congress briefly prohibited LCMs with capacities greater than ten rounds when it enacted the Violent Crime Control

---

[10] These states included Michigan (1927, repealed in 1959), Rhode Island (1927, repealed in 1975), and Ohio (1933, repealed in 2014). It is important to note that the Rhode Island and Michigan statutes applied only to weapons rather than magazines, and the Ohio statute was interpreted to only forbid the *simultaneous* purchase of a firearm and compatible 18-round magazine.

and Law Enforcement Act of 1994. *See* Pub. L. No. 103-322, 108 Stat. 1796 (codified at 18 U.S.C. §§ 921(a)(31)(A), 922(w)(1) (expired 2004)). But even during the ten years between the federal ban's enactment and expiration, a grandfather clause allowed continued possession for previously purchased LCMs. *See id.* § 922(w)(2) (expired 2004). In fact, the *only* statute regulating LCMs that has been in continuous existence, and only since 1932, is found in the District of Columbia, which prohibits possession of a firearm that "shoots automatically or semi-automatically more than twelve shots without reloading." Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 650. Only recently, and in apparent conjunction with the 1994 federal experiment banning assault weapons, have a small smattering of states experimented with various LCM regulations.

In sum, laws restricting ammunition capacity emerged in 1927 and all but one have since been repealed. *Cf. Heller*, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law . . . that contradicts the overwhelming weight of other evidence regarding the [Second Amendment]."). Modern LCM restrictions are of an even younger vintage, only enacted within the last three decades. Thus, the LCM restrictions of section 32310 cannot be considered longstanding, and thus do not enjoy a presumption of lawfulness.[11]

---

[11] *See Ass'n of New Jersey Rifle and Pistol Clubs v. Attorney Gen. New Jersey*, 910 F.3d 106, 116, 117 n. 18 (3d Cir. 2018) ("While a lack of longstanding history does not mean that the regulation is unlawful, the lack of such a history deprives us of reliance on *Heller*'s presumption that such regulation is lawful."); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("*Heller II*") ("We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of

4.  There is no persuasive historical evidence in the record showing LCM possession falls outside the ambit of Second Amendment protection.

In a similar vein, courts may assess historical understandings to determine whether a challenged law is a permissible regulation. To do so, we must look for "persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Jackson*, 746 F.3d at 960; *see also Peruta v. Cty. of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc) (holding that carriage of concealed weapons outside the home was beyond the scope of the Second Amendment after engaging in a lengthy historical analysis spanning the late English medieval period through Supreme Court precedent in the late 1800s); *Chovan*, 735 F. 3d at 1137 (noting the lack of historical evidence that the Second Amendment did not apply to domestic violence misdemeanants).

The record before us provides no persuasive historical evidence showing that LCM possession is understood to fall outside the scope of the Second Amendment. As discussed above, the historical record shows that LCM restrictions are modern creations.

The Seventh Circuit in *Ezell v. City of Chicago* reached a similar conclusion. That case involved a municipal ordinance that required firing-range training as a prerequisite to gun ownership while prohibiting all firing ranges in the City of Chicago. 651 F.3d 684, 704–05 (7th Cir. 2011). The

---

validity."); *see also Chovan*, 735 F.3d at1137 (doubting whether a restriction was longstanding because similar restrictions were enacted starting in 1938).

*Ezell* court was presented with two laws from 1826 and 1831 that were relevant to its analysis. *Id.* at 706. These laws fell "far short of establishing that target practice is wholly outside the Second Amendment as it was understood when incorporated as a limitation on the States." *Id. Compare with Peruta*, 824 F.3d at 939 (noting an unbroken lineage of prohibitions on concealed carriage since 1541).

\* \* \*

As for prong one of our analysis, the record shows that LCMs are not subject to the exceptions announced in *Heller*. Magazines are protected arms, and larger capacity magazines are not unusual. LCMs have never been subject to longstanding prohibitions. And a historic analysis fails to persuade that LCMs otherwise fall outside constitutional protections. We hold that California Penal Code section 32310 burdens protected conduct and proceed to the second prong of the analysis.

## C. Prong Two: Strict scrutiny is the appropriate standard to apply.

Because California Penal Code section 32310 burdens protected conduct, we must now determine what standard of constitutional scrutiny applies. Section 32310 strikes at the core right of law-abiding citizens to defend hearth and home, and the burden imposed on the core right is substantial. As this court has held, where a burden on the core right is substantial, strict scrutiny is appropriate. *See Silvester*, 843 F.3d at 821.

1.  California Penal Code section 32310 strikes at
    the core right of law-abiding citizens to self-
    defend by banning LCM possession within the
    home.

*Heller* held that the "core" Second Amendment right is
for law-abiding citizens to defend hearth and home. 554 U.S.
at 635; *see also Kachalsky v. Cty. of Westchester*, 701 F.3d
81, 89 (2d Cir. 2012) ("Second Amendment guarantees are
at their zenith within the home."). This is a simple inquiry:
If a law regulating arms adversely affects a law-abiding
citizen's right of defense of hearth and home, that law strikes
at the core Second Amendment right. *See Jackson*, 746 F.3d
at 963 (finding that a challenged law "[o]n its face . . .
implicates the core because it applies to law-abiding citizens
and imposes restrictions on the use of handguns within the
home").

Section 32310 strikes at core Second Amendment rights.
By banning LCMs everywhere for nearly everyone, it
necessarily bans possession of LCMs within the home where
protections are "at their zenith." *Kachalsky*, 701 F.3d at 89.
We stated in *Fyock* that because Sunnyvale's LCM
ordinance "restricts the ability of law-abiding citizens to
possess large-capacity magazines within their homes for the
purpose of self-defense, . . . [the ordinance] may implicate
the core of the Second Amendment." 779 F.3d at 999. The
Second Circuit in *NYSRPA* was more explicit. That court
held that LCM restrictions "[b]y their terms . . . implicate the
core of the Second Amendment's protection by extending
into the home, 'where the need for defense of self, family
and property is most acute.'" 804 F.3d at 258 (citing *Heller*,
554 U.S. at 628). So too here.

2. California Penal Code section 32310
substantially burdens core Second Amendment
rights.

Section 32310 burdens core Second Amendment rights in a substantial way, requiring us to review it under strict scrutiny. The law categorically bars the possession of magazines that are commonly used in handguns, the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. And it bans LCM possession for nearly everyone, everywhere in California. Simply put, any law that comes close to categorically banning the possession of arms that are commonly used for self-defense imposes a substantial burden on the Second Amendment.

a. *Self-defense is a fundamental right rooted in our national history.*

While the political branches enjoy latitude to craft legislation to stamp out gun violence, their powers are not limitless if they encroach on an enumerated right enshrined in our Constitution. Moreover, the Second Amendment is more than just a right guaranteed in our Bill of Rights. As the Supreme Court has held, self-defense is a "fundamental" individual right that is "necessary to our system of ordered liberty." *See McDonald*, 561 U.S. at 778. It is also pre-existing. "This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." *United States v. Cruikshank*, 92 U.S. 542, 553 (1875). In short, the right of armed self-defense sits atop our constitutional order and remains rooted in our country's history. Any law that limits this right of self-defense must be evaluated under this constitutional and historical backdrop.

The seeds of the modern right to defend oneself germinated from fertile ground long ago. The English Bill of

Rights, considered the predecessor to our own, conferred an individual right to self-defense. *See Heller*, 554 U.S. at 593. "[T]he right secured in 1689 as a result of the Stuarts' abuses was by the time of the founding understood to be an individual right protecting against both public and private violence." *Id.* And "[b]y the time of the founding, the right to have arms had become fundamental for English subjects." *Id.*

American colonists similarly understood their rights to include the "'right of self-preservation' as permitting a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Id.* at 594–95 (citing 1 William Blackstone, Commentaries *145–146, n. 42). This belief was galvanized by George III's attempt to disarm the colonists just as the Stuarts attempted to disarm Protestants. *Id.* at 594.

Before our federal Bill of Rights was ratified, at least four states — Pennsylvania, Vermont, North Carolina, and Massachusetts — included within their state constitutions, or "Declaration of Rights," a guarantee to keep and bear arms. See *Heller*, 554 U.S. at 601, 595 n. 8. Shortly after the ratification of our Constitution, at least nine state constitutions "enshrined a right of citizens to 'bear arms in defense of themselves and the state' or 'bear arms in defense of himself and the state.'" *Id.* at 584–85, 585 n.8.

Perhaps the most poignant and persuasive reminder of the fundamental right to self-defense rests in the denial of that right to Black Americans during tragic chapters of our country's history. After the founding, Southern states often severely limited, or outright prohibited, firearm possession

by slaves, freedmen, and others.[12] The judicial branch, too, played a role in denying this fundamental right of self-defense to Blacks. In the infamous *Dred Scott v. Sanford* decision, Chief Justice Taney recited a parade of horribles if Black Americans were to be considered citizens: it would give Blacks the "right to enter every other State whenever they pleased," to exercise "full liberty of speech," to "hold public meetings upon political affairs," and "to keep and carry arms wherever they went." 60 U.S. 393, 417 (1857).

It did not get much better even after a bloody war that tore the country apart. Post-Civil War state legislation and the Black Codes in the South deprived newly freed slaves of their Second Amendment rights. *McDonald*, 561 U.S. at 771. Meanwhile, armed bands of ex-Confederates roamed the countryside forcibly disarming and terrorizing African-Americans. *See id.* at 772–73. The Radical Republicans in Congress fought back against these "systematic efforts . . . to disarm" Black Americans by enacting the Freedmen's Bureau Act of 1866 and the Civil Rights Acts of 1866, both of which guaranteed all persons the right of self-defense. *Id.* at 771–74.

