No. 19-55376

# IN THE
# United States Court of Appeals
# for the Ninth Circuit

VIRGINIA DUNCAN, et al.,
*Plaintiffs-Appellees*
v.

XAVIER BECERRA, in his official capacity
as Attorney General of the State of California,
*Defendant-Appellant.*

On Appeal From The United States District Court
For the Southern District of California
No. 17-cv-1017

**BRIEF OF *AMICI CURIAE* MARCH FOR OUR LIVES ACTION FUND,
BRADY, EVERYTOWN FOR GUN SAFETY, GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE, AND TEAM ENOUGH IN SUPPORT OF
DEFENDANT-APPELLANT'S PETITION FOR REHEARING EN BANC**

Scott A. Edelman
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071-3197
(213) 229-7000

Vivek R. Gopalan
Zhen He Tan
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Ste. 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel of Record for Amici Curiae*
(additional counsel on inside cover)

Hannah Shearer
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062

*Counsel for* Amicus Curiae *Giffords
Law Center to Prevent Gun Violence*

J. Adam Skaggs
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY 10018
(917) 680-3473

*Counsel for* Amicus Curiae *Giffords
Law Center to Prevent Gun Violence*

Janet Carter
William J. Taylor, Jr.
EVERYTOWN LAW
450 Lexington Ave. # 4184
New York, NY 10017
(646) 324-8215

*Counsel for* Amicus Curiae
*Everytown for Gun Safety*

Jonathan E. Lowy
BRADY
840 First Street NE Suite 400
Washington, D.C. 20002
(202) 370-8104

*Counsel for* Amicus Curiae *Brady*

Christa Y. Nicols
BRADY
840 First Street NE Suite 400
Washington, D.C. 20002
(202) 370-8131

*Counsel for* Amicus Curiae *Team
ENOUGH*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, March For Our Lives Action Fund, Brady, Everytown For Gun Safety (formally, Everytown for Gun Safety Action Fund), Giffords Law Center to Prevent Gun Violence, and Team ENOUGH state that they have no parent corporations. None of the *amici* organizations have stock, and therefore no publicly held company owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ...........................................................1

INTRODUCTION ...............................................................................3

ARGUMENT .....................................................................................5

I.    THIS CASE INVOLVES EXCEPTIONALLY IMPORTANT QUESTIONS ABOUT THE ABILITY OF STATE LEGISLATURES AND VOTERS TO ADDRESS GUN SAFETY ...............................................................................5

      A.    The Panel Ruling Compromises Americans' Right to Debate and Legislate on the Complex, Deadly Problem of Gun Violence ...........................................................5

      B.    The Panel Ruling Denies Communities of Color and Other Historically Under-Protected Groups the Ability to Determine Their Own Safety ......................................8

II.    THE PANEL OPINION CONFLICTS WITH PRECEDENT IN WAYS THAT WOULD IMMUNIZE GUNMAKERS FROM MEANINGFUL REGULATION......................................................11

      A.    The Panel's Analysis of History and LCMs' Commercial Popularity Conflicts with *Heller* and Circuit Precedent ..........11

            1.    Conflicts Created by the Panel's Market-Share Test ......................................................................12

            2.    Conflicts Created by the Panel's Historical Analysis ......................................................................15

      B.    The Panel's Heightened Scrutiny Analysis Contradicts Circuit Law ............................................................16

CONCLUSION ................................................................................19

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
    458 U.S. 592 (1982)................................................................6

*Caetano v. Mass.,*
    136 S. Ct. 1027 (2016)..........................................................5

*Columbia Broadcasting Sys., Inc. v. Democratic National Committee,*
    412 U.S. 94 (1973)................................................................18

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)..............................................2, 5, 13, 14, 15

*Fyock v. City of Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) ........................................12, 15

*Heart of Atlanta Motel, Inc. v. United States,*
    379 U.S. 241 (1964)................................................................9

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) ...........................................4, 6, 8, 12

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018)..........................................................9

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)..............................................2, 5, 11, 14

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y.,*
    140 S. Ct. 1525 (2020)........................................................5, 6