But laws promising protection and equality for African-Americans rang hollow because, in the post-Reconstruction era, the Ku Klux Klan and other marauding bands of terrorists slaughtered thousands of unarmed Black Americans. *See generally* Allen W. Trelease, White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction

---

[12] *See, e.g.*, Act of Mar. 2, 1819, ch. 111, § 7, 1819 Va. Acts 423 (repealed); Act of Nov. 1, 1806, ch. 81, § 1, 1811 Md. Laws 297 (repealed); *State v. Newsom*, 27 N.C. 250, 207 (N.C. 1844) (quoting Act of Jan. 11, 1841, ch.30, 1840 N.C. Sess. Laws 61) (repealed); Act of Dec. 19, 1865, vol. 8, Ch. 13, No. 4731, 1865 S.C. Acts 250 (S.C. 1865) (repealed).

36          DUNCAN V. BECERRA

(1971); *see also* Robert J. Kaczorowski, *Federal Enforcement of Civil Rights During the First Reconstruction*, 23 Fordham Urb. L. J. 155, 156–57 (1995). Not surprisingly, Black Americans embraced their right to self-defense, understanding that protections offered by the state may be promising in theory but fatal in fact. Ida B. Wells — the crusading journalist who co-founded the NAACP — wrote that "a Winchester rifle should have a place of honor in every black home, and it should be used for that protection which the law refuses to give." Ida B. Wells, *Southern Horrors and Other Writings: The Anti-Lynching Campaign of Ida B. Wells, 1892–1900* 70 (Jacqueline Jones Royster ed., 1997). Martin Luther King, Jr., despite his non-violent approach to protest, owned numerous firearms and hired armed men to guard his house during the Montgomery Bus Boycott in 1956. *See* Annelieke Dirks, *Between Threat and Reality: The National Association for the Advancement of Colored People and the Emergence of Armed Self-Defense in Clarksdale and Natchez, Mississippi, 1960–1965*, 1 J. for the Study of Radicalism 71, 73 (2007). One civil rights activist who visited Dr. King's home during that time described the house as an "arsenal." *Id.*

Stories of other civil rights activists exercising their right to self-defense are legion. While the NAACP espoused nonviolence, many of its members carried firearms for self-protection, and for good reason. *See id.* at 71. Aaron Henry, then a branch president of the NAACP, would openly display his firearm after his house was firebombed in 1963. *See id.* When NAACP activist Hartman Turnbow tried to register to vote, nightriders lit his house on fire with Molotov cocktails. *See id.* at 72. Turnbow recounted that he grabbed his rifle, escaped the burning building, and exchanged gunfire with two white men waiting outside. *See id.* The men

fled once Turnbow started shooting back. *See id.* Ida B. Wells documented that "[o]f the many inhuman outrages of [that] year, the only case where the proposed lynching did *not* occur, was where the men armed themselves . . . and prevented it. The only times an Afro-American who was assaulted [and] got away has been when he had a gun and used it in self-defense." Ida B. Wells, *supra*.

During the crucible of the civil rights movement, Black American veterans from World War II and the Korean War founded the Deacons for Defense and Justice to protect Black people from racial violence at the hands of the Ku Klux Klan. *See generally* Lance Hill, The Deacons for Defense: Armed Resistance and the Civil Rights Movement (Univ. of N.C. Press ed., 2004). In 1966, the small Louisiana town of Bogalusa integrated the local junior high school to the ire of the local Klan. *See id.* at 1. Armed with guns, this roving band of racist terrorists arrived at the junior high school. *See id.* Their intentions were obvious: In that small town, two African-Americans, one of whom was a deputy sheriff, had been recently killed by white people. *See id.* But this time around, the Klan encountered something unexpected at the entrance of the school: The Deacons for Defense and Justice — armed with revolvers and rifles, and rooted in righteousness and resolution. Outgunned by the Deacons, the Klan fled. *See id.* As one member of the Deacons noted afterwards, "From that day forward, we didn't have too many more problems." *Id.* at 2.

These terrible events did not occur long ago in faraway lands. They occurred on American soil, some less than sixty years ago. And tragically, they are not unique. Indeed, Black Americans' experience throughout the civil rights movement was just the latest iteration in an ongoing struggle to defend hearth and home from those who wished them ill.

*See* Dirks, *supra*, at 72–73 ("This was part of a long-standing tradition of revolts, armed resistance, and self-defense that developed during slavery and continued after emancipation when Reconstruction failed to deliver political and social equality for Black Americans.").

Our country's history has shown that communities of color have a particularly compelling interest in exercising their Second Amendment rights. The Second Amendment provides one last line of defense for people of color when the state cannot — or will not — step in to protect them. This remains true today across all communities of color. For example, amid the COVID-19 pandemic, Asian-Americans have become the target of physical attacks by those who scapegoat them for the virus. *See* Sabrina Tavernise and Richard A. Oppel, Jr., *Spit On, Yelled At, Attacked: Chinese-Americans Fear for Their Safety*, N.Y. Times, Mar. 24, 2020, at A1. In response to these assaults and threats to their lives, Asian-Americans have begun arming themselves. *See id.* When one Asian mother was asked why she was buying a pistol, she replied in tears, "[t]o protect my daughter." *Id.* Another Asian immigrant purchasing an AR-15 rifle feared violence should COVID-19 deaths continue to mount: "And when all these bad things come, I am a minority. People can see my face is Chinese, clearly. My son, when he goes out, they will know his parents are Chinese." *Id.*

People of color are not alone in relying on the Second Amendment to protect themselves when the state's protections fail them. We need look no further than the facts of the Supreme Court's *Caetano* decision. Jaime Caetano had obtained multiple restraining orders against her abusive boyfriend after he had put her in the hospital. *See Caetano*, 136 S. Ct. at 1028–29 (Alito, J., concurring). Unfortunately, restraining orders meant little to her abuser. *See id.* He

continued to stalk and menace her. One day, he waited for her outside her workplace, but this time she came armed. *See id.* The abusive boyfriend "got scared and he left [her] alone." *Id.* Her story is not unique. For many women, a firearm may be the equalizer against their abusers and assailants when the state fails to protect them.[13]

So, too, for members of the lesbian, gay, bisexual, and transgender (LGBT) communities. They are "disproportionately the victims of hate crimes and other types of criminal violence" because they are "perceived . . . as safe targets for violence and hateful acts." Brief for Pink Pistols, et al. as Amici Curiae Supporting Plaintiffs-Appellees at 2. As amici Pink Pistols explain in their brief, armed self-defense can dispel those perceptions and deter such attacks against LGBT members. *See id.*

We mention these examples to drive home the point that the Second Amendment is not a second-class right. *See McDonald*, 561 U.S. at 780–81. Nor is self-defense a dispensation granted at the state's mercy. Rather, the Second Amendment is a fundamental constitutional right guaranteed to the people — especially those who may not be equally protected by the state. Moreover, the Second Amendment is not a relic relevant only during the era of Publius and parchments. It is a right that is exercised hundreds of times on any given day. The parties and amici disagree on the number of times that guns are used for defensive purposes, offering anywhere from 240,000 to 2.5 million times a year.

---

[13] *See McDonald v. City of Chicago*, 561 U.S. 742, 78–90, 790 n.33 (2010) (citing, among others, Brief for Pink Pistols as Amici Curiae) ("Amici . . . contend that the right is especially important for women and members of other groups that may be especially vulnerable to violent crime.").

That means that an average of 657 Americans — and perhaps up to 6,849 Americans — use guns to defend themselves every single day of the year. We take notice of this fact in recognizing the fundamental right of self-defense.

> b. *California Penal Code section 32310 substantially burdens Second Amendment rights.*

California Penal Code section 32310 substantially burdens core Second Amendment rights because of its sweeping scope and breathtaking breadth. Half of all magazines in the United States are now illegal to own in California. It does not matter that these magazines are not unusual and are used commonly in guns for self-defense. Law-abiding citizens must alter or turn them over — or else the government may forcibly confiscate them from their homes and imprison them up to a year. The law's prohibitions apply everywhere in the state and to practically everyone. It offers no meaningful exceptions at all for law-abiding citizens. These features are the hallmark of substantial burden.

The state argues that its law does not impose a substantial burden on the Second Amendment because citizens still can defend themselves with guns equipped with non-LCMs. But the Supreme Court in *Heller* rejected that type of policy argument when it comes to a fundamental constitutional right. We know from that case that a regulation may impose a substantial burden on the Second Amendment, even though the restriction does not foreclose the right to self-

defense. *See Heller*, 554 U.S. at 574.[14] The District of Columbia law banning possession of handguns did not prevent citizens from defending themselves because, as the District argued, they could still use a shotgun or a variety of other arms to defend themselves. But the Supreme Court rejected the argument that "it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Heller*, 554 U.S. at 629. Because the law banned an "entire class of 'arms' that is overwhelmingly chosen by American society" for self-defense — a handgun, in that case — the restriction was "severe" and ran afoul of the Second Amendment. *Id.* at 628. California's law, too, bans an "entire class of 'arms'" that is commonly used for self-defense and thus infringes on the Second Amendment.[15]

The state essentially invites us to engage in a policy decision that weighs the pros and cons of an LCM ban to

---

[14] As discussed earlier (n.6), *Heller* itself does not mention "substantial burden," but this court has construed *Heller* to require a two-step analysis that includes a substantial burden component.