*New State Ice Co. v. Liebmann,*
    285 U.S. 262 (1932)................................................................7

*Nixon v. Shrink Missouri Gov't PAC,*
    528 U.S. 377 (2000)................................................................18

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Pena v. Lindley*,
    898 F.3d 969 (2018)......................................................................17

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)....................................................................6, 9

*Soto v. Bushmaster Firearms Int'l, LLC*,
    331 Conn. 53 (2019) .......................................................................9

*Turner Broadcasting Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)......................................................................17

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019), *cert. denied*,
    2020 WL 3146687 (June 15, 2020) ................................5, 12, 14, 17

**Other Authorities**

BUREAU OF ALCOHOL, TOBACCO & FIREARMS, ANNUAL FIREARMS
    MANUFACTURING & EXPORT REPORT (2015),
    https://www.atf.gov/file/113611/download.......................................13

Charles Branas et al., *Investigating the Link Between Gun Possession
    and Gun Assault* AM. J. PUB. HEALTH 2034 (2009) ...........................10

Daniel Lathrop & Anna Flagg, *Killings of Black Men by Whites are
    Far More Likely to be Ruled "Justifiable,"* THE MARSHALL
    PROJECT (Aug. 14, 2017),
    https://www.themarshallproject.org/2017/08/14/killings-of-black-
    men-by-whites-are-far-more-likely-to-be-ruled-justifiable................10

Darrell A. H. Miller, *Self-Defense, Defense of Others, and the State*,
    80 L. & CONTEMP. PROBS. 85 (2017)................................................14

David Hemenway & Sara J. Solnick, *The Epidemiology of Self-
    Defense Gun Use: Evidence from the National Crime Victimization
    Surveys 2007-2011*, 79 PREVENTIVE MED. 22 (2015) .........................9

Eric Ruben, *An Unstable Core: Self-Defense and the Second Amendment*, 108 CALIF. L. REV. 63 (2020) ........................................................14

GLOBAL STRATEGY GROUP, KEY FINDINGS ON PUBLIC SUPPORT FOR FIREARM LICENSING (Apr. 23, 2020), https://tinyurl.com/y553fber...................8

Jonathan Lowy & Kelly Sampson, *The Right Not To Be Shot: Public Safety, Private Guns, and The Constellation of Constitutional Liberties*, 14 GEO. L.J. & PUB. POL'Y 187 (2016) ...............................................6

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 HARV. J. LEGIS. 279 (2016) ......................................14

Joseph Blocher, *Bans*, 129 YALE L.J. 308 (2019) ...................................................17

Justin Murphy, *Are "Stand Your Ground" Laws Racist and Sexist? A Statistical Analysis of Racism and Sexism in 'Stand Your Ground' Cases in Florida, 2005-2013*, SOC. SCI. Q. (2017), https://onlinelibrary.wiley.com/doi/abs/10.1111/ssqu.12402............................10

Lois Beckett, *The Gun Numbers: Just 3% of American Adults Own a Collective 133m Firearms*, THE GUARDIAN (Nov. 15, 2017), https://tinyurl.com/y9zecysl.................................................................9

Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AM. J. PUBLIC HEALTH 1754 (2019)......................................................................18

PEW RESEARCH CENTER, DEMOGRAPHICS OF GUN OWNERSHIP (June 22, 2017), https://tinyurl.com/qpawr6w.....................................................8

Reva Siegel & Joseph Blocher, *Why Regulate Guns*, 48(4) J.L. MED. & ETHICS (forthcoming 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3599603 ...........................6

Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017) .............................16

**March For Our Lives Action Fund** ("March For Our Lives" or "MFOL") is a non-profit organization of young people from across the country fighting for sensible gun violence prevention policies. Formed after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL immediately began organizing the largest single day of protest against gun violence in history. Since then, students seeking change have formed hundreds of MFOL chapters across the country. These young people have a vital interest in ensuring that the Constitution is correctly interpreted to allow the enactment of gun violence prevention measures that will protect all Americans.