[15] The dissent concludes that LCMs do not qualify as a separate class of arms, but rather "are simply larger magazines." Dissent Op. at 71. But we need only look at California's statute to conclude that it is indeed a class of arms: The state created this separate class by its definition of what constitutes an LCM under Penal Code section 16740. Moreover, LCMs cannot be fairly characterized as a mere subset of magazines because they account for half the magazines in America. Finally, the dissent concludes that the LCM restriction is more akin to a manner restriction because it only affects how one can exercise her Second Amendment right. But in the First Amendment context, no court would uphold a state's ban on half of all parks and sidewalks for public protest because the other half remained available for use. We thus do not agree that prohibiting possession of one of every two otherwise protected arms constitutes a mere regulation on the manner in which one exercises her Second Amendment rights.

determine "substantial burden." That is exactly what the dissent in *Heller* proposed: Ask "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.* at 689–90 (Breyer, J., dissenting). But the Supreme Court in *Heller* took any such policy-balancing notion off the table: "The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35.

Put another way, a "substantial burden" on the Second Amendment is viewed not through a policy prism but through the lens of a fundamental and enumerated constitutional right. We would be looking through the wrong end of a sight-glass if we asked whether the government permits the people to retain some of the core fundamental and enumerated right. Instead, *Heller* counsels us to look at whether the government regulation restricts the core fundamental right from the outset. In other words, we look to what a restriction *takes away* rather than what it leaves behind. Here, California's law takes away a substantial swath of the core constitutional right of self-defense because it bans possession of half of all magazines in America today, even though they are common in guns used for self-defense. In short, a law that takes away a substantial portion of arms commonly used by citizens for self-defense imposes a substantial burden on the Second Amendment.

Notably, the Supreme Court has taken a similar approach in a kaleidoscope of cases involving other fundamental enumerated rights. The Court does not look away from a governmental restriction on the people's liberty just because the state did not impose a full-tilt limitation on a fundamental and enumerated right. Rather, in assessing a governmental imposition on a fundamental right, the Court shuns policy-balancing and focuses on the erosion of the people's liberties. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964) ("Undoubtedly, the right [to vote] . . . is a fundamental matter in a free and democratic society. . . [A]ny alleged infringement of the right . . . must be carefully and meticulously scrutinized."); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ( "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."); *Jacob v. City of N.Y.*, 315 U.S. 752, 752–53 (1942) ("A right [to jury trial] so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts."). We find ourselves in good company in declining the state's invitation to hold otherwise.

Our decision today is in keeping with Ninth Circuit precedent. While we have not articulated a precise standard for what constitutes a substantial burden on core Second Amendment rights, we have consistently stated that a law that bans *possession* of a commonly used arm for self-defense — with no meaningful exception for law-abiding citizens — likely imposes a substantial burden on the Second

44 DUNCAN V. BECERRA

Amendment.[16] And for good reason: The Supreme Court has scrutinized with a gimlet eye any limitation of a fundamental right exercised at home because such an imposition, by its nature, severely restricts individual liberty. Here, the state effectively intrudes into the homes of law-abiding citizens to forcibly confiscate arms that they rely on for self-defense. If the Supreme Court has made one thing clear time and again, it is that the home is a sanctuary and the government should be chary to intrude. *Cf. Lawrence v. Texas*, 539 U.S. 558, 562 (2003) ("Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home.").

So, in *Jackson*, we held that a bar on the *sale* of hollow-point ammunition within city limits was not a severe burden because San Francisco residents could still *own* that ammunition within the home. 746 F.3d at 968. We thus applied intermediate scrutiny to the regulation. *See id.* Stated differently, we implied that strict scrutiny likely applies if a law completely bans the possession of a certain class of ammunition (there, hollow-point bullets).

Two years later in *Silvester*, we applied intermediate scrutiny to a ten-day waiting period because it did not completely ban possession. 843 F.3d at 827. We held that such regulations were more akin to time, place, or manner restrictions in the First Amendment context. *See id.* In doing so, we implied that a complete ban on possession likely merits a more stringent review than intermediate scrutiny.

---

[16] We are not articulating a universal principle but are providing one circumstance where strict scrutiny applies.

Then in 2018 in *Pena*, our court reaffirmed that possession bans on arms are strong medicine likely requiring strict scrutiny. We held that a grandfather provision was "important[]" to our decision to apply intermediate scrutiny. 898 F.3d at 977.**[17]** Put differently, the lack of a grandfather provision likely requires strict scrutiny because governmental bans on possession cut deeply into the core constitutional right to protect hearth and home.

Perhaps this point was made most clear in *Chovan*. 735 F.3d at 1138. While we applied intermediate scrutiny on a ban on arms for domestic violence misdemeanants, we made clear that the standard was different for law-abiding citizens. *See id.* If a ban on arms borders on a "total prohibition" of ownership for law-abiding citizens, the burden is substantial. *See id.***[18]**

Turning to whether section 32310 imposes a substantial burden on the Second Amendment, the record makes that answer plainly obvious. Half of all magazines in America are prohibited under section 32310. The state threatens imprisonment if law-abiding citizens do not alter or turn them over. It does not matter that LCMs come standard for guns commonly used for self-defense, or that law-abiding

---

**[17]** In *Worman v. Healy*, the Fourth Circuit similarly applied intermediate scrutiny to a law containing a grandfather clause for weapons owned lawfully before its enactment. *See* 922 F.3d 26, 31–32.

**[18]** Other courts have adopted similar analysis. The Third Circuit has held, for example, that a ban on possessing firearms with obliterated serial numbers did not generate significant burdens because a gun owner remains free to possess any firearm they choose so long as it has an intact serial number. *See United States v. Marzzarella*, 614 F.3d 85, 97 (3d. Cir. 2010); *see also Kolbe v. Hogan*, 849 F.3d 114, 123 (4th Cir. 2017) (noting that the law under review "does not ban the possession of a large-capacity magazine").

citizens may have owned them lawfully for years or even decades. When the government bans tens of millions of protected arms that are staples of self-defense and threatens to confiscate them from the homes of law-abiding citizens, that imposes a substantial burden on core Second Amendment rights.

Moreover, California's law has no meaningful exceptions for law-abiding citizens. There is no grandfather clause that *Pena* found "important" to avoid strict scrutiny. 898 F.3d at 977. None of the limited exceptions in the statute speak to the average law-abiding citizen, and none mitigate the severe burdens imposed by section 32310 on core Second Amendment rights. California's LCM ban applies to almost everyone, everywhere, and to nearly every weapon that can be reasonably expected for use in self-defense. If a far-reaching law restricting arms contains no meaningful exceptions for law-abiding citizens who use them for self-defense, it invites strict scrutiny.

Section 32310 also cannot be considered merely a time, place, or manner regulation. Unlike *Jackson*'s storage requirements, a wholesale statewide prohibition on possession of one out of every two magazines is greater in scope and severity. And *Pena*'s microstamping requirement for guns could properly be considered a manner restriction because it did not dispossess owners of nonconforming weapons. The same can be said for the law in *Silvester* that otherwise did not affect how a citizen exercises her Second Amendment rights after completing the ten-day waiting period.

Section 32310 instead appears to be more like the firing-range restrictions that the Seventh Circuit in *Ezell* struck down. The City of Chicago had banned firing ranges within city limits, which the Seventh Circuit held was "a serious

encroachment" on the right to self-defense. 651 F.3d at 708–09. This, the court held, constituted more than a restriction on the manner in which those rights were exercised because of the importance of having weapons training and proficiency among the firearm-owning public. *Id.* at 708. The magazine restrictions here, as in *Ezell*, amount to a "serious encroachment." *Cf. Jackson v. City and Cty. of San Francisco*, 135 S. Ct. 2799, 2801 (2015) (Thomas, J., dissenting from denial of certiorari) (considering the burden "significant" where residents are prohibited from keeping handguns operable for immediate self-defense via storage requirements).

More fundamentally, no court would ever countenance similar restrictions for other fundamental rights. The nub of the state's position is that even though it bars Californians from owning one of every two magazines in the United States, that restriction is not substantially burdensome because Californians can still possess other magazines. But no court would hold that the First Amendment allows the government to ban "extreme" artwork from Mapplethorpe just because the people can still enjoy Monet or Matisse. Nor would a court ever allow the government to outlaw so-called "dangerous" music by, say, Dr. Dre, merely because the state has chosen not to outlaw Debussy.[19] And we would never sanction governmental banning of allegedly "inflammatory" views expressed in Daily Kos or Breitbart on the grounds

---

[19] *Cf.* Rebecca Laurence, *NWA: 'The World's Most Dangerous Group'?*, BBC (Aug. 13, 2015), http://www.bbc.com/culture/story/20150813-nwa-the-worlds-most-dangerous-group (discussing failed efforts to limit "dangerous" gangster rap music).

that the people can still read the New York Times or the Wall Street Journal.[20]

The state relies on the fallback position that the Second Amendment deserves less protection because it allegedly poses an inherent danger to public safety that other rights do not. But individual rights often impose at least some risk on public safety. "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, 561 U.S. at 783 (internal citations omitted).