**Brady** (formerly the Brady Center to Prevent Gun Violence) is one of the nation's oldest and largest nonpartisan, non-profit organizations dedicated to reducing gun violence through education, research, and direct legal advocacy on behalf of victims and communities affected by gun violence. Brady has a substantial interest in ensuring that the Second Amendment is not interpreted or applied in a way that would jeopardize the public's interest in protecting communities from the effects of gun violence. Brady's legal team has filed numerous amicus briefs in

---

[1] This brief is filed with all parties' consent. No counsel for a party authored any part of this brief. No person other than *amici curiae*, their members, or their counsel funded this brief's preparation or submission.

cases involving firearms regulations, including *McDonald v. City of Chicago,* 561 U.S. 742 (2010) and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

**Everytown for Gun Safety** ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly six million supporters, including tens of thousands in California. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, formed after the murder of 20 children and six adults in an elementary school in Newtown, Connecticut by a gunman using large-capacity magazines.

**Giffords Law Center to Prevent Gun Violence** ("Giffords Law Center") was founded after a 1993 gun massacre at a San Francisco law firm, perpetrated by a shooter using large-capacity magazines. Under its former names, the organization supported the 1994 federal restrictions on assault weapons and large-capacity magazines; advocated for California's 2000 ban on manufacturing and sale of large-capacity magazines; and was the primary drafter and key proponent of Proposition 63, the ballot initiative at issue in this case prohibiting possession of large-capacity magazines. The group was renamed after joining forces with former Congresswoman Gabrielle Giffords' gun-safety group.

**Team ENOUGH** is a youth-led, Brady supported initiative that mobilizes young people to demand that elected officials take action to end gun violence.

Comprised of survivors of gun violence, students, and activists in California and across the country, Team ENOUGH has a substantial interest in promoting laws that seek to bring an end to gun violence. The group's Lobbying Collectives, based in California, Virginia, Florida, and Washington D.C., educate young people in electoral and legislative organizing to bring a common-sense approach to America's gun policy.

## INTRODUCTION

With the sole exception of the panel that heard this appeal, the federal circuits have consistently and correctly held it is constitutional for states to restrict the sale or possession of large-capacity ammunition magazines (LCMs). These courts recognize that LCMs enable killing more people, more quickly, and in a more horrifying manner than the Second Amendment requires states to endure. While correct, the reasoning of the sister circuits still does not fully describe the wreckage these weapons leave behind. The impact of gun violence does not stop when the last bullet is fired, or the final funeral held. Gun violence continues to reverberate by motivating survivors to use the political process to protect others from enduring the same horror. Yet, gun violence has also been used to intimidate people from civic participation and advocating for gun safety reforms.

Without such advocacy, shootings threaten to remain our unending national tragedy. It will be harder to ensure that people can visit public spaces without fear

and retain confidence in democratic institutions. Since "[p]roviding for the safety of citizens within their borders has long been state government's most basic task," *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring), states' regulatory power should be at its zenith with respect to weaponry that contributes to the most catastrophic deaths, injuries, and trauma, and thereby poses the gravest threat to the safety of our political process. But the panel's decision reverses that principle, barring states from restricting magazines that have repeatedly been used to kill and terrorize and have no proven value for lawful self-defense. In doing so, the majority suggests gunmakers may insulate weapons from regulation by marketing and selling them in sufficient numbers that they become nationally "common," despite no evidence they effectively protect Americans.

*Amici* offer two points in support of the state's en banc petition. ***First***, this case implicates critical questions about Americans' authority to address gun violence through the political process. By invalidating laws adopted by California's voters and legislature, the panel's ruling thwarts the will of millions who support magazine limitations. This includes the diverse members of *amici* organizations, who reject the majority's flawed assumptions about their safety. ***Second***, the panel's historical analysis and market-driven definition of a weapon's commonality contradict *Heller* and Circuit precedent. These conflicts could wrongly insulate commercially popular weapons from regulation and further frustrate Americans'

ability to protect their communities from violence.