The exclusionary rule in criminal procedure is a clear example. Under that doctrine, "the criminal is to go free because the constable has blundered." *Mapp v. Ohio*, 367 U.S. 643, 659 (1961) (internal quotations and citation omitted). Surely, too, the government's efforts to secure

---

[20] The state's implicit suggestion that the Second Amendment deserves less protection than the First Amendment conflicts with precedent that we look to the First Amendment for guidance in fleshing out jurisprudence for the Second Amendment. *See, e.g., Jackson*, 746 F.3d at 960 (the Second Amendment "inquiry bears strong analogies to the Supreme Court's free-speech caselaw"); *Ezell*, 651 F.3d at 706–07 ("*Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, and . . . have already begun to adapt First Amendment doctrine to the Second Amendment context." (internal citations omitted)). The state's approach is also at odds with the Supreme Court's framework for other rights. *Cf., e.g., June Med. Servs. LLC v. Russo*, 591 U.S. ___ at 35 (June 29, 2020) (invalidating a state law as unduly burdensome on a woman's right to abortion because it would have reduced the state's abortion capacity by over half); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2312 (2016) (invalidating as unduly burdensome a similar law that reduced the number of abortion clinics "from about 40 to about 20" within the state).

damning criminal confessions has been hobbled since *Miranda v. Arizona*. "The most basic function of any government is to provide for the security of the individual and of his property. . . . The rule announced today will measurably weaken the ability of the criminal law to perform these tasks." *Miranda v. Arizona*, 384 U.S. 436, 539–41 (1966) (White, J., dissenting). This is not hypothetical. Criminals sometimes go free because our society prioritizes individual constitutional rights over concerns that freed offenders may commit crimes again. *See, e.g.*, Jim Haner, Kimberly A.C. Wilson, & John B. O'Donnell, *Cases Crumble, Killers Go Free*, Balt. Sun, Sept. 29, 2002, at 1A (discussing a group of 83 defendants who had charges for homicide dropped due to technical error and were later rearrested for new crimes, "including 24 indicted in fresh murders or attempted murders").

There is also no stopping point to the state's argument. Under its logic, California could limit magazines to as few as three bullets and not substantially burden Second Amendment rights because, on average, 2.2 bullets are used in every defensive encounter according to one study.[21] But the threat to life does not occur in an average act in the abstract; self-defense takes place in messy, unpredictable, and extreme events. And what's more, the state's logic is in no way limited to restricting the number of bullets in a magazine. If it is not substantially burdensome to limit magazines to ten rounds because the average defensive

---

[21] At oral argument, counsel for the state conceded that there is a threshold below which some capacity "does actually impose a severe burden on the core right of self-defense" and would be "too low." When asked whether the state could permissibly restrict magazines to contain zero bullets, allowing for one round in the firearm's chamber, counsel offered only a qualified concession: "I think that might be too low. Hypothetically."

shooter uses fewer bullets, then there is no reason it could not impose a one-gun-per-person rule. In fact, there is a more compelling case to impose a one-gun policy under the state's theory. After all, the study relied on by the state also shows that an overwhelming majority of mass shootings involved the use of multiple guns while a relative few definitively involved LCMs. This cannot be right. We would never uphold such a draconian limitation on other fundamental and enumerated constitutional rights.

More broadly, the government's argument misses the mark because the Second Amendment limits the state's ability to second-guess the people's choice of arms if it imposes a substantial burden on the right to self-defense. As discussed above, "substantial burden" cannot be a policy-balancing inquiry because it implicates a fundamental constitutional right. Banning the ownership of half the magazines in America inflicts a substantial burden on the Second Amendment.

In any event, it does not take a wild imagination to conclude that citizens may need LCMs to defend hearth and home. While Hollywood and the Bay Area symbolize California to the world, the Golden State is in fact a much more diverse and vibrant place, with people living in sparsely populated rural counties, seemingly deserted desert towns, and majestic mountain villages. In such places, the closest law enforcement may be far, far away — and it may take substantial time for the county sheriff to respond. And it is no guarantee that the things that go bump in the night come alone; indeed, burglars often ply their trade in groups recognizing strength in numbers. *See* Carl E. Pope, Law Enf't Assistance Admin., U.S. Dep't of Justice, 148223, Crime-Specific Analysis: An Empirical Examination of Burglary Offenses and Offender Characteristics 48 (1977)

(finding that 70% of burglars operate in groups); *see also* Andy Hochstetler, *Opportunities and Decisions: Interactional Dynamics in Robbery and Burglary Groups*, 39 Criminology 737, 746–56 (2001) (suggesting that burgling in groups reduces anxiety of punishment). Law-abiding citizens in these places may find security in a gun that comes standard with an LCM.

Further, some people, especially in communities of color, do not trust law enforcement and are less likely — over 40% less likely, according to one study — to call 911 even during emergencies. *See* 163 Cong. Rec. S1257-58 (daily ed. Feb. 16, 2017) (statement of Sen. Kamala Harris) (discussing a study showing that certain ethnic groups are over 40% less likely to call 911 in an emergency); *see also* Nik Theodore & Robert Habans, *Policing Immigrant Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, 42 J. of Ethnic and Migration Stud. 970 (2016). These citizens may rely more on self-defense than the "average" person in a home invasion or some other emergency.

Law-abiding citizens trapped in high-crime areas where the law enforcement is overtaxed may defend themselves in their homes with a handgun outfitted with LCMs. And in incidents of mass chaos and unrest, law enforcement simply may be unable to protect the people, leaving them solely responsible for their own safety in a seemingly Hobbesian world. Finally, many citizens will not take any chances or compromise their ability to defend themselves and their

families, and they may place their trust in guns equipped with LCMs as a last resort.[22]

Simply put, the guardrails found in our precedent that limit the government's intrusion on the Second Amendment right do not exist in California's near-categorical ban of LCMs. It imposes a substantial burden on the people's Second Amendment rights. Strict scrutiny applies. *See Jackson*, 746 F.3d at 961.

### 3. Decisions in other circuits are distinguishable.

The state attempts to seek refuge in the holdings of extra-circuit authority. But those decisions present myriad distinctions and are inapposite.

To begin, many of the other states' laws are not as sweeping as section 32310. For example, the Maryland state law in the Fourth Circuit's decision in *Kolbe* did not ban possession of LCMs, but only barred the sale of them. *See* 849 F.3d at 122–23. Similarly, the Massachusetts state law in *Worman* had a grandfather clause that allowed owners of LCMs to keep them. *See* 922 F.3d at 31. As our court has explained, laws that only ban the sale of arms or include a grandfather clause impose a lesser burden. *See Pena*, 898 F.3d 969, 977–78 (grandfather clause was an "important" reason for applying intermediate scrutiny); *see also Jackson*, 746 F.3d 964–65 (intermediate scrutiny applies when law only banned sale of hollow-point ammunition and did not ban possession).

---

[22] This, of course, does not mean that a citizen has a right to own any weapon solely because it will aid her in self-defense. As *Heller* pointed out, if a weapon is "dangerous and unusual," then it does not fall within the Second Amendment's ambit. 554 U.S. at 627.

Moreover, almost all the other state laws banned *both* LCMs *and* assault weapons. As a result, the decisions too often conflated the analysis between the two. For example, the D.C. Circuit in *Heller v. District of Columbia* ("*Heller II*") upheld the ban on assault weapons and LCMs because the record reflected that assault weapons are not typically used for self-defense, quoting a study that "revolvers and *semi-automatic pistols* are together used almost 80% of the time in incidents of self-defense with a gun." 670 F.3d 1244, 1262 (D.C. Cir. 2011) (emphasis added). But "semi-automatic pistols" used for self-defense — such as a Glock — routinely use LCMs, and, in fact, an LCM is the standard magazine that comes equipped with the gun. The analysis in many of these cases is thus rendered unsound for our purposes today, as we only opine on the validity of California's LCM ban.[23]

> 4.  Fyock v. City of Sunnyvale does not obligate us to apply intermediate scrutiny.

The state relies on this court's decision in *Fyock v. City of Sunnyvale* to maintain that intermediate scrutiny applies here. But it hangs too heavy a hat on too small a hook. *Fyock* does not hold that as a matter of law intermediate scrutiny applies to LCM regulations.

In *Fyock,* we did not reach the merits of the case, but instead were asked to review a preliminary injunction denial relating to an LCM ban in the City of Sunnyvale based on a

---

[23] We also note that most extra-circuit decisions were split with dissents that strongly disagreed. *See ANJRPC*, 910 F.3d at 126–34 (Bibas, J., dissenting); *Kolbe*, 849 F.3d at 151–63 (Traxler, J., dissenting, joined by Niemeyer, Shedd, and Agee); *Friedman v. City of Highland Park*, 784 F.3d 406, 412–21 (7th Cir. 2015) (Manion, J., dissenting); *Heller II*, 670 F.3d at 1269–96 (Kavanaugh, J., dissenting).

limited record. Critically, we acknowledged that we were merely "consider[ing] whether the district court *abused its discretion by applying intermediate scrutiny*." *Fyock*, 779 F.3d at 998 (emphasis added). We held only that the district court did not abuse its discretion by choosing intermediate scrutiny based on the limited record before it on a preliminary injunction appeal. *Id.* at 1001. The abuse of discretion standard, of course, is highly deferential, and an appellate court can reverse only if the trial court made "a clear error of judgment." *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011). The limited nature of that opinion is self-evident; in its eight pages, it referenced the abuse of discretion standard twelve times, and it repeatedly emphasized the narrow scope of the ruling. *See, e.g.*, *Fyock*, 779 F.3d at 995 ("our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits"); *id.* at 997 n.3 (noting the "undeveloped record" before it and stating that the record will be developed at the merits stage); *id.* at 1001 ("we decline to substitute our own discretion for that of the district court").

It is perhaps understandable why our court in *Fyock* ruled as it did in light of the deferential standard of review and the unique facts presented in the case. Sunnyvale is a small and affluent community. Its violent crime rate is less than half of the statewide violent crime rate. *Compare* City of Sunnyvale, *Sunnyvale Uniform Crime Report 2018* (1.7 incidents per 1,000 people), *with* Cal. Dep't of Justice, *Crime in California 2018*, Criminal Justice Statistics Center Publications at 1, 10 (4.4 incidents per 1,000 people).[24]

---

[24] Available at https://sunnyvale.ca.gov/civicax/filebank/blobdload. aspx?BlobID=22968 (last updated Apr. 22, 2020), and https://data-

Sunnyvale also boasts one of the largest combined public safety departments in the United States. *See* Erika Towne, *Sunnyvale's Department of Public Safety is One of the Largest Combined Departments in the U.S.*, Santa Clara Weekly (Apr. 10, 2019), at 9. We are not in Sunnyvale anymore.[25]

\*   \*   \*

California Penal Code section 32310 substantially burdens core Second Amendment rights. It bans LCMs that come standard in guns commonly used for self-defense in the home. Its scope is broad and indiscriminate. And it provides no meaningful exceptions for law-abiding citizens. Strict scrutiny applies under the reasoning of our prior decisions: "A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny." *Silvester*, 843 F.3d at 821, 827; *see also Pena*, 898 F.3d at 977, 978–79; *Jackson*, 746 F.3d at 961, 964; *Chovan*, 735 F.3d at 1138.