## ARGUMENT

### I. THIS CASE INVOLVES EXCEPTIONALLY IMPORTANT QUESTIONS ABOUT THE ABILITY OF STATE LEGISLATURES AND VOTERS TO ADDRESS GUN SAFETY

#### A. The Panel Ruling Compromises Americans' Right to Debate and Legislate on the Complex, Deadly Problem of Gun Violence

In each of its modern Second Amendment rulings, the Supreme Court has recognized Americans' right to protect themselves against gun violence. In *Heller*, the Court assured governments that they retain "a variety of tools for combating" handgun violence, "including some measures regulating handguns." 554 U.S. at 636. *McDonald* confirmed this authority, *see* 561 U.S. at 785, and in two later rulings, the Court declined invitations to issue sweeping rulings constraining it. *Caetano v. Mass.*, 136 S. Ct. 1027 (2016) (per curiam); *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of N.Y.*, 140 S. Ct. 1525 (2020) (per curiam). The Court has also repeatedly denied certiorari requests urging a more expansive interpretation of the Second Amendment, including in LCM cases. *E.g.*, *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), *cert. denied*, 2020 WL 3146687 (June 15, 2020).

Through these careful rulings, the Supreme Court confirmed the government's ability to regulate guns. But, independent of this binding precedent, this Court should still exercise caution in Second Amendment cases because gun vio-

lence is a devastating and complicated problem that strikes at the core of our democratic values. *See generally* Amicus Brief of March For Our Lives Action Fund, *N.Y. State Rifle & Pistol Ass'n*, 140 S. Ct. 1525 (No. 18-280). No other constitutional right so directly implicates Americans' rights to stay alive and uninjured. *See Kolbe*, 849 F.3d at 150 (Wilkinson, J., concurring); Jonathan Lowy & Kelly Sampson, *The Right Not To Be Shot: Public Safety, Private Guns, and The Constellation of Constitutional Liberties*, 14 Geo. L.J. & Pub. Pol'y 187, 190 (2016). No other right more powerfully affects citizens' ability to engage in public and political life without fear. Reva Siegel & Joseph Blocher, *Why Regulate Guns*, 48(4) J.L. Med. & Ethics (forthcoming 2020) (manuscript at 3-4), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3599603 ("Americans living in fear of gun violence" must be able to "turn to their government to enact gun laws, not simply to keep people from being shot, but also to protect people from being terrorized and intimidated."). The Supreme Court has "long recognized that a State's interests in the health and well-being of its residents extend beyond mere physical interests," *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 609 (1982), and that governments may safeguard "the benefits of wide participation in political, economic, and cultural life." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984).

In this context, it is paramount that citizens not be dissuaded from political

participation out of fear of intimidation and violence.  But the panel's holdings that strict scrutiny applies to LCM restrictions (Opn. 52), and that California's legislative judgments are due *no* deference under any standard of review (Opn. 62), interfere with this basic promise of government.  Presuming that LCM restrictions are unlawful while declining to respect legislative expertise deprives voters and legislatures of the ability to debate and adopt laws on the life-or-death subject of gun safety.  *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) (states are "laborator[ies]" of democracy; "[d]enial of the right to experiment may be fraught with serious consequences to the nation").

*Amici* understand the value of public debate and legislative action better than most.  *Amicus* Giffords Law Center was the principal drafter of the ballot measure in which Californians voted two-to-one to prohibit LCM possession.  Supporters and leaders from *amicus* Everytown and its grassroots network, *amicus* Brady, and *amicus* Team ENOUGH advocate in public and in legislatures for LCM regulations and other commonsense laws.  And advocacy by *amicus* March For Our Lives following the Parkland shooting spurred historic youth turnout in the 2018 midterm elections.  "To say in the wake of so many mass shootings in so many localities across this country that the people" are "powerless" to respond in this way to atrocities—that "all they can do is stand by and watch as federal courts design their destiny"—would "deliver a body blow to democracy as we have known it

since the very founding of this nation." *Kolbe*, 849 F.3d at 150 (Wilkinson, J., concurring).