---

openjustice.doj.ca.gov/sites/default/files/2019-07/Crime%20In%20CA%202018%2020190701.pdf (last visited June 12, 2020).

[25] The dissent suggests that we are engaging in policy-based judgments by reciting these facts. But this is not so. We only mention these considerations to provide some context in understanding why the *Fyock* court may have ruled as it did, based on the highly deferential standard of review that court applied while reviewing a preliminary injunction with a limited record before it. Even Justice Breyer's dissent in *Heller* recognized that laws that are limited in geographic scope may reduce burdens compared to restrictions that burden the broader public. *See Heller*, 554 U.S. at 682 (voting to uphold DC's law in part because "[t]he law is tailored to the urban crime problem in that it is local in scope and thus affects only a geographic area both limited in size and entirely urban") (Breyer, J., dissenting).

Apart from this circuit's two-prong analysis for tiers of scrutiny, our approach is in keeping with how we generally address fundamental rights in our Constitution. As the Supreme Court held, the Second Amendment is a "fundamental" right that is "necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778. When the government tries to limit the people's fundamental rights, the Supreme Court typically presumes that strict scrutiny applies. *See, e.g.*, *Glucksberg*, 521 U.S. at 721 (strict scrutiny applies to "fundamental" liberty interests); *Poe v. Ullman*, 367 U.S. 497, 548 (1961) (Harlan, J., dissenting) (laws affecting "fundamental aspect[s] of liberty" are "subjected to strict scrutiny") (internal quotations omitted).[26] And it makes sense to do so. If the government imposes a substantial limitation on the most sacred and fundamental rights enumerated in our Constitution, then such a law restricting the people's liberty should face the highest tier of scrutiny.

### D. California Penal Code section 32310 does not survive strict scrutiny review.

Strict scrutiny is the "most rigorous and exacting standard of constitutional review," and requires that a state law be "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995); *see also Kolbe*, 849 F.3d at 133. "[I]f there are other, reasonable ways to achieve [a compelling state purpose] with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose

---

[26] We recognize that the Supreme Court, for example, applies intermediate scrutiny for time, place, or manner restrictions on First Amendment rights, but as noted above, section II.C.2.ii, the restriction here is not a time, place, or manner regulation.

'less drastic means.'" *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 909–10 (1986) (citing *Dunn v. Blumstein,* 405 U.S. 330, 343 (1972)) (alterations original).

1. The state interests advanced here are compelling.

In the court below, the state advanced four interests underlying California Penal Code section 32321: protecting citizens from gun violence, protecting law enforcement from gun violence, protecting public safety, and preventing crime. The district court found these interests to be "important." On appeal, the Attorney General does not explicitly enumerate these four interests but does stylize them as "interests in preventing and mitigating gun violence, particularly public mass shootings and the murder of law enforcement personnel." The state claims that these interests are compelling. We agree.[27] *See Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted.").

2. California Penal Code section 32310 is not narrowly tailored to achieve the compelling state interests it purports to serve.

California Penal Code section 32310 cannot withstand strict scrutiny analysis because the state's chosen method — a statewide blanket ban on possession everywhere and for nearly everyone — is not the least restrictive means of achieving the compelling interests.

---

[27] We remind future litigants that it is still necessary to show that the stated interest is compelling and may not simply be presumed.

As discussed above, section 32310 provides few meaningful exceptions for the class of persons whose fundamental rights to self-defense are burdened. The scope of section 32310 likewise dooms its validity. Section 32310 applies statewide. It necessarily covers areas from the most affluent to the least. It prohibits possession by citizens who may be in the greatest need of self-defense like those in rural areas or places with high crime rates and limited police resources. It applies to nearly everyone. It is indiscriminating in its prohibition. Nor is the law limited to firearms that are not commonly used for self-defense. These are not features of a statute upheld by courts under the least restrictive means standard.[28]

### E. Even if intermediate scrutiny were to apply, California Penal Code section 32310 would still fail.

As made plain by our earlier discussion, intermediate scrutiny is the wrong standard to apply. But even if we were to apply it today, California Penal Code section 32310 would

---

[28] *See, e.g.*, *Holt v. Hobbs*, 574 U.S. 352, 364–65 (2015) (restriction preventing beard growth for religious practitioners to half of an inch not the least restrictive means of furthering prison safety and security); *United States v. Alvarez*, 567 U.S. 709, 729 (2012) (Stolen Valor Act held unconstitutional because other less speech-restrictive means were available to the government to combat fraudulent Medal of Honor recipient claims); *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816–27 (2000) (statute regulating the hours for sexually oriented cable channel programming to shield children from pornography held unconstitutional because other plausible less restrictive means were readily available); *Reno v. ACLU*, 521 U.S. 844, 874–75 (1997) (statute that criminalized "indecent" or "patently offensive" speech on the internet was unconstitutional because it was "an unnecessarily broad suppression" of free speech rights and therefore not the least restrictive means).

still fail. While that provision doubtless purports to serve important state interests, the means chosen by the state are not substantially related to serving those interests.

1. Intermediate scrutiny as traditionally understood has bite.

Courts apply intermediate scrutiny in a variety of contexts. Broadly speaking, to survive intermediate scrutiny a statute "must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

Recently, the Supreme Court emphasized the potent nature of intermediate scrutiny. In *Packingham v. North Carolina*, the Court held that to survive intermediate scrutiny "a law must be 'narrowly tailored to serve a significant governmental interest." 137 S. Ct. 1730, 1736 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

While the precise contours of intermediate scrutiny may vary, this much is certain: It has bite. It is a demanding test. While its application is neither fatal nor feeble, it still requires a reviewing court to scrutinize a challenged law with a healthy dose of skepticism. Indeed, the law must address "harms" that "are real" in a "material" way. *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). At its core, intermediate scrutiny is a searching inquiry.

2. Appellate courts have not settled on a particular intermediate scrutiny formulation for Second Amendment challenges.

This circuit has used seemingly varying formulations of intermediate scrutiny in the Second Amendment context.

*Chovan* provides that intermediate scrutiny requires "(1) the government's stated objective be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." 735 F.3d at 1139. But in *Silvester*, we stated that gun regulations need only promote a "substantial government interest that would be achieved less effectively absent the regulation." 843 F.3d at 829. We cited *both* standards in *Pena*, though that decision appears to interpret the latter as a means to assess the fit prong of the former. 898 F.3d at 979.

Other decisions within our court and elsewhere have used language that suggests varying intensities of "bite." Some applications of intermediate scrutiny are severe. *See, e.g.*, *Jackson*, 746 F.3d at 966 (whether the challenged restriction is "substantially related to the important government interest of reducing firearm-related deaths and injuries"); *Heller II*, 670 F.3d at 1258 (requiring "a tight 'fit' between the [regulation] and an important or substantial government interest, a fit 'that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective'"). Others appear less stringent. *See, e.g.*, *Worman*, 922 F.3d at 38–39 ("there must be a 'reasonable fit' between the restrictions imposed by the law and the government's valid objectives, 'such that the law does not burden more conduct than is reasonably necessary'"); *ANJRPC*, 910 F.3d at 119 (same). A few fall somewhere in between. *See, e.g.*, *Kolbe*, 849 F.3d at 139 (restriction passes intermediate scrutiny if "reasonably adapted to a substantial government interest") (citation omitted).

3. Some courts have applied a diluted form of intermediate scrutiny that approximates rational basis, which Heller forbids.

Whatever its precise contours might be, intermediate scrutiny cannot approximate the deference of rational basis review. *Heller* forecloses any such notion. *See Heller*, 554 U.S. at 628 n.27. Yet the state asserts that the deferential standard presented by the case of *Turner Broadcasting System, Inc. v. F.C.C.* applies here. But reliance on this line of cases is misplaced. While some courts have analyzed Second Amendment regulations under the highly deferential *Turner* standard, it has been inconsistently applied and ultimately remains inapplicable.

*Turner* deference stems from two Supreme Court cases that addressed certain rules imposed on cable television companies. *See Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994) ("*Turner I*"); *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180 (1997) ("*Turner II*"). These cases establish a general rule that where "policy disagreements exist in the form of conflicting legislative 'evidence,'" courts "'owe [the legislature's] findings deference in part because the institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions.'" *Pena*, 898 F.3d at 979 (quoting *Turner II*, 520 U.S. at 195). A few courts have imported this deference to analyze Second Amendment claims. *See, e.g.*, *Kolbe*, 849 F.3d at 140 (applying *Turner* deference to LCM restrictions); *NYSRPA*, 804 F.3d at 261 (same); *Drake v. Filko*, 724 F.3d 426, 436–37 (3d Cir. 2013) (same, for public carriage restrictions). But courts in our own circuit have been inconsistent in its application. In *Pena*, we applied *Turner* deference. *See* 898 F.3d at 979–80. But in *Silvester*, *Fyock*, *Jackson*, and

*Chovan* we did not. *See generally* 843 F.3d at 817–29; 779 F.3d at 994–1001; 746 F.3d at 957–70; 735 F.3d at 1129–42.