**B.     The Panel Ruling Denies Communities of Color and Other Historically Under-Protected Groups the Ability to Determine Their Own Safety**

The majority seemingly justifies its abandonment of judicial restraint by arguing it is for the benefit of those who have historically been deprived the right to defend themselves from violence.  This shameful history does not speak to whether the Second Amendment permits states to prohibit LCM use and possession.  But in any event, the majority draws the wrong conclusion from history.  For too long, Black, Brown, Asian, Indigenous, and LGBTQ Americans, as well as women, have been denied the safe exercise of civil rights and the ability to participate in the democratic process on an equal footing.  But that is exactly why, today, these communities are at the forefront of efforts to demand firearms be regulated, Black lives be protected, and the gun industry be held accountable for enabling violence.  Indeed, Americans from these groups overwhelmingly support *stronger* gun regulations than we have today.[2]  Conversely, gunmakers market primarily to white men[3]

---

[2] For example, while most Americans support gun regulations, support is higher among Black and Latinx Americans. *See* GLOBAL STRATEGY GROUP, KEY FINDINGS ON PUBLIC SUPPORT FOR FIREARM LICENSING, (Apr. 23, 2020), https://tinyurl.com/y553fber.

[3] White men are twice as likely to own guns as white women and non-white men, and three times as likely as non-white women.  PEW RESEARCH CENTER,

and have used advertising to encourage their illegal use of guns.[4]  California's enactment and defense of LCM restrictions is part of its broader effort to secure equal civic participation for  historically under-protected groups—an interest the Supreme Court recognizes as critical.  *E.g., Roberts*, 468 U.S. at 625 (women); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256-57, 261-62 (1964) (people of color); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727-28 (2018) (LGBTQ people).

Support for gun safety laws is not only stronger among communities of color, but it is rooted in firm evidence that firearms have limited protective effect for self-defense and are more likely to do harm—with harms amplified as ammunition capacity increases.  *See infra* pp. 14-15.  Public health research shows that when guns are used defensively, they do not actually reduce the risk of injury—whereas other protective actions do.  David Hemenway & Sara J. Solnick, *The Epi-*

---

DEMOGRAPHICS OF GUN OWNERSHIP, (June 22, 2017), https://tinyurl.com/qpawr6w. Firearm "super-owners"—the 3% who own half of America's guns—are even less diverse.  Lois Beckett, *The Gun Numbers: Just 3% of American Adults Own a Collective 133m Firearms*, THE GUARDIAN (Nov. 15, 2017), https://tinyurl.com/y9zecysl.

[4] *E.g.*, *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 74, 158 (2019) (citing egregious advertisements claimed to "encourage[] consumers to use the weapons not for legal purposes such as self-defense, hunting, collecting, or target practice, but to launch offensive assaults against their perceived enemies").

*demiology of Self-Defense Gun Use: Evidence from the National Crime Victimization Surveys 2007-2011*, 79 PREVENTIVE MED. 22, 23 (2015). Indeed, guns can have the opposite effect: one study found people who possess guns are up to four times more likely to be shot in an assault. Charles Branas et al., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034, 2037 (2009). Shooters armed with LCMs can therefore be expected to create more harms than those using smaller magazines, without experiencing any corresponding benefit for self-defense. *Infra* pp. 14-15.

Combined with evidence that the attempted defensive use of guns disproportionately harms people of color, these studies refute the majority's speculation about the advantages of ever-more powerful weaponry. For instance, research shows that "Stand Your Ground" laws benefit white men while women and Americans of color are denied self-defense rights under identical circumstances. Justin Murphy, *Are "Stand Your Ground" Laws Racist and Sexist? A Statistical Analysis of Racism and Sexism in 'Stand Your Ground' Cases in Florida, 2005-2013*, SOC. SCI. Q. (2017), https://onlinelibrary.wiley.com/doi/abs/10.1111/ssqu.12402. Meanwhile, the use of force against people of color, particularly Black Americans, is more likely to be deemed lawful, making "self-defense" a viable justification to kill unarmed Black boys and men like Trayvon Martin and Ahmaud Arbery. Daniel Lathrop & Anna Flagg, *Killings of Black Men by Whites are Far More Likely to*

*be Ruled "Justifiable,"* THE MARSHALL PROJECT (Aug. 14, 2017),

https://www.themarshallproject.org/2017/08/14/killings-of-black-men-by-whites-

are-far-more-likely-to-be-ruled-justifiable.