The latter opinions get it right. *Turner* is an inappropriate standard for a simple reason: That line of cases addressed a very different set of laws and circumstances. There, cable television operators challenged the constitutionality of must-carry provisions of the Cable Television Consumer Protection and Competition Act of 1992. *See Turner I*, 512 U.S. at 626–27. As the Court explained in *Turner II*, the deferential principle outlined in *Turner I* applies mainly in "cases . . . involving congressional judgments concerning *regulatory schemes of inherent complexity and assessments about the likely interaction of industries undergoing rapid economic and technological change.* Though different in degree, the deference to Congress is in one respect akin to deference owed to administrative agencies because of their expertise." *Turner II*, 520 U.S. at 196 (emphasis added).

Not so here. While the issue of gun violence is important and emotionally charged, it does not involve highly technical or rapidly changing issues requiring such deference. The state cannot infringe on the people's Second Amendment right, and then ask the courts to defer to its alleged "expertise" once its laws are challenged. Put another way, intermediate scrutiny cannot mean *Chevron*-like deference. Indeed, this very argument advanced by the state was roundly rejected by the majority in *Heller*. Despite Justice Breyer's dissenting opinion explicitly advancing *Turner* deference, *see* 554 U.S. at 690–91, 704–05, the majority in *Heller* did not once mention *Turner* and its progeny. To apply *Turner* today would amount to an abdication of our judicial independence and we refuse to do so. And in any event, the *Turner I* Court emphasized that deference does "not foreclose our independent judgment of the facts bearing

on an issue of constitutional law." *Id.* at 666 (citation omitted).

    4. California Penal Code section 32310 would still fail to pass constitutional muster under an intermediate scrutiny analysis.

Even if we were to apply intermediate scrutiny, California Penal Code section 32310 would still fail. While the interests expressed by the state no doubt qualify as "important," *Chovan*, 735 F.3d at 1139, the means chosen to advance those interests are not substantially related to their service.

Section 32310 fails intermediate scrutiny for many of the same reasons it fails strict scrutiny. Even with the greater latitude offered by this less demanding standard, section 32310's fit is excessive and sloppy. In his dissent in *Heller*, Justice Breyer would have upheld D.C.'s law under his interest-balancing test because the law was "tailored to the urban crime problem [] that is local in scope and thus affects only a geographic area both limited in size and entirely urban." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). Not so here. The statute operates as a blanket ban on all types of LCMs everywhere in California for almost everyone. It applies to rural and urban areas, in places with low crime rates and high crime rates, areas where law enforcement response times may be significant, to those who may have high degrees of proficiency in their use for self-defense, and to vulnerable groups who are in the greatest need of self-defense. The law also prohibits possession outright. And it applies to all firearms, including handguns that are the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629.

Section 32310's failure to incorporate a grandfather clause is another red flag. We do not write on a blank slate on this matter. This court has already held that grandfather clauses are "important[]" in reducing burdens generated by a restriction. *Pena*, 898 F.3d at 977. It follows that grandfather clauses are also important to assess fit. Without such a clause, law-abiding citizens who legally possessed LCMs before enactment are deprived of the right to use those arms for lawful ends. These law-abiding citizens could have owned LCM for decades, and perhaps even used them for self-defense in the past. But none of that matters under California law. They must turn them over — or face a year in jail. Based on the record before us, there is no apparent justification or support for the lack of a grandfather exception. *See New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1543 (2020) (Alito, J., dissenting from denial of certiorari) ("a court engaged in any serious form of scrutiny would . . . question[] the absence of evidence").

The state speculates that a complete prohibition is necessary to avoid legally owned LCMs from falling into the wrong hands. But the flaws of that argument are obvious. The state could ban virtually anything if the test is merely whether something causes social ills when someone other than its lawful owner misuses it. Adopting such a radical position would give the government carte blanche to restrict the people's liberties under the guise of protecting them.

While the harms that California attempts to address are no doubt real, section 32310 does not address them in a "material" way. *Edenfield*, 507 U.S. at 770–71. The data relied on by the state in defense of section 32310 is, as the trial court found, "remarkably thin." California primarily cites two unofficial surveys to support dispossessing law-

abiding Californians of millions of magazines. But the district court pointed out that these surveys hardly show that section 32310 is effective — and in any event, they cannot save that provision. One of the surveys documents that in 14 of the 17 mass shootings in California, assailants brought multiple weapons.[29] This undercuts the state's claim, as noted by the district court, that LCMs shoulder much of the blame for casualties because the more weapons brought to a shooting incident, the greater the capacity for casualties.

But more than that, the district court pointed out that only three of these incidents definitively involved LCMs. And for each, the assailant brought high capacity magazines that were illegally smuggled into California. In other words, section 32310 would have had little effect on the outcomes in these tragic events. Many incidents do not appear to have involved LCMs, and for those that did, the LCMs appear to have been smuggled into the state. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

---

[29] Our dissenting colleague notes that we analyze the fit of section 32310 using statewide statistics, yet we look to national statistics to determine common ownership. Our colleague's point is well taken. But we must necessarily look to national statistics in that analysis because, as discussed earlier, LCM prohibitions in California have been operative for years. As the Seventh Circuit agrees, "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). When it comes to *fit* however, we look to state statistics to determine how the challenged law operates in practice within the jurisdiction of its operation.

Put simply, California fails to show a reasonable fit between Penal Code section 32310's sweeping restrictions and its asserted interests. Were we to apply intermediate scrutiny, section 32310 would still fail.

## CONCLUSION

Let us be clear: We are keenly aware of the perils of gun violence. The heartbreak and devastation caused by criminals wielding guns cannot be overstated. And we also understand the importance of allowing state governments the ability to fashion solutions to curb gun violence. We have thus held that California can, for example, impose waiting periods, *Silvester*, 843 F.3d at 829, require microstamping of guns, *Pena*, 898 F.3d at 986, and forbid felons, the mentally ill, or misdemeanants convicted of domestic violence from owning firearms, *Chovan*, 735 F.3d at 1141.

We also want to make clear that our decision today does not address issues not before us. We do not opine on bans on so-called "assault weapons," nor do we speculate about the legitimacy of bans on magazines holding far larger quantities of ammunition. Instead, we only address California's ban on LCMs as it appears before us. We understand the purpose in passing this law. But even the laudable goal of reducing gun violence must comply with the Constitution. California's near-categorical ban of LCMs infringes on the fundamental right to self-defense. It criminalizes the possession of half of all magazines in America today. It makes unlawful magazines that are commonly used in handguns by law-abiding citizens for self-defense. And it substantially burdens the core right of self-defense guaranteed to the people under the Second Amendment. It cannot stand.

We **AFFIRM** the district court's grant of summary judgment for plaintiffs-appellees.

LYNN, District Judge, dissenting:

The majority opinion conflicts with this Circuit's precedent in *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), and with decisions in every other Circuit to address the Second Amendment issue presented here. I am willing to at least assume that the law at issue implicates conduct protected by the Second Amendment, but I part ways with the majority regarding the appropriate level of scrutiny and its application in this case. I would reverse the district court's grant of summary judgment. I respectfully dissent.

## ANALYSIS

California was not the first city or state to ban the possession of large capacity magazines ("LCMs"), and this panel is not the first (even within this Circuit) to address the constitutionality of such bans. A panel of this Court previously affirmed a district court's refusal to preliminarily enjoin the City of Sunnyvale's ban on LCMs, and six of our sister Circuits have held that various LCM restrictions are constitutional. *See Fyock*, 779 F.3d 991; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ("*NYSRPA*"); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018); *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc); *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015). Thus, this panel is not writing on a blank slate. I would reach the same result as the *Fyock* panel and our sister Circuits and hold that California's ban on LCMs does not violate the Second Amendment.

To determine whether a challenged law violates the Second Amendment, this Court "employs a two-prong test:

(1) the court 'asks whether the challenged law burdens conduct protected by the Second Amendment'; and (2) if so, what level of scrutiny should be applied." *Fyock*, 779 F.3d at 996 (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)).

## I. Whether § 32310 Affects Second Amendment-Protected Conduct

California argues that § 32310 does not burden conduct protected by the Second Amendment. Rejecting those arguments, the majority holds that it does. I assume this holding to be correct. As this Court previously held, "our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable." *Fyock*, 779 F.3d at 998. Additionally, there is no serious dispute that millions of LCMs are in circulation. *See* Maj. Op. at 12. Given my determination below that § 32310 withstands the applicable level of scrutiny, however, I find it unnecessary to further analyze whether it burdens protected conduct. I therefore assume, without deciding, that the challenged law burdens Second Amendment rights. *See Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018) ("We assume without deciding that the challenged UHA provisions burden conduct protected by the Second Amendment because we conclude that the statute is constitutional irrespective of that determination."); *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) ("[F]or purposes of this analysis, we assume, without deciding, that the challenged fee burdens conduct falling within the scope of the Second Amendment."); *Silvester v. Harris*, 843 F.3d 816, 826–27 (9th Cir. 2016) ("We assume, without deciding, that the regulation is within the scope of the Amendment and

is not the type of regulation that must be considered presumptively valid.").[1]

## II. The Appropriate Level of Scrutiny

The next question is which level of scrutiny applies. In making that determination, "the court must consider (1) how closely the law comes to the core of the Second Amendment right; and (2) how severely, if at all, the law burdens that right." *Fyock*, 779 F.3d at 998 (citing *Chovan*, 735 F.3d at 1138). "Intermediate scrutiny is appropriate if the regulation at issue does not implicate the core Second Amendment right *or* does not place a substantial burden on that right." *Id.* at 998–99 (citing *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 964 (9th Cir. 2014)).