When our laws authorize people to carry deadlier weapons in public and

more readily use them, the harms are predictably unequal.  Defining self-defense

so expansively as to cover LCMs is no solace to communities of color, because

history proves such weapons will be used to harm, not protect, these communities.

Conversely, enforcing *McDonald*'s promise that governments may "devise solu-

tions to social problems that suit local needs and values," 561 U.S. at 785, respects

the lives of Black, Brown, Asian, Indigenous, and LGBTQ Americans and of

women and ensures they have a full voice in our democratic process.

## II. THE PANEL OPINION CONFLICTS WITH PRECEDENT IN WAYS THAT WOULD IMMUNIZE GUNMAKERS FROM MEANINGFUL REGULATION

### A. The Panel's Analysis of History and LCMs' Commercial Popularity Conflicts with *Heller* and Circuit Precedent

Having left behind the guardrails of judicial restraint, the panel majority se-

lectively surveys historical sources and contemporary sales estimates to conclude

LCMs are commonly owned weapons not subject to "longstanding regulations."

(Opn. 22-26, 27-29.)  The panel's market-share analysis and historical review are

irreconcilable with precedent.  Instead of following *Heller* and this Court's

caselaw, the majority endorsed an unbounded "common use" test—applied to a

11

court-defined "class of arms"—that gives the gun industry the benefit of strict scrutiny for any commercially successful products.

### 1. Conflicts Created by the Panel's Market-Share Test

The panel's "market-share" test for commonality (*see* Opn. 12, 22, 45) is in tension with *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), and creates inter-circuit conflicts with decisions rejecting reliance on weapons' commercial popularity. *See Kolbe*, 849 F.3d at 142 (noting that "the *Heller* majority said nothing to confirm that it was sponsoring the popularity test"); *Worman*, 922 F.3d at 34 n.5 ("measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical") (citation omitted).

Recognizing the limitations of an approach that looks to sheer numbers of weapons, *Fyock* observed that LCM "marketing materials and sales statistics" do "*not* necessarily show that large-capacity magazines are in fact commonly possessed by law-abiding citizens for lawful purposes." *Id.* at 998 (emphasis added). That is particularly true of the single sales estimate the panel relied on here, supplied by members of the firearms industry and purportedly showing that LCMs are "half of all magazines in America." (Opn. 9, 12, 22, 40, 41 n.15, 42, 45, 50, 66.) This "extrapolation from indirect sources" (ER001700) comes nowhere close to establishing commonality (even assuming *arguendo* that commonality, as the panel

defines it, is the correct inquiry).  First, the "indirect sources" relied upon are *firearm manufacturing* records that appear to include weapons made for and sold to military and law enforcement.  *See* ER001700; BUREAU OF ALCOHOL, TOBACCO & FIREARMS, ANNUAL FIREARMS MANUFACTURING & EXPORT REPORT (2015), https://www.atf.gov/file/113611/download (report covers all firearms "manufactured and disposed of in commerce").[5]  Second, even if the estimate were discounted to exclude sales to non-civilians, it still fails to account for the increasing concentration of firearm (and magazine) ownership, where more magazines are owned by a declining number of households.  (*See* ER 00317, ¶17.)  Under *Fyock,* this Court should not rely on such a specious estimate.

Reliance on this estimate also contradicts *Heller* and *McDonald*.  The panel's assumption that national commercial popularity equates to Second Amendment protection, without attempting to isolate how many LCMs are sold and used for lawful civilian self-defense, conflicts with *Heller*, which emphasized that the Amendment covers only arms "typically possessed by law-abiding citizens for lawful purposes," 554 U.S. at 630, 625, and diminishes *McDonald*'s assurance that

---

[5] Furthermore, the estimate includes magazines for *all* rifles and handguns that accept them, including those not typically possessed for self-defense.  In fact, plaintiffs' expert determined that the vast majority of magazines for handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629—hold 10 rounds or fewer. (ER001703.)