As to the first prong, I acknowledge that § 32310, like the law at issue in *Fyock*, "may implicate the core of the Second Amendment" regarding self-defense in the home. *Id.* at 999. The majority holds that LCMs may be used "for the core lawful purpose of self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008). I need not

---

[1] This approach also is consistent with that used by several Circuits in deciding similar cases. *See, e.g.*, *Heller II*, 670 F.3d at 1261 (declining to resolve whether laws banning LCMs and assault weapons implicate the Second Amendment, because "even assuming they do impinge upon the right protected by the Second Amendment, we think intermediate scrutiny is the appropriate standard of review and the prohibitions survive that standard"); *Worman*, 922 F.3d at 30 ("We assume, without deciding, that the proscribed weapons have some degree of protection under the Second Amendment."); *NYSRPA*, 804 F.3d at 257 ("[W]e proceed on the assumption that these laws ban weapons protected by the Second Amendment."); *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 117 ("We will nonetheless assume without deciding that LCMs are typically possessed by law-abiding citizens for lawful purposes and that they are entitled to Second Amendment protection.").

resolve that question, however, because I cannot agree that § 32310 is a substantial burden on that right.[2] Section 32310 "restricts possession of only a subset of magazines that are over a certain capacity. It does not restrict the possession of magazines in general such that it would render any lawfully possessed firearms inoperable, nor does it restrict the number of magazines that an individual may possess." *Fyock*, 779 F.3d at 999. Just as "[a] ban on the sale of certain types of ammunition does not prevent the use of handguns or other weapons in self-defense," and "leaves open alternative channels for self-defense in the home," *Jackson*, 746 F.3d at 968,[3] § 32310 does not place a substantial burden on core Second Amendment rights because it does not prevent the use of handguns or other weapons in self-defense.

---

[2] Again, this approach is consistent with that taken by other courts, who have declined to resolve whether bans on LCMs implicate core Second Amendment rights, because even if they do, the burden is not substantial. *See, e.g.*, *Heller II*, 670 F.3d at 1262 ("Although we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right."); *Worman*, 922 F.3d at 38 (finding that an LCM ban "arguably implicates the core Second Amendment right to self-defense in the home but places only a modest burden on that right").

[3] I disagree that *Jackson* "implied that strict scrutiny likely applies if a law completely bans the possession of a certain class of ammunition." Maj. Op. at 44. While the opinion mentions that the law at issue in that case banned only the sale, not use or possession, of certain ammunition, it also mentioned other factors relevant to its decision, including that other types of bullets could be sold. *Jackson*, 746 F.3d at 968. At bottom, *Jackson* asked whether the regulation left "open alternative channels for *self-defense*" generally, *id.* at 961 (emphasis added), not alternative channels for possessing the same weapon regulated by the law being examined.

DUNCAN V. BECERRA 71

The majority writes that the existence of alternatives is irrelevant under *Heller*. *See* Maj. Op. at 40–41. Unlike the law at issue in *Heller*, however—and contrary to the majority's characterization of California's law—§ 32310 does not ban an entire "class" of arms. "LCMs" are not a separate "class" of weapons; they are simply larger magazines. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 117 ("[T]he Act . . . does not categorically ban a class of firearms. The ban applies only to magazines capable of holding more than ten rounds and thus restricts 'possession of only a subset of magazines that are over a certain capacity.'" (quoting *Fyock*, 779 F.3d at 999)). In fact, the claim that § 32310 is a "categorical[] bar[]," Maj. Op. at 33, is circular, because "it amounts to a suggestion that whatever group of weapons a regulation prohibits may be deemed a 'class.'" *Worman*, 922 F.3d at 32 n.2. Understood in that way, "virtually any regulation could be considered an 'absolute prohibition' of a class of weapons." *Id.* It makes no difference that the weapons at issue are "popular." Just like "being unable to purchase a subset of semiautomatic weapons"—even some of the "most popular models"—"does not significantly burden the right to self-defense in the home," *Pena*, 898 F.3d at 978, so too does being unable to purchase a subset of magazines not significantly burden Second Amendment rights.

In short, although the availability of a different "class" of firearms (like a rifle instead of a handgun) might be "no answer" to a Second Amendment challenge, *Heller*, 554 U.S. at 629, alternatives in the same "class" are relevant to the burden analysis. *See, e.g.*, *Jackson*, 746 F.3d at 961 ("[F]irearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not."). The difference between using a handgun versus a

rifle for self-defense, for example, is much more significant than the difference between using a magazine that holds eleven rounds versus a magazine that holds ten rounds.[4]  For this reason, the prohibition on LCMs is more analogous to a restriction on *how* someone exercises their Second Amendment rights, by restricting the number of bullets a person may shoot from one firearm without reloading. "[L]aws which regulate only the '*manner* in which persons may exercise their Second Amendment rights' are less burdensome than those which bar firearm possession completely."  *Silvester*, 843 F.3d at 827.

Because I would find that § 32310 does not substantially burden the core Second Amendment right, I would apply intermediate scrutiny.  This conclusion is consistent with that reached by all of our sister Circuits that chose a level of scrutiny in LCM cases.  *See Heller II*, 670 F.3d at 1262 (applying intermediate scrutiny and analogizing to First Amendment time, place, and manner doctrine, because "the prohibition of . . . large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves."); *Worman*, 922 F.3d at 37 (applying intermediate scrutiny and reasoning that an LCM ban does not heavily burden the core right of self-defense in the home, in part because the law prohibited only "magazines of a particular capacity"); *NYSRPA*, 804 F.3d at 259 ("No 'substantial burden' exists—and hence heightened scrutiny is not triggered—'if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense.'" (quoting *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012)); *Ass'n of N.J.*

---

[4] For similar reasons, § 32310 is not analogous to a ban on Mapplethorpe in favor of Monet or Matisse, or the majority's other examples.  *See* Maj. Op. at 47–48.

*Rifle & Pistol Clubs*, 910 F.3d at 118 (applying intermediate scrutiny because an LCM ban "does not severely burden, and in fact respects, the core of the Second Amendment right.").[5]

The majority splits with our sister Circuits, claiming that those decisions are distinguishable because the laws at issue in those cases were "not as sweeping" as § 32310 as they banned only sale (not possession) or included grandfather clauses, or because the decisions "too often conflated the analysis between" a ban on assault weapons and a ban on LCMs.  Maj. Op. at 52–53.  Those distinctions rest on a flimsy firmament.  For example, all but one of the laws at issue banned possession, not just sale.  *See Heller II*, 670 F.3d at 1249; *Worman*, 922 F.3d at 30; *NYSRPA*, 804 F.3d at 247; *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 110; *Friedman*, 784 F.3d at 407.[6]  Only two mention a grandfather clause.  *See Worman*, 922 F.3d at 31; *NYSPRA*, 804 F.3d at 251 n.19.  None of the cases suggested that these allegedly distinguishing features made a critical difference to the courts' analyses.  In fact, *NYSPRA* involved two laws, one of which included a grandfather clause, the other of which did not, but the Second Circuit held that both laws were constitutional.  *See* 804 F.3d at 249, 251 n.19.  While an exception for possession or grandfathered weapons might

---

[5] *Kolbe* applied intermediate scrutiny in the alternative, after holding that the Second Amendment does not protect LCMs at all.  849 F.3d at 139 ("[A]ssuming the Second Amendment protects the FSA-banned assault weapons and large-capacity magazines, the FSA is subject to the intermediate scrutiny standard of review.").  The Seventh Circuit's decision in *Friedman* is the only LCM ban case in which a court of appeals did not apply intermediate scrutiny, but the court in that case did not enunciate any level of scrutiny at all.  *See* 784 F.3d 406.

[6] The only exception is the Maryland law at issue in *Kolbe*, 849 F.3d at 122, that the majority cites as an example.

be relevant to the burden analysis, we have never held that such exceptions are *required*.[7]

As for the majority's comment that decisions from other Circuits conflate assault weapon and LCM bans, I read those cases differently. *Association of New Jersey Rifle & Pistol Clubs*, 910 F.3d 106, involved only an LCM ban, so it could not have improperly "conflated" the analysis. Additionally, even the cases involving multiple types of restrictions separately analyze the distinct bans. In fact, in *Fyock*, we referred to *Heller II* as a "well-reasoned opinion." 779 F.3d at 999. Yet today, the majority effectively ignores *Heller II*. In short, I think the majority's distinctions constitute too thin a reed on which to support a conflict with our sister Circuits.

The majority also departs from our Circuit's decision in *Fyock*, reasoning that *Fyock* was decided on a different record, using a different standard of review.[8] Maj. Op. at 53–55. The relevant undisputed facts here, however, are identical to the facts at issue in *Fyock*. Specifically, the laws at issue "restrict[] possession of only a subset of magazines that are over a certain capacity." *Fyock*, 779 F.3d at 999.

---

[7] It would be surprising if a person's Second Amendment rights turned on whether a person had the foresight to purchase a later-banned firearm before a law was enacted. Similarly, a ban on sale but not possession makes a practical difference only if nearby jurisdictions allow sale, meaning that under the majority's analysis, the constitutionality of a law in one jurisdiction would turn on laws enacted in neighboring jurisdictions.

[8] Ironically, the majority's attempt to distinguish *Fyock* on the ground of its "unique facts" based on Sunnyvale's size, affluency, and crime rate is exactly the type of policy judgment in which even the majority acknowledges courts should not engage. Moreover, the *Fyock* decision did not find these facts important enough to mention, so I cannot conclude that they are relevant distinguishing factors.