states can adopt laws serving local needs, 561 U.S. at 784-88.  Taken altogether, the panel's test for commonality improperly divorces the Second Amendment from its core protection of responsible individual self-defense.  To the extent "common use" plays a role in analyzing LCM restrictions, that role should be tied to "the purpose of the right to keep and bear arms."  Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 HARV. J. LEGIS. 279, 291 (2016).  Under *Heller*, the focus should be on whether regulated arms are commonly used or reasonably necessary for self-defense.  *See Heller*, 554 U.S. at 630; *Worman*, 922 F.3d at 35 & n.5.  Assessing commonality this way harmonizes the core *Heller* right with government authority to ensure that self-defense is exercised within the common-law constraints of necessity and proportionality.  Eric Ruben, *An Unstable Core: Self-Defense and the Second Amendment*, 108 CALIF. L. REV. 63, 64, 67 (2020).  After all, the Second Amendment does not change the principle that traditional self-defense law "tilt[s] in favor of the preservation of human life." *See* Darrell A. H. Miller, *Self-Defense, Defense of Others, and the State*, 80 L. & CONTEMP. PROBS. 85, 89 (2017).

Had the panel tied its analysis to the core purpose of the Second Amendment, it would have acknowledged that no matter how many LCMs have been sold in states where they are unregulated, the record documents *zero instances* in California where anyone actually had to fire more than ten rounds in self-defense.

ER000288-89; ER000287-88 (nationwide, "defenders fired 2.2 shots on average,"

and 2.0 in California).  Contrast that with the state's empirical evidence that crimi-

nal shooters use LCMs to increase casualty counts, Petition 12-13, and testimony

from physicians that LCMs inflict uniquely grievous injuries, *e.g.*, Amicus Brief

for California Chapter of the American College of Emergency Physicians et al.,

Dkt. No. 14.  Treating LCM possession as a core Second Amendment right is fun-

damentally flawed given the dearth of evidence that anyone has ever needed LCMs

for lawful self-defense.

### 2.    Conflicts Created by the Panel's Historical Analysis

The Supreme Court and this Court emphasize that "longstanding prohibi-

tions" on possession of certain weapons are "traditionally understood to be outside

the scope of the Second Amendment."  *Fyock*, 779 F.3d at 997; *see Heller*, 554

U.S. at 626-27, 635.  Under *Heller*—which counts laws from the past century

among the traditional Second Amendment limits—even "early twentieth century

regulations might nevertheless demonstrate a history of longstanding regulation if

their historical prevalence and significance is properly developed in the record."

*Fyock*, 779 F.3d at 997.  LCM restrictions qualify because there is unrebutted evi-

dence that, around the turn of the twentieth century, semiautomatic weapons be-

came more popular; that, when combined with larger magazines, these weapons

became more lethal; and that numerous states, including California, regulated this

weaponry—based specifically on the number of rounds users could fire without re-loading—shortly thereafter. *See* Amicus Brief of Everytown for Gun Safety, Dkt No. 17, at 4-9 ("Everytown Amicus Brief").

The panel flatly rejects *Heller* and *Fyock*'s assurances that twentieth-century regulations can establish a longstanding tradition and demands evidence that a "challenged law traces its lineage to founding-era or Reconstruction-era regulations." (Opn. 27-28.) The panel also determines that "multi-shot firearms" were historically common by citing experimental oddities (*id.* at 22-23) like a Renaissance-era design and Lewis and Clark's air rifle, which required laborious use of a hand pump to operate. Everytown Amicus Brief at 13. This bizarre analysis cannot be squared with *Heller*, *Fyock*, and the historical record in this case, and would grant undue protections to extraordinarily lethal modern weaponry that becomes popular before the government has a chance to regulate it. That approach is inherently ahistorical because gun regulations have generally followed, and not preceded, a surge in popularity. *See* Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55, 68 (2017).