The abuse of discretion standard gave the district court leeway in finding those facts, but if the district court had applied the wrong legal standard—such as an incorrect level of scrutiny—"[a]n error of law necessarily constitutes an abuse of discretion." *Akopyan v. Barnhart*, 296 F.3d 852, 856 (9th Cir. 2002); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). In other words, if intermediate scrutiny were the wrong legal standard for cases presenting these facts, applying that level of scrutiny necessarily would have been an abuse of discretion. *Fyock* held, however, that intermediate scrutiny was the correct standard. I would hold that *Fyock* requires this panel to apply intermediate scrutiny in this case as well.

## III.    Applying Intermediate Scrutiny

Having determined that § 32310 is subject to intermediate scrutiny, I also part ways with the majority's alternative holding that § 32310 does not satisfy that standard. Again, the majority's decision conflicts with *Fyock* and all six of our sister Circuits to have addressed the issue.

"Intermediate scrutiny requires (1) a significant, substantial, or important government objective, and (2) a 'reasonable fit' between the challenged law and the asserted objective." *Pena*, 898 F.3d at 979 (quoting *Jackson*, 746 F.3d at 965). While the challenged law must "promote[] a 'substantial government interest that would be achieved less effectively absent the regulation,'" the test does not require that the government choose "the 'least restrictive means' of achieving [its] interest." *Id.* (quoting *Fyock*, 779 F.3d at 1000).

I agree with the majority that California has satisfied the first part of the test by showing a significant, substantial, or

important government objective.  Maj. Op. at 57, 59, 63.  I disagree, however, that § 32310 is not a "reasonable fit" for achieving that objective, particularly when we are reviewing a summary judgment decision.  *See Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013) ("[W]e view the evidence in the light most favorable to Appellant in reviewing summary judgment . . . .").

"When considering California's justifications for the statute, we do not impose an 'unnecessarily rigid burden of proof,' and we allow California to rely on any material 'reasonably believed to be relevant' to substantiate its interests in gun safety and crime prevention."  *Pena*, 898 F.3d at 979 (quoting *Mahoney v. Sessions*, 871 F.3d 873, 881 (9th Cir. 2017)).  The "analysis of whether there is a 'reasonable fit between the government's stated objective and the regulation' considers 'the legislative history of the enactment as well as studies in the record or cited in pertinent case law.'"  *Id.* (quoting *Fyock*, 779 F.3d at 1000) (internal quotation marks omitted).  We must "giv[e] the [state] 'a reasonable opportunity to experiment with solutions to admittedly serious problems.'"  *Jackson*, 746 F.3d at 966 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).

Like Sunnyvale in *Fyock*, California "presented evidence that the use of large-capacity magazines results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries." 779 F.3d at 1000; Excerpts of Record ("ER") 357 ("[T]he use of LCMs in massacres resulted in a 59 percent increase in fatalities per incident."); ER 405 ("[T]he available evidence suggests that gun attacks with semiautomatics— including both assault weapons and guns equipped with LCMs—tend to result in more shots fired, more persons

wounded, and more wounds inflicted per victim than do attacks with other firearms."); ER 756 ("[I]t is common for offenders to fire more than ten rounds when using a gun with a large-capacity magazine in mass shootings."); ER 756–57 ("[C]asualties were higher in the mass shootings that involved large-capacity magazine guns than other mass shootings. In particular, we found an average number of fatalities or injuries of 31 per mass shooting with a large-capacity magazine versus 9 for those without."); ER 972.

It "also presented evidence that large-capacity magazines are disproportionately used in mass shootings as well as crimes against law enforcement, and it presented studies showing that a reduction in the number of large-capacity magazines in circulation may decrease the use of such magazines in gun crimes." *Fyock*, 779 F.3d at 1000; ER 358 ("[S]ince 1968, LCMs have been used in 74 percent of all gun massacres with 10 or more deaths, as well as in 100 percent of all gun massacres with 20 or more deaths—establishing a relationship between LCMs and the deadliest gun massacres."); ER 405 ("It also appears that guns with LCMs have been used disproportionately in murders of police."); ER 418 ("Consistent with prior research, we also found that LCM firearms are more heavily represented among guns used in murders of police and mass murders."); ER 756 ("We found that large-capacity magazines were used in the majority of mass shootings since 1982 . . . ."). "[I]t strains credulity to argue that the fit between the Act and the asserted governmental interest is unreasonable." *Worman*, 922 F.3d at 40. To the extent that the district court weighed this evidence against contrary evidence, it was inappropriate to do so in the context of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is

not himself to weigh the evidence and determine the truth of the matter . . . .").

This evidence is not based on pure speculation. California offered evidence based on different data sources, from multiple experts. California also pointed to evidence that the federal ban on assault weapons and LCMs was beginning to have an effect—and likely would have had a larger effect in the absence of a grandfather clause—when it expired in 2004. *See, e.g.*, ER 415 (opining that the federal ban "may have had a more substantial impact on the supply of LCMs to criminal users by the time it expired in 2004"); ER 419 (discussing an "upward trend in criminal use of LCM firearms" after the 2004 expiration of the LCM ban, suggesting that the federal ban may have had an effect). California's decision to pass a similar law finds support in the past federal experience.

The majority faults § 32310 for being "a blanket ban on all types of LCMs everywhere in California for almost everyone." Maj. Op. at 63. Actually, California offered evidence to explain why the law's scope is a "reasonable fit," notwithstanding its breadth. For example, "the majority of guns used in mass shootings were obtained legally." ER 296. Contrary to the majority's suggestion, this argument would not justify "ban[ning] virtually anything if the test is merely whether something causes social ills when someone other than its lawful owner misuses it." Maj. Op. at 64. It is merely one factor to consider in determining whether there is a "reasonable fit" between the state's goals and the scope of the law.

Importantly, while § 32310 prohibits certain types of magazines, it leaves many other types of magazines (and firearms) available to law-abiding citizens to use for self-defense. *Cf. Jackson*, 746 F.3d at 968 ("There is no evidence

in the record indicating that ordinary bullets are ineffective for self-defense."). Just like the ban on particular types of ammunition in *Jackson* was "a reasonable fit for achieving its objective of reducing the lethality of ammunition because it targets only that class of bullet which exacerbates lethal firearm-related injuries," *id.* at 969, § 32310 is a reasonable fit for achieving the state's objective because it targets only the types of magazines most likely to present increased risk.

That § 32310 will not prevent all mass shootings,[9] or that it is not the least restrictive means of doing so, does not render the law unconstitutional. *See Pena*, 898 F.3d at 979 (explaining that intermediate scrutiny does not require that the government choose "the 'least restrictive means' of achieving [its] interest" (quoting *Fyock*, 779 F.3d at 1000)). This is not to suggest that intermediate scrutiny does not have bite. I agree with the majority that it does.[10] At the same time, the Court should not improperly transform intermediate scrutiny into strict scrutiny. "Our role is not to re-litigate a policy disagreement that the California legislature already settled, and we lack the means to resolve that dispute. Fortunately, that is not our task." *Pena*, 898 F.3d at 980. Because "California's evidence 'fairly

---

[9] If the majority is going to rely on nationwide statistics about the prevalence of LCMs, it stands to reason that it should also use nationwide statistics about the use of LCMs in mass shootings. However, its intermediate scrutiny analysis mentions only 17 shootings in California. *See* Maj. Op. at 65.

[10] It is unnecessary to decide whether "*Turner* deference" is relevant to the question before this Court, because the outcome is the same regardless. But to the extent that the majority identifies any confusion about the applicability of *Turner* deference or the meaning of intermediate scrutiny in this Court's precedents, I respectfully suggest that is reason for the Circuit to consider this case *en banc*.

support[ed]' its conclusions," *id.* (quoting *Jackson*, 746 F.3d at 969), I would hold that § 32310 satisfies intermediate scrutiny.

This conclusion is consistent with *Fyock* and all our sister Circuits to resolve this question. In every case, the court has held that the LCM restrictions at issue satisfy intermediate scrutiny. *See Heller II*, 670 F.3d at 1264 ("We conclude the District has carried its burden of showing a substantial relationship between the prohibition of . . . magazines holding more than ten rounds and the objectives of protecting police officers and controlling crime."); *Worman*, 922 F.3d at 40 (holding that a ban on LCMs "does not impermissibly intrude upon [Second Amendment] right[s] because it withstands intermediate scrutiny"); *NYSRPA*, 804 F.3d at 264 (holding that a ban on LCMs "survive[s] intermediate scrutiny"); *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 122 ("[T]he Act survives intermediate scrutiny, and like our sister circuits, we hold that laws restricting magazine capacity to ten rounds of ammunition do not violate the Second Amendment."); *Kolbe*, 849 F.3d at 140 ("Being satisfied that there is substantial evidence indicating that the FSA's prohibitions against assault weapons and large-capacity magazines will advance Maryland's goals, we conclude that the FSA survives intermediate scrutiny.").[11] The record in this case is nearly identical to the records in those other cases, with

---

[11] The majority calls *Kolbe* an "outlier" that has been rejected by other Circuits, Maj. Op. at 26, but only with respect to its holding that LCMs are not protected by the Second Amendment. *Kolbe*'s alternative holding—that, assuming LCMs are protected, intermediate scrutiny applies and was satisfied—is consistent with every other Circuit to answer that question, as described in the text above.

DUNCAN V. BECERRA                81

many of the same experts and studies.  I would not depart from those well-reasoned opinions.

## IV.    Conclusion

Because I would hold that intermediate scrutiny applies and § 32310 satisfies that standard, I would reverse the district court's grant of summary judgment in Plaintiffs' favor.[12]  I respectfully dissent.

---

[12] Given the majority's opinion on the Second Amendment issue, as a result of which it did not reach the Takings Clause issue, I express no opinion on that issue.