### B. The Panel's Heightened Scrutiny Analysis Contradicts Circuit Law

The panel's step-two analysis also creates irreconcilable conflicts. *First*, the panel holds that prohibiting a "class" of nationally popular arms always triggers strict scrutiny (Opn. 40-41), but defines "class" contrary to precedent. As Judge

Lynn's dissent notes (*id.* at 70-71), *Fyock* did not treat LCMs as a class of arms. Nor did this Court in *Pena v. Lindley*, 898 F.3d 969, 978 (2018), find a subset of handguns without design safety features to be a "class" under its constitutional analysis. Instead, these decisions took the logical approach of designating subsets of weapons and accessories as just that—subsets, not classes—and viewed the "class"-focused argument with appropriate skepticism, given that "[c]haracterizing something as a ban" on a class of arms is "an exercise of judicial power masquerading as restraint." Joseph Blocher, *Bans*, 129 YALE L.J. 308, 315 (2019). The panel's contrary characterization could let courts designate any prohibited sub-category of arms as a class—including semiautomatic firearms with specified "combat-style features" (*Worman*, 922 F.3d at 37) or handgun magazines holding over 10 rounds (Amended Complaint, *Abbott v. Connors*, No. 20-cv-00360 (D. Haw. filed Aug. 24, 2020)). Under the panel's rationale, "classes of arms" could be anything at all, and because the panel credits sales estimates and not use patterns as evidence of defensive value (*supra* pp. 12-14), a prohibition on such a "class" automatically poses a severe burden even if it negligibly affects self-defense.

*Second*, the panel contradicts Circuit precedent by disavowing application of *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622 (1994), on grounds that gun regulation "does not involve highly technical or rapidly changing issues." (Opn. 62.) The complex empirical record in Second Amendment cases proves otherwise.

Reflecting the multi-faceted nature of gun violence and oft-litigated disputes over its causes, research teams generate complex models to evaluate gun laws' effectiveness. *E.g.*, Louis Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AM. J. PUBLIC HEALTH 1754 (2019) (empirical model controls for 10 independent variables). Gun violence is at least as complicated as subjects typically granted deference. *See Columbia Broadcasting Sys., Inc. v. Democratic National Committee*, 412 U.S. 94, 103 (1973) (deferring to Congress's expertise because "[b]alancing the various First Amendment interests involved in the broadcast media" involves "great delicacy and difficulty"); *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 402-03 (2000) ("the Court in practice defers to empirical legislative judgments").

*Amici* have discussed why a constitutional analysis driven by market share creates perverse industry incentives, letting gunmakers insulate new products by marketing them before their dangerousness becomes apparent and there is political momentum to regulate them. The panel's second conclusion—that LCMs are a "class of arms" that legislatures cannot use their policy expertise to prohibit—will only cement the gun industry's veto power over the People's safety. And by unjustifiably limiting legislatures' ability to regulate firearms in line with scientific and popular consensus, the panel's conclusion destroys the ability of democratic institutions to fulfill their most basic role—protecting the public.

## CONCLUSION

Should the panel decision stand, not only would it fracture Second Amendment law, but it would circumscribe states' ability to govern based on public-health evidence that contradicts the industry's profit-driven classifications. More fundamentally, it would constitutionally foreclose life-or-death policy choices that communities should make through democratic processes. The Court should grant California's petition for en banc rehearing.

Dated: September 8, 2020

Respectfully submitted,

/s/ Scott Edelman
Scott A. Edelman
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071-3197
(213) 229-7000

Vivek R. Gopalan
Zhen He Tan
GIBSON, DUNN & CRUTCHER LLP
555 Mission St., Ste. 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel of Record for Amici Curiae*

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION, TYPEFACE
REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I certify that:

1.     This brief complies with the type-volume limitation of Ninth Circuit Rule 29-2(c)(2) because it contains 4,200 words, as determined by the word-count function of Microsoft Word 2010, excluding the cover and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Ninth Circuit Rule 32-1.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ Scott Edelman

Scott Edelman
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071-3197

Dated:  September 8, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2020, an electronic copy of the forego-

ing Amicus Brief was filed with the Clerk of Court for the United States Court of

Appeals for the Ninth Circuit using the Court's CM/ECF system and was served

electronically by the Notice of Docket Activity upon registered CM/ECF partici-

pants.

/s/ Scott Edelman

Scott Edelman
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071-3